**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| CURTIS JAMES JACKSON, III, | : | CHAPTER 11 |
| Debtor. | : | CASE NO. 15-21233 (AMN) |
| | : | |
| _____ | : | |
| | : | |
| CURTIS JAMES JACKSON, III, | : | |
| | : | ADVERSARY PROCEEDING |
| Plaintiff, | : | CASE NO. 17-02005 (AMN) |
| | : | |
| v. | : | |
| | : | |
| REED SMITH LLP AND PETER | : | APRIL 30, 2020 |
| RAYMOND, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW**
**OF REED SMITH LLP AND PETER RAYMOND**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

    A.    Reed Smith Plans a Defense Centered on Jackson, Without Risky Testimony
from the Three Uncalled Witnesses ...................................................................... 3

    B.    To Save Money, Jackson Ignores Reed Smith's Advice to Settle and
Ultimately Discharges Reed Smith ..................................................................... 11

    C.    New Trial Counsel Abandons Reed Smith's Trial Plan and
Tries—and Loses—the Case Without Putting Jackson on the Stand ................. 13

    D.    Jackson Settles with Leviston, Abandoning His Own Efforts to Mitigate
His Alleged Damages .......................................................................................... 16

    E.    Jackson Asserts Counterclaims Against Reed Smith for Failing to Call the
Three Uncalled Witnesses, Despite Having No Idea What They Would Say If
Called as Witnesses in the Leviston Matter ........................................................ 17

ARGUMENT ..................................................................................................................... 18

I.     JACKSON CANNOT MEET HIS BURDEN OF SHOWING THAT REED SMITH'S
EXERCISE OF JUDGMENT WAS NEGLIGENT UNDER THE "ATTORNEY
JUDGMENT RULE" ............................................................................................. 19

II.    JACKSON CANNOT MEET HIS BURDEN OF PROVING THAT REED SMITH
WAS THE BUT FOR OR PROXIMATE CAUSE OF HIS ALLEGED DAMAGES .... 23

    A.    Jackson Has No Proof That Testimony From the Three Uncalled Witnesses
Would Have Reduced His Alleged Damages ...................................................... 24

    B.    Jackson Cannot Prove Proximate Causation Because Successor Counsel
Broke the Chain of Causation ............................................................................. 26

        1.    Jackson Cannot Prove Proximate Causation Because Successor
Counsel Implemented a Radically Different Trial Strategy ..................... 27

        2.    Jackson Cannot Prove Proximate Causation Because Successor Counsel
Could Have Cured the Alleged Negligence but Failed to Do So ............. 29

    C.    Jackson Cannot Prove Proximate Causation Because Jackson Chose to Settle
the Leviston Matter Instead of Challenging the Verdict and Pursuing His
Claim for Contribution ........................................................................................ 31

III.   JACKSON CANNOT MEET HIS BURDEN OF PROVING AN ACTUAL AND
ASCERTAINABLE MITIGATION AMOUNT ................................................... 32

IV.   JACKSON CANNOT MEET HIS BURDEN OF PROVING THAT
REED SMITH'S OUTSTANDING LEGAL FEES WERE EXCESSIVE ..................... 34

CONCLUSION .................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328 (2d Cir. 2006) ........................................................................................ 19

*Allen v. Krna,*
    723 N.Y.S.2d 730 (N.Y. App. Div. 2001) ................................................................ 33, 34

*Baptist v. Global Holding & Inv. Co., L.L.C,*
    C.A. No. 04-CV-2365 (DGT), 2007 WL 1989450 (E.D.N.Y. July 9, 2007) ......................... 25

*Bison Capital Corp v. Hunton & Williams, LLP,*
    No. 153793/2015, 2019 WL 1502943 (N.Y. Sup. Ct. Apr. 5, 2019) ................................... 20

*Boye v. Rubin & Bailin, LLP,*
    56 N.Y.S.3d 57 (N.Y. App. Div. 2017) ................................................................ 27, 28, 32

*Breen v. Laric Entm't Corp.,*
    769 N.Y.S.2d 270 (N.Y. App. Div. 2003) .............................................................. 30

*Brooks v. Lewin,*
    800 N.Y.S.2d 695 (N.Y. App. Div. 2005) .............................................................. 18

*Brookwood Cos., Inc. v. Alston & Bird LLP,*
    49 N.Y.S.3d 10 (N.Y. App. Div. 2017) .............................................................. 20, 21

*Bua v. Purcell & Ingrao, P.C.,*
    952 N.Y.S.2d 592 (N.Y. App. Div. 2012) ................................................................ 20

*Buczek v. Dell & Little, LLP,*
    7 N.Y.S.3d 558 (N.Y. App. Div. 2015) .............................................................. 31, 32

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .............................................................................................. 18

*In re Eternal Enter., Inc.,*
    558 B.R. 47 (Bankr. D. Conn. 2016) ...................................................................... 35

*In re Feinberg,*
    442 B.R. 215 (Bankr. S.D.N.Y. 2010) .................................................................... 35

*Feldman v. Finkelstein & Partners, LLP*
    39 WL 1867033 (N.Y. Sup. Ct. May 6, 2013), *aff'd*, 15 N.Y.S.3d 173 (N.Y.
    App. Div. 2015) .............................................................................................. 20, 21

*Freeman v. Brecher*,
    64 N.Y.S.3d 13 (N.Y. App. Div. 2017) ................................................................31

*Gallet, Dreyer & Berkey, LLP v. Basile*,
    35 N.Y.S.3d 56 (N.Y. App. Div. 2016) ...........................................................33, 34

*Geraci v. Munnelly*,
    924 N.Y.S.2d 693 (N.Y. App. Div. 2011) ............................................................26

*Grasson v. Bd. of Educ. Of Town of Orange*,
    24 F. Supp. 3d 136 (D. Conn. 2014) ...............................................................32, 33

*Guzman v. Spring Creek Towers, Inc.*,
    882 N.Y.S.2d 278 (N.Y. App. Div. 2009) ............................................................30

*Hand v. Silberman*,
    789 N.Y.S.2d 26 (N.Y. App. Div. 2005) ..............................................................19

*Hashmi v. Messiha*,
    886 N.Y.S.2d 712 (N.Y. App. Div. 2009) ............................................................33

*Hatfield v. Herz*,
    109 F. Supp. 2d 174 (S.D.N.Y. 2000) .................................................................20

*Howell v. N.Y. Post Co., Inc.*,
    612 N.E.2d 699 (N.Y. 1993) ..................................................................................5

*Iocovello v. Weingrad & Weingrad, LLP*,
    772 N.Y.S.2d 53 (N.Y. App. Div. 2004) ..............................................................21

*Leviston v. Jackson*,
    980 N.Y.S.2d 716 (N.Y. Sup. Ct. 2013) ...........................................................8, 23

*LIC Commercial Corp. v. Rosenthal*,
    609 N.Y.S.2d 301 (N.Y. App. Div. 1994) ............................................................22

*Lok Prakashan, Ltd. v. Berman*,
    349 F. App'x 640 (2d Cir. 2009) ....................................................................20, 21

*McCord v. O'Neill*,
    369 F. App'x 237 (2d Cir. 2010) ....................................................................21, 26

*Molina v. Phoenix Sound Inc.*,
    747 N.Y.S.2d 227 (N.Y. App. Div. 2002) ..............................................................4

*New Kayak Pool Corp. v. Kavinoky Cook LLP*,
    5 N.Y.S.3d 625 (N.Y. App. Div. 2015) ................................................................33

*Otero v. Houston St. Owners Corp.*,
  No. 104819/2010, 2012 WL 5230209 (N.Y. Sup. Ct. Feb. 21, 2012) ......................................4

*Perkins v. Am. Transit Ins. Co.*,
  No. 10 Civ. 5655(CM), 2013 WL 174426 (S.D.N.Y. Jan. 15, 2013) ......................................34

*Perks v. Lauto & Garabedian*,
  760 N.Y.S.2d 231 (N.Y. App. Div. 2003) ..............................................................................27

*In re Reilly*,
  245 B.R. 768 (B.A.P. 2d Cir. 2000) ........................................................................................34

*In re Residential Capital, LLC*,
  513 B.R. 856 (Bankr. S.D.N.Y. 2014) ....................................................................................35

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*,
  867 N.E.2d 385 (N.Y. 2007) ...........................................................................23, 24, 26, 33

*Russo v. Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, LLP*,
  750 N.Y.S.2d 277 (N.Y. App. Div. 2002) ........................................................................24, 25

*Sevey v. Friedlander*,
  920 N.Y.S.2d 831 (N.Y. App. Div. 2011) ..............................................................................25

*Sierra Holdings, LLC v. Phillips, Weiner, Quinn, Artura & Cox*,
  977 N.Y.S.2d 751 (N.Y. App. Div. 2013) ..............................................................................33

*Somma v. Dansker & Aspromonte Assocs.*,
  843 N.Y.S.2d 577 (N.Y. App. Div. 2007) ......................................................27, 30, 31, 32

*THOIP v. Walt Disney Co.*,
  788 F. Supp. 2d 168 (S.D.N.Y. 2011) ....................................................................................25

*Traverso v. Sharinn*,
  No. CIV. N-88-446(WWE), 1989 WL 265042 (D. Conn. Sept. 15, 1989) ..........................18

*Weil, Gotshal & Manges LLP v. Fashion Boutique of Short Hills, Inc.*,
  780 N.Y.S.2d 593 (N.Y. App. Div. 2004) ..............................................................................24

**Statutes**

New York Civil Rights Law §§ 50 and 51 ...........................................................................3, 4

## INTRODUCTION

Over three years ago, in response to Reed Smith's claim for unpaid attorneys' fees and costs, Plaintiff Curtis James Jackson, III filed malpractice counterclaims against Defendants Reed Smith LLP and Peter Raymond (collectively, "Reed Smith" or "Defendants"). Over one year ago, on March 1, 2019, the Court dismissed almost all of Jackson's claims, allowing the case to proceed on a single claim: namely, Jackson's allegation that the jury in the Leviston Matter would have awarded lower damages to Lastonia Leviston based on unknown testimony from three non-parties who were never called at trial by the lawyers who replaced Reed Smith.[1]

In allowing this limited claim to proceed through discovery, the Court cautioned that "Mr. Jackson must nonetheless prove that the Defendants' conduct was negligent and that but for the Defendants' negligent conduct, Mr. Jackson would not have suffered some amount of actual and ascertainable damage." AP-ECF No. 62 at 24. The Court recognized that Jackson's "[f]ailure or inability to do so may result in summary judgment entering in favor of Defendants." *Id.* After extensive, expensive, and repeatedly extended discovery, Jackson is unable to come forward with proof supporting the essential elements of his sole remaining claim that the testimony of the Three Uncalled Witnesses would somehow have mitigated Jackson's alleged damages.

At the time Jackson filed this malpractice action, neither Jackson nor his trial counsel in the Leviston Matter ever spoke to the Three Uncalled Witnesses to learn what their testimony

---

[1] The three non-parties are Maurice Murray, William Leonard Roberts, II a/k/a Rick Ross, and the internet provider NING Interactive, Inc. ("NING"). They are referred to collectively herein as the "Three Uncalled Witnesses." The "Leviston Matter" refers to the lawsuit Lastonia Leviston commenced against Jackson in New York Supreme Court on February 24, 2010.

would have been.  Ex. 1, Response Nos. 4-6, 10-12.[2]  To this very day, there is no evidence of

what Murray or NING would have said if called to testify in the Leviston Matter.  Jackson first

learned what Ross would have said two weeks ago, when Ross provided an April 13, 2020

affidavit to Jackson and Reed Smith.  With the Ross affidavit in hand, Jackson took Ross's

deposition on April 22 and 24, 2020.  Nothing from the two-day Ross deposition supports

Jackson's allegations.  To the contrary, Ross's testimony in this case—both at his deposition and

in his affidavit—refutes Jackson's speculative and unfounded allegation that Ross's testimony

would have helped him at trial in the Leviston Matter.

Jackson lacked a factual basis for making his allegations about the testimony of the Three

Uncalled Witnesses when he filed his complaint, and now, more than three years later, Jackson

cannot meet his burden of establishing any of the elements of a malpractice claim that this Court

identified in its ruling on Reed Smith's motion to dismiss:

- ***Negligence***.  There is no evidence of Reed Smith's negligence—only evidence that Reed
  Smith exercised professional judgment in deciding not to depose the Three Uncalled
  Witnesses.  The testimony of those witnesses would have been at best cumulative (if they
  actually supported Jackson's own testimony) and, potentially, catastrophic (if they
  contradicted or undermined Jackson's testimony or defenses).

- ***Causation***.  There is no evidence of but for or proximate causation.  Not only is there no
  evidence that supports Jackson's claim that the Three Uncalled Witnesses would have
  helped him, but, as a matter of law, the decisions Jackson made after discharging Reed
  Smith prevent him from showing that Reed Smith caused him any injury.  Reed Smith
  developed a case strategy built around the trial testimony of Jackson.  Jackson's trial
  counsel, however, implemented a different trial strategy where Jackson would not appear
  to testify on his own behalf at trial—without any live witness to replace Jackson's crucial
  testimony.  As a result, the trial court gave a "missing witness" charge and told the jury it
  could "draw the strongest inference against the defendant that his testimony would not be
  favorable to his defense."  And instead of pursuing an appeal or contribution claim from
  the verdict in the Leviston Matter, Jackson chose to "wipe it all out" by settling with
  Leviston instead.

---

[2] References to exhibits are to the exhibits annexed to the Declaration of Craig M. Reiser in Support of
Reed Smith LLP and Peter Raymond's Motion for Summary Judgment, dated April 30, 2020.

- ***Actual and Ascertainable Damages***.  There is no evidence of actual and ascertainable damages, i.e., no proof that any testimony by the Three Uncalled Witnesses would have reduced the amount of damages Jackson claims to have suffered due to Reed Smith's alleged negligence by an actual and ascertainable amount.

To avoid summary judgment, Jackson must come forward with admissible proof establishing *each* of these three elements.  His inability to do that here provides three separate and independent reasons that this Court should enter summary judgment for Reed Smith on what remains of Jackson's malpractice claim.  Likewise, Reed Smith is entitled to summary judgment on Jackson's Objection that Reed Smith's claim for unpaid attorneys' fees and costs should be disallowed as excessive because Jackson has failed to adduce any evidence supporting that assertion.

## FACTUAL BACKGROUND

On February 24, 2010, Lastonia Leviston sued Jackson in New York Supreme Court, alleging that Jackson posted an explicit sex video of Leviston without Leviston's permission. Ex. 2. ¶¶ 5-11; *see* Reed Smith LLP and Peter Raymond's Local Rule 56(a)(1) Statement of Undisputed Material Facts ("Rule 56(a)(1) Stmt.") ¶ 1.  Leviston did not sue Maurice Murray (who appeared in the video with Leviston) in New York, and she did not sue Rick Ross (the father of Leviston's child).  *See* Rule 56(a)(1) Stmt. ¶ 2.  Leviston asserted two intentional tort claims against Jackson alone: (1) violating New York Civil Rights Law Sections 50 and 51; and (2) intentional infliction of emotional distress ("IIED").  Ex. 2 ¶¶ 15-23; *see* Rule 56(a)(1) Stmt. ¶ 3.

### A.    Reed Smith Plans a Defense Centered on Jackson, Without Risky Testimony from the Three Uncalled Witnesses

"*The key to my defense was going to be Mr. Jackson's own testimony.*" Raymond Dep. 83:11-13, Ex. 3.

From late February 2010 until discharged and replaced on March 27, 2015, Jackson's

3

longtime litigation counsel at Reed Smith prepared Jackson's defense in the Leviston Matter.

*See* Rule 56(a)(1) Stmt. ¶ 4.  Because Leviston never gave Jackson her written consent to publish

the private sex tape between her and Murray (into which Jackson subsequently inserted

degrading and vulgar commentary), Reed Smith concluded that Jackson's best defense to

Leviston's Civil Rights Law claim turned on whether Jackson posted the video for commercial

purposes.  Raymond Dep. 84:24-85:19, 259:2-13, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶¶ 6-7, 13;

*see also* Farber Dep. 216:10-13, Ex. 4 ("The principal defense . . . was that when Mr. Jackson

posted it, it wasn't for commercial purpose.").[3]  In structuring Jackson's defense, Reed Smith

concluded, in its professional judgment, that the best way to prove Jackson's state of mind would

be through Jackson's own testimony about his purposes in posting the video:

> We still were going to have Mr. Jackson again testify that he purposefully put this
> tape on BooBooTV, not on . . . his commercial website . . . .  BooBooTV was
> specifically set up . . . as a noncommercial website.  So he could put this video on
> it and therefore, there was no commercial purpose for this use of the tape.  Therefore
> [Leviston] did not have a claim under the requirements of Civil Rights Law 50, 51.
> So, again, in both cases our defenses turned on Mr. Jackson's testimony and his
> ability to convince the jury of these two things.

Raymond Dep. 85:7-19, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶ 13.

As to the IIED claim, Reed Smith also determined that Jackson would be the best witness

to testify on the required element of "intent."  Raymond Dep. 83:10-84:20, 263:6-11, Ex. 3;

*see* Jackson Dep. 12:8-14 (Aug. 15, 2019), Ex. 5 ("Jackson Dep.") (testifying that Jackson

"understood from Mr.  Raymond . . . that it was important that [he] convey to the jury that [he]

had the belief that [he] had the permission to air this video"); Rule 56(a)(1) Stmt. ¶ 14;

---

[3] To establish a claim under New York Civil Rights Law Sections 50 and 51, a plaintiff must prove
"(i) usage of plaintiff's name, portrait, picture, or voice, (ii) within the state of New York, (iii) for
purposes of advertising or trade, (iv) without plaintiff's written consent."  *Molina v. Phoenix Sound Inc.,*
747 N.Y.S.2d 227, 230 (N.Y. App. Div. 2002).  One's name, portrait, picture, or voice is used for trade
purposes "if its use is to attract trade to a business entity."  *Otero v. Houston St. Owners Corp.,* No.
104819/2010, 2012 WL 5230209, at *4 (N.Y. Sup. Ct. Feb. 21, 2012).

*see also* Jackson Dep. 13:3-6, Ex. 5 (Jackson's testimony that he "would be the best person to be able to explain to the jury what was in [his] head at the time").[4] Jackson would testify that Murray told Jackson that Jackson was free to use the sex tape and that both Murray and Leviston consented to that use. Raymond Dep. 83:13-84:6, 209:9-16, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶ 15. Jackson also would testify that he believed what he was told by Murray because he was told by Tia Kemp (who knew Leviston) that Leviston posed nude, was a topless dancer, and was a "call girl." Raymond Dep. 84:6-14, 209:17-210:6, Ex. 3; *see* Jackson Dep. 11:13-17, Ex. 5; Rule 56(a)(1) Stmt. ¶ 15; *see also* Jackson Dep. 57:9-58:5 (Oct. 11, 2011), Ex. 6 ("Jackson Leviston Matter Dep.") (testifying that Jackson believed Leviston was a "call girl"). This litigation strategy allowed Reed Smith to prove Jackson's state of mind through Jackson's own testimony, without fear that some other witness—such as Murray or Kemp—might contradict Jackson's account. Raymond Dep. 256:14-257:12; *see* Rule 56(a)(1) Stmt. ¶ 22. As Reed Smith's lead attorney on the case, Peter Raymond, explained:

> Well, on the intentional infliction of emotional distress the key to my defense was going to be Mr. Jackson's own testimony. Because when he was given this tape by Maurice Murray, he was told by Mr. Murray that he had, that Mr. Jackson had, both Mr. Murray and Miss Leviston's permission to use the tape however he wanted.
>
> \*\*\*
>
> And it was my hope and belief that Mr. Jackson, as my key witness at trial, would be able to convince the jury that he honestly believed that he had Miss Leviston's permission to use the tape in the way that he ended up using it. Based both on what Mr. Murray told him and on what Tia Kemp had told him . . . . So I believe he honestly believed that he had her permission to use the tape. And that was going to be the key to our defense on the question of intentional infliction of emotional distress.

---

[4] To establish a claim for IIED under New York law, a plaintiff must prove: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993).

Raymond Dep. 83:10-84:20, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶¶ 4, 22.

While planning a trial strategy based on Jackson's testimony, Reed Smith also considered whether there was a need for more witnesses—and whether those witnesses posed risks that could be avoided by not relying on their unknown testimony. *See* Raymond Dep. 118:11-119:6, Ex. 3 (describing how Raymond considered, but decided against, seeking testimony from Ross and Murray); Rule 56(a)(1) Stmt. ¶ 19. Among those potential witnesses were Murray, Ross, and the internet provider that hosted one website that contained the sex video. *See* Rule 56(a)(1) Stmt. ¶¶ 20, 22, 24. Although the Reed Smith lawyers kept an open mind on the possibility of calling these witnesses, they recognized that it was risky to call unpredictable, unfriendly, or unnecessary non-party witnesses. *See, e.g.*, *id.*; Raymond Dep. 128:19-22, Ex. 3 ("We did not call Rick Ross as a witness because . . . Rick Ross was a potentially dangerous witness."); *id.* at 191:19-192:12 (testifying that Reed Smith did not subpoena NING because "[w]e didn't need to do that. We had other ways of proving the fact; there were better ways of proving the facts"); *id.* at 278:15-20 ("I didn't want Maurice Murray to get on the stand, and possibly either refute what 50 Cent said he was told, or to be cross-examined -- if we called him as a witness, to be cross-examined by Leviston's counsel; that was my concern.").

*Murray*. Reed Smith determined that the risks of having Murray testify about his conversation with Jackson outweighed the potential benefit of having him corroborate Jackson's account, because Murray knew that Leviston did not consent to the use of the video:

> Under any balancing he wanted to do, it was a million times better than trying to get Maurice Murray on the stand -- the admitted long-term criminal, who at that time was in jail, in any event -- who I knew for a fact, at that point, did not have Ms. Leviston's permission to give Mr. Jackson this tape. As I said, she wrote him numerous texts and other writings, begging -- demanding -- she get the tape back from him. She broke into his apartment and stole every tape that she could find, in hopes of finding the tape, to get it back. So I knew that was going to be the testimony if Maurice Murray got on the stand. So is there a balance? Sure.

\*\*\*

[B]ut it was a million times better chance of getting Mr. Jackson to be able to testify about his state of mind than having Maurice Murray testify to the fact. We didn't even know what Maurice Murray would have said. He might have said, "I didn't give them permission." But even if he said he gave them permission, he would have gotten shredded on cross-examination.

Raymond Dep. 262:8-263:18, Ex. 3; *see* Leviston Dep. 69:7-70:6 (Feb. 22, 2011), Ex. 7 (testifying that, at Leviston's request, Murray had promised not to show anyone the video); *id.* at 71:5-18, 85:3-88:22 (explaining that Leviston repeatedly "pleaded" with Murray to give her the video or to destroy it, and stole several videotapes from Murray in the hope that one of them was the video); Leviston Matter Trial Tr. ("Trial Tr.") 655:8-24, Ex. 8 (testifying that Leviston contacted a lawyer about recovering the video, which Murray "absolutely" did not have her consent to share); Farber Dep. 200:5-201:15, Ex. 4 (testifying that Reed Smith decided not to pursue Murray as a witness because he would be neither credible nor likable, and because Jackson's testimony would be unrebutted in Murray's absence); Rule 56(a)(1) Stmt. ¶¶ 5-6, 22; *see also* Ex. 9 (warning that if "Murray were to testify that he never told 50 that Leviston consented to him using the tape, our defense that 50 had a good faith belief . . . would take a serious hit"). Reed Smith believed that Jackson was ignorant of Leviston's repeated attempts to get the video back from Murray, and could therefore credibly testify that he believed that Leviston did not object to its use—a fact that would have helped establish Jackson's defense that he lacked the intent to cause Leviston harm. Raymond Dep. 83:10-84:20, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶¶ 14-15, 22-23.

**Ross**. While Ross's connection to the Leviston Matter was more attenuated, Reed Smith considered whether it could somehow use Ross to Jackson's advantage. Unlike Murray, Ross did not appear in the video, give it to Jackson, or tell Jackson that he was free to use it. *See* Rule 56(a)(1) Stmt. ¶¶ 5, 9. While Jackson speculated that Ross might have posted the edited video on

Ross's website before Jackson posted it, it was Jackson—not Ross—who edited the video to include Jackson, dressed in garish costume, mocking Leviston with vulgar and degrading commentary. Jackson Dep. 21:9-17, Ex. 5; Jackson Leviston Matter Dep. 35:2-10, 36:11-20, Ex. 6; Singh Dep. 38:18-21, 46:8-12, Ex. 10; *see* Rule 56(a)(1) Stmt. ¶¶ 7-8, 10. And it was Jackson—not Ross—who had already posted on his website an edited "trailer" featuring Leviston naked and having sex while Jackson is seen mocking her. Jackson Dep. 61:17-24, 66:2-8, Ex. 5; Ex. 11, 13; *see* Rule 56(a)(1) Stmt. ¶ 8. Moreover, almost as soon as the full video appeared on a website that Jackson claimed was owned by Ross, Jackson's employees intentionally streamed the video to Jackson's non-commercial website, BooBooTV.com ("BooBooTV"), as Jackson had previewed in his trailer.[5] *See* Jackson Dep. 59:19-60:11, 62:4-63:19, Ex. 5; Jackson Leviston Matter Dep. 142:18-144:4, Ex. 6; Singh Dep. 83:25- 84:13, Ex. 10; Rule 56(a)(1) Stmt. ¶¶ 10, 12. As the court in the Leviston Matter held, the fact that someone else might have posted the video first was not a defense to Jackson's undisputed action of posting it on his website. *Leviston v. Jackson*, 980 N.Y.S.2d 716, 722 (N.Y. Sup. Ct. 2013). Even so, Reed Smith considered the possibility of suggesting to the jury that someone else—perhaps even Ross—posted the full video first.

To introduce the tangential evidence of the full video's first posting, Reed Smith planned to call two of Jackson's employees, Christopher Singh a/k/a Broadway and Corentin Villemeur, both of whom had been deposed during discovery. *See* Singh Dep. 1, Ex. 10; Villemeur Dep. 1, Ex. 14; Rule 56(a)(1) Stmt. ¶ 16. As fact witnesses, they could testify that before they posted the

---

[5] Reed Smith has filed the trailer as Exhibit 11, and has filed the full video and a transcript of that video as Exhibits 12 and 13, respectively. There is no dispute that Jackson published the trailer before the full video was ever published and that Jackson streamed the full video to BooBooTV, as he had promised to do. *See* Rule 56(a)(1) Stmt. ¶¶ 8, 12.

full video on Jackson's website BooBooTV, they saw it on ThisisSabrinasSin.com or

ThisisSabrinasSin.Ning.com (together with ThisisSabrinasSin.com, "ThisisSabrinasSin"), which

they believed was owned by Rick Ross.  They then streamed the video to BooBooTV from

ThisisSabrinasSin.  Raymond Dep. 92:9-17, 94:21-95:15, Ex. 3; Jackson Dep. 57:23-58:15,

Ex. 5; *see* Singh Dep. 50:20-25, 84:6-13, 96:4-9, Ex. 10; Villemeur Dep. 60:14-23, 114:18-

116:24, 161:16-21, Ex. 14; Rule 56(a)(1) Stmt. ¶¶ 12, 17.  This testimony was supported by

Leviston's own expert, Steven Burgess, who opined in deposition (and, later, at trial) that the

video on BooBooTV streamed from ThisisSabrinasSin.  Raymond Dep. 92:17-23, 183:18-184:5,

Ex. 3; Burgess Dep. 108:17-20, Ex. 15; Trial Tr. 273:18-22, Ex. 16; *see* Rule 56(a)(1) Stmt. ¶ 18.

On balance, Reed Smith determined that any marginal benefit of attempting to prove that

Ross was somehow involved was less important than showing that someone other than Jackson

posted it first.  *See* Raymond Dep. 191:9-14, Ex. 3 ("[W]e did not think it mattered whether it

was Rick Ross who put the video on Thisissabrinassin.  We thought it might be relevant to the

jury to show that it went up on another site . . . .").  The testimony of Singh, Villemeur, and

Burgess sufficed to prove that limited point without sponsoring a potentially adverse or harmful

witness such as Ross or NING.[6]  Raymond Dep. 96:10-17, 128:10-18, 134:2-11, Ex. 3.

Moreover, Ross had previously appeared in an interview and explained that the feud with

Jackson was all about business.  Aff. of William Leonard Roberts, II ¶¶ 9-10, Ex. 17 ("Ross

Aff."); *see* Rule 56(a)(1) Stmt. ¶ 9.  If Ross testified that airing the video was part of a business

strategy to generate fan support and interest, that would have undermined the defense Reed

---

[6] In addition, Raymond did not believe it would be productive to serve an internet provider because, based on his experience, "you can subpoena the internet provider and . . . in probably 100 percent of the cases you don't find out who was behind the website."  Raymond Dep. 134:20-135:11, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶ 24.

Smith developed for Jackson. Farber Dep. 106:24-107:10, Ex. 4; *see* Rule 56(a)(1) Stmt. ¶¶ 13, 20-21; *see also* Jackson Dep. 24:4-21, Ex. 5 (testifying that Ross "might have said" that "this whole thing of posting the video was for a trade purpose").

Thus, Reed Smith concluded that the risk of seeking Ross's testimony was not worth taking because it was unnecessary and could be devastating to Jackson's case:

> We did not call Rick Ross as a witness because . . . Rick Ross was a potentially dangerous witness. He . . . was clearly not a friend of Mr. Jackson. This whole thing started because of the beef between them and all the nasty things that were being said. He was the father of Lastonia Leviston's daughter. He said many, many negative things in the press about Mr. Jackson . . . we were very concerned about taking his deposition and making a record of these things and many other things that maybe he would say, which would then be in front of the other side and they could then use it as a non-party deposition transcript at trial.
>
> ***
>
> We planned to put into evidence the fact that it went up on a site prior to the link on BooBooTV. So we were planning to put that into evidence, whether it was Rick Ross's site or somebody else's site was irrelevant.

Raymond Dep. 128:19-129:15, 132:18-23, Ex. 3; *see also* Leviston Dep. 247:15-248:9 (Aug. 11, 2011), Ex. 18 (describing Ross's financial support of Leviston); Raymond Dep. 220:18-221:9, Ex. 3 (expressing concern that Ross might deny that ThisisSabrinasSin was his website or deny that he ever authorized the video to be posted there); Farber Dep. 106:24-107:22, Ex. 4 ("[W]e thought he might talk about how the whole rap war was done as a business matter. . . . And we thought that perhaps he could testify that [Leviston's] emotional life had been completely destroyed by this."); Rule 56(a)(1) Stmt. ¶¶ 19-20.

Ross's affidavit in this case confirmed the wisdom of Reed Smith's judgment. Ross emphatically denied—under oath—any involvement in posting the video. Ross Aff. ¶¶ 10, 13, 16, Ex. 17. And Ross testified that if he had been called in the Leviston Matter he would have testified that: (i) he never had possession of the video; (ii) he did not post the video; (iii) he did

not own ThisisSabrinasSin; and (iv) hip-hop artists such as Jackson publicized their "beefs" for commercial purposes, namely self-promotion and generating fan interest. Ross Aff. ¶ 15, Ex. 17; *see* Roberts Dep. 34:14-17, Ex. 57 ("Ross Dep. I") ("██████████████████████████

██████████████████████████████████████████████████████████"); *id.* at 43:4-5 ("██████████████████████████████"); Roberts Dep. 22:7-13, Ex. 58 ("Ross Dep. II") ("██████████████████████████████

████████"); *id.* at 77:6-12; 79:4-9; Rule 56(a)(1) Stmt. ¶ 55. Even before Jackson's counsel signed the 2017 malpractice counterclaims against Reed Smith, Ross had specifically *denied* Jackson's allegations that Ross posted the video in response to a separate contribution action Jackson's new lawyers filed on the eve of trial in the Leviston Matter. *See* Ex. 19 ¶ 11 (Jackson's complaint alleging that "Ross or someone under Ross' control was the first person to publish the Video online"); Ex. 20 ¶ 11 (Ross's response denying "each and every allegation contained in Paragraph 11 of the Complaint"); Rule 56(a)(1) Stmt. ¶ 54.

**B.    To Save Money, Jackson Ignores Reed Smith's
       Advice to Settle and Ultimately Discharges Reed Smith**

Despite having crafted the strongest defense that could be made for Jackson, Reed Smith understood that the Leviston Matter presented serious risks for Jackson. Accordingly, Reed Smith repeatedly advised Jackson that he should settle the case if possible. Raymond Dep. 79:14-22, Ex. 3. In early 2011, for example, Raymond advised Jackson, through his representatives Theodor Sedlmayr and Nikki Martin, that they "should discuss how far [they were] willing to go to settle," because the "case [was] a total crap shoot," and "virtually any woman on the jury [was] going to side with Leviston." Ex. 21. Raymond warned Jackson that it would take a seven-figure offer to settle. *E.g.*, Raymond Dep. 223:4-9, Ex. 3; Jackson Dep. 48:20-49:2, 52:8-23, Ex. 5. Despite this advice, Jackson never authorized a settlement offer

greater than $250,000, and testified that he would not have offered even $2-3 million to settle the case.  Raymond Dep. 222:24-223:3, 225:5-6, Ex. 3; Jackson Dep. 47:23-48:7, 53:16-18, Ex. 5.  Given Jackson's unwillingness to settle the Leviston Matter, the Reed Smith team began preparing Jackson's case for trial.  In late 2014, with trial scheduled for January 2015, Jackson told Reed Smith—which billed Jackson at its ordinary hourly rate throughout the course of its representation and anticipated trial costs of approximately $500,000—that the case needed to be tried for only $250,000.  Ex. 22 at 1.

On March 27, 2015, a few months before a new trial date, Jackson decided to fire Reed Smith and replace it with Bickel & Brewer P.C. ("Bickel").  Jackson Dep. 25:17-23, Ex. 5; Ex. 23; *see* Rule 56(a)(1) Stmt. ¶ 25.  Jackson did not discharge Reed Smith for its performance in the Leviston Matter.  Rather, as Jackson testified, he did so due to the cost of the litigation and Reed Smith's repeated advice that he should settle the case:

> Q. Okay.  So I want to make sure I'm getting all your reasons.
> A. Right.
> Q. So you wanted to get rid of Mr. Raymond and Reed Smith.  For one reason, they were too expensive?
> A. Right.
> Q. And for a second reason, you didn't think that he was confident he was going to win the case?
> A. Right.
> Q. And a third reason was, he was asking you to spend more to settle the case?
> A. Right.  So a mediator, [they] bring a mediator to you.  These guys make everybody feel like they're going to explode.  Like they're going to lose.  This is how they get them to move closer to agreeing to an amount.  That's one thing.  But, you know, so that's one thing, but when the attorney's talking like that, it changes it.
> Q. And are those all the reasons, then, those three, for your terminating Reed Smith and Mr. Raymond?
> A. I'm not sure if it's all of the reasons, but that's what I felt about it.
> Q. Those were the substantial --
> A. The big reasons.

Jackson Dep. 50:23-52:7, Ex. 5; *see also* Ex. 24 at 28:4-29:9 (in response to the trial court's statement that "everything in this record indicates that this was a question of financial

inconvenience," Jackson's counsel replies that, to be "[a] hundred percent" clear, Jackson was "unhappy with [Reed Smith] from the size of the bills").

### C.    New Trial Counsel Abandons Reed Smith's Trial Plan and Tries—and Loses—the Case Without Putting Jackson on the Stand

Before Jackson replaced Reed Smith with Bickel, Reed Smith advised Jackson that it was vital to his defense that Jackson appear in court every day to show the jurors that Jackson respected them and cared about the case. *See* Jackson Dep. 32:18-33:3, Ex. 5. Reed Smith also advised Jackson that he was the "best person to . . . explain to the jury" his state of mind. *See* Jackson Dep. 8:4-9:6, 12:8-13:6, Ex. 5; *see* Raymond Dep. 258:16-18, Ex. 3 ("I would have called him as a witness. He was the star of the case."); Ex. 25 ("What is key to our defense is for 50 to convince the jury that Murray told 50 he could use the tape and that Leviston was ok with it.").

But Bickel rejected that trial plan. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Disregarding the trial strategy that Reed Smith developed during discovery, Bickel implemented its own trial strategy. Bickel told Jackson *not* to attend the trial at all until the trial court ordered him to attend during the punitive damage phase. Jackson Dep. 31:20-32:11, 57:16-22, 58:4-6, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 37. Even though Jackson (and Singh) were both on the witness list Bickel submitted to the trial court, Ex. 27, Bickel believed there was "no need" for their live testimony. *See* Trial Tr. 1264:2-4, Ex. 28 ("There is no need for us to bring [Jackson] in the courtroom and repeat what he said in that [deposition] testimony."); *id.* at 1271:7-18 (describing Singh's deposition testimony).

Without Jackson taking the stand, pursuant to Bickel's new trial strategy, there was no live witness prepared to testify on the lynchpins of Reed Smith's defense: Jackson's lack of

intent to inflict emotional distress or use the video for a commercial purpose. *See* Ex. 27 at 1; Jackson Dep. 33:23-34:4, Ex. 5 (testifying that Jackson was "not sure" who else could testify to his conversation with Murray); *see* Rule 56(a)(1) Stmt. ¶¶ 37-39. At the trial, Bickel called only two witnesses: a psychiatrist and Corentin Villemeur, who did little more than testify about his basic job functions. *See* Trial Tr. 1089:14-1107:9, Ex. 29 (describing Villemeur's testimony); Rule 56(a)(1) Stmt. ¶ 39. Bickel then rested, without Jackson taking the stand. Jackson Dep. 33:4-34:4, 57:16-22, Ex. 5; Trial Tr. 1176:6-1177:7, Ex. 30; *see* Rule 56(a)(1) Stmt. ¶¶ 37, 39. Even though Bickel concluded its defense case, the trial court invited Bickel to reconsider and call Jackson to the stand. Trial Tr. 1210:5-24, Ex. 31. When Bickel declined to do so, the court gave the jury a *missing witness charge*, telling the jury that it could "*draw the strongest inference against the defendant that his testimony would not be favorable to his defense.*" Trial Tr. at 1366:6-22, Ex. 32 (emphasis added); *see* Rule 56(a)(1) Stmt. ¶ 40.

Bickel never tried to submit a witness list identifying the Three Uncalled Witnesses. To the contrary, even though Bickel decided not to call Jackson to the stand, Bickel confirmed before trial that "Defendant will not call any witnesses at trial other than Mr. Jackson, Correntin [sic] Villemeur, Christopher Singh, [and two psychological experts]." Ex. 33 at 1; *see* Rule 56(a)(1) Stmt. ¶¶ 26-27. Nor did Bickel ever move to take the Three Uncalled Witnesses's depositions. *See* Rule 56(a)(1) Stmt. ¶ 32. In fact, Bickel and the other lawyers who represented Jackson during the trial never even interviewed or communicated with those Three Uncalled Witnesses. Ex. 1, Response No. 4; *see* Rule 56(a)(1) Stmt. ¶ 28. Instead, Bickel filed a motion to adjourn the trial date, to add Ross as a new third-party defendant, and to allow additional discovery of Ross and NING. *See* Ex. 34 at 2, 5-7; Ex. 35 at 1; Ex. 36 ¶¶ 1, 7, 25-40, 59; *see* Rule 56(a)(1) Stmt. ¶ 29. When that multifaceted motion to adjourn the trial date and add a

14

new party was denied (without denying additional, non-party discovery), *see* Ex. 24 at 43:15-46:25; Rule 56(a)(1) Stmt. ¶ 30, Bickel did not seek to take discovery of Ross and NING or to call those witnesses at trial.  Instead, Bickel used the existing evidence to make arguments at trial about the Three Uncalled Witnesses.

Rather than viewing Murray as an honest corroborating witness, Bickel, echoing the same concerns voiced by Reed Smith in deciding against pursuing Murray as a possible witness, told the jury that "this whole fiasco was precipitated by a pack of lies from Maurice Murray," who was "an ex-convict."  Trial Tr. 1266:17-19, 1287:24, Ex. 28; *see* Rule 56(a)(1) Stmt. ¶ 35.  As for Ross and NING, Bickel argued that "[b]efore any public use of this video could be made, Mr. Jackson and Mr. Singh discovered that it had been downloaded and appearing on another website called thisissabrinassin, a website that was not controlled, owned or managed by Mr. Jackson or his organization."  Trial Tr. 1271:9-14, Ex. 28; *see* Rule 56(a)(1) Stmt. ¶ 36.

This effort to shift to others blame for Jackson's posting of the video went nowhere.  The trial court refused to give an apportionment charge to the jury because "comparative fault does not apply to intentional torts."  Trial Tr. 1238:6-19, Ex. 28; *see* Rule 56(a)(1) Stmt. ¶ 41.  Without apportionment, it did not matter to Jackson's damages whether Ross or Murray were also liable to Leviston for their actions.  The court instructed the jury that it could only assess damages against Jackson for those postings that were proved to be on Jackson's website: "you are to disregard any evidence regarding the publication of the videotape on any website that you find has not been established to be owned or controlled by the defendant."  Trial Tr. 1364:17-1365:8, Ex. 32; Rule 56(a)(1) Stmt. ¶ 41.

After receiving these instructions, the jury entered an award against Jackson in favor of Leviston for $7 million: $2.5 million on the Civil Rights Law claim; $2.5 million on the IIED

claim; and $2 million in punitive damages.  Ex. 37 at 2, 8; Ex. 38 at 1-2; *see* Rule 56(a)(1)

Stmt. ¶¶ 42, 44.

### D.    Jackson Settles with Leviston, Abandoning His Own Efforts to Mitigate His Alleged Damages

Jackson had many options to mitigate—and avoid—financial responsibility for the jury's

$7 million award.  Before jury selection began in the Leviston Matter, Jackson sued Ross for

"contribution on a proportionate basis towards any and all amounts Jackson may have to pay"

Leviston in the Leviston Matter.  Ex. 19 ¶ 16; *see* Rule 56(a)(1) Stmt. ¶ 33.  After the verdict in

the Leviston Matter was entered, Jackson filed a post-trial motion attacking the jury's conclusion

on numerous grounds, including that the $2.5 million compensatory damages awards on both the

Civil Rights Law and IIED claims were duplicative, and that the $2 million punitive damages

award was excessive.  Ex. 39 at 2-16; *see* Rule 56(a)(1) Stmt. ¶ 45; *see also* Ex. 40 at 1-4, 9-10.

As Jackson's own expert in this case admitted, there was a "very good argument" that the

$5 million in compensatory damages should be reduced to $2.5 million.  Lupkin Dep. 222:20-

224:3, Ex. 41; *see* Rule 56(a)(1) Stmt. ¶ 46; *see also* Ex. 42 ¶¶ 120-121 (opining that Jackson's

arguments "had a reasonable probability of success").

Rather than pursue his post-trial motion or contribution action, Jackson settled the

Leviston Matter for a $6 million allowed claim in his bankruptcy, of which he ultimately paid no

more than $4.32 million.  ECF No. 485 at 22; ECF No. 552 at 6; ECF No. 742 ¶ 11; ECF

No. 742-1 at 1; *see* Rule 56(a)(1) Stmt. ¶¶ 48, 52.  In settling, Jackson voluntarily abandoned his

post-trial relief and knowingly extinguished his contribution claim against Ross.  *See* Ex. 43

at 15:17-21 ("[A]fter the confirmation of the plan and we have settled with Ms. Leviston . . .

Mr. Jackson, the debtor, would have waived his . . . claims against Mr. Ross under New York

Obligation Laws."); Ex. 44, Response No. 3 (stating that Jackson received nothing from his

contribution claim against Ross); Rule 56(a)(1) Stmt. ¶¶ 49-50.  In other words, as Jackson

admitted, he "chose to settle the case when [he] had motions pending that would have reduced

[his] judgment by at least half and where [he] had a claim for contribution" even though he

understood that entering that settlement would "wipe it all out."  Jackson Dep. 72:9-16, Ex. 5;

*see* Rule 56(a)(1) Stmt. ¶ 51.

> ### E.      Jackson Asserts Counterclaims Against Reed Smith for Failing to Call the Three Uncalled Witnesses, Despite Having No Idea What They Would Say If Called as Witnesses in the Leviston Matter

Despite having settled the Leviston Matter for $4.32 million, Jackson commenced this

action against Reed Smith for the $7 million the jury awarded Leviston—which Jackson never

fully paid—plus $25 million in punitive damages.  Jackson alleged that the testimony of the

Three Uncalled Witnesses would have mitigated his damages.  Yet, as he admitted in discovery,

whatever testimony those witnesses might have offered if called to testify in the Leviston Matter

is "hypothetical in nature."  Ex. 44, Response No. 1; Rule 56(a)(1) Stmt. ¶ 58.  As he likewise

admitted, neither he nor his trial counsel in the Leviston Matter ever interviewed them or

communicated with them, before or after the Leviston Matter concluded.  Ex. 1, Response Nos.

4-6, 10-12; *see* Rule 56(a)(1) Stmt. ¶ 53.

When pressed at his deposition, Jackson conceded that these witnesses, at best, would

offer nothing more than the same testimony that Jackson and his employees would have given if

Bickel had presented their testimony as Reed Smith had planned.  With respect to Murray, for

example, Jackson testified:

> Q. [Y]ou would be the best person to be able to explain to the jury what was in
> your head at the time, right?
> A. Yes.
> Q. And have you talked to Mr. Murray at any time to ask him what he would have
> said if he was called to testify at trial?
> A. No.
> Q. Do you know if anyone on your behalf has talked to Mr. Murray to find out

what he would have said at trial?
A. No.

Jackson Dep. 13:3-14, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶¶ 23, 56.

Jackson offered similar testimony as to Ross:

Q. So Rick Ross then would have explained the nature of this argument between him and you; is that correct?
A. Yes.
Q. You also could explain the nature of the argument between him and you, correct?
A. Yes.
Q. And you were prepared to do that, to testify at trial about the argument that you had with Rick Ross?
A. Yes.

***

Q. So you could go and testify that you didn't have any interest in elevating your profile and your fan base, but he did?
A. Yes.
Q. And do you know what he would have said if he was called to testify?
A. No.

Jackson Dep. 14:13-15:4, 17:11-17, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 21.  And as to NING,

Jackson testified that he "was more interested in the people."  Jackson Dep. 25:7-16, Ex. 5.

## <u>ARGUMENT</u>

A malpractice plaintiff must establish: "(1) that the attorney was negligent; (2) that such negligence was a proximate cause of plaintiff's losses; and (3) proof of actual damages." *Brooks v. Lewin*, 800 N.Y.S.2d 695, 697 (N.Y. App. Div. 2005).  Because Jackson cannot meet his burden of proving any of these elements, the Court should enter summary judgment in Reed Smith's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Traverso v. Sharinn*, No. CIV. N-88-446(WWE), 1989 WL 265042, at *1 (D. Conn. Sept. 15, 1989) ("A motion for summary judgment thus is the appropriate vehicle to isolate and dispose of factually unsupported

claims or defenses." (quotations omitted)).  As set forth below:

- Point I—As a matter of law, an attorney who exercises his or her considered judgment cannot be liable for negligence.  Jackson cannot meet his burden of proving that Reed Smith was negligent in exercising its judgment and electing not to seek discovery from the Three Uncalled Witnesses.

- Point II—Jackson cannot meet his burden of proving that but for Reed Smith's judgment, Jackson would have had a lower verdict against him, much less settled Leviston's claims for a lower amount.  Until April 2020, Jackson had no admissible evidence of what any of the Three Uncalled Witnesses would have said.  We now know that if Ross had testified in the Leviston Matter, his testimony would not have helped Jackson.  To the contrary, Ross would have denied that he posted the video, and would have testified that his "beef" with Jackson had a commercial purpose.  Further breaking the chain of causation, the case Bickel tried was different from the case that Reed Smith had prepared to try.  Jackson did not testify at trial as Reed Smith had planned, and Jackson voluntarily abandoned his post-trial motion and contribution claim.

- Point III—Jackson has no proof that the jury, after hearing unknown (or harmful) testimony from the Three Uncalled Witnesses, would have reduced the damages that Jackson claims to have suffered by an actual and ascertainable amount.

In addition, having failed to adduce evidence that the fees Reed Smith seeks were excessive, Jackson cannot maintain his objection to Reed Smith's proof of claim on that basis.  *See* Point IV.

### I. JACKSON CANNOT MEET HIS BURDEN OF SHOWING THAT REED SMITH'S EXERCISE OF JUDGMENT WAS NEGLIGENT UNDER THE "ATTORNEY JUDGMENT RULE"

It is a bedrock principle of New York law that a claim for malpractice cannot be based on a lawyer's exercise of judgment in choosing a course of action.  Whether described as "judgmental immunity" or the "attorney judgment rule," "[n]either an error in judgment nor in choosing a reasonable course of action constitutes malpractice."  *Hand v. Silberman*, 789 N.Y.S.2d 26, 27 (N.Y. App. Div. 2005).  Simply stated, if a lawyer, employing his or her professional judgment, chooses one of several reasonable courses of action, there is no claim for malpractice—even if it turns out that the best course was not chosen. *See Achtman v. Kirby*,

*McInerney & Squire, LLP*, 464 F.3d 328, 337-38 (2d Cir. 2006); *Bua v. Purcell & Ingrao, P.C.*, 952 N.Y.S.2d 592, 597-98 (N.Y. App. Div. 2012) (citing authority).

Courts regularly hold, as a matter of law, that a plaintiff cannot prevail on a malpractice claim where the lawyer exercised judgment in making a strategic decision about how to try a case, even if it is contended that other options were better. *See, e.g.*, *Brookwood Cos., Inc. v. Alston & Bird LLP*, 49 N.Y.S.3d 10, 15 (N.Y. App. Div. 2017); *Bison Capital Corp v. Hunton & Williams, LLP*, No. 153793/2015, 2019 WL 1502943, at *6-7 (N.Y. Sup. Ct. Apr. 5, 2019); *Lok Prakashan, Ltd. v. Berman,* 349 F. App'x 640, 642 (2d Cir. 2009).  Thus, attorneys are not liable—even for errors of judgment—if "the proper course is open to reasonable doubt." *Brookwood*, 49 N.Y.S.3d at 15 (quoting *Bernstein v. Oppenheim & Co.*, 554 N.Y.S.2d 487, 489 (N.Y. App. Div. 1990)).

Courts routinely refuse to second-guess a trial lawyer's judgment when the alleged malpractice is the failure to pursue certain witnesses.  For example, in *Hatfield v. Herz*, the court granted summary judgment for the defendant-attorney, who did not call witnesses whose testimony allegedly would have provided a defense in the underlying litigation.  109 F. Supp. 2d 174 (S.D.N.Y. 2000).  There, as here, testimony of one witness would have been duplicative of other evidence and testimony.  *Id.* at 182-84.  Moreover, there, as here, the other witness's unfavorable demeanor and "selective memory," as well as the possibility of "extremely damaging testimony on cross-examination," meant that such testimony may have been counterproductive.  *Id.* at 184-85.  So, too, in *Feldman v. Finkelstein & Partners, LLP*, the court granted summary judgment for the defendant-attorney on judgmental immunity grounds where the defendant-attorney chose not to call two witnesses.  39 Misc. 3d 1222(A), 2013 WL 1867033 (N.Y. Sup. Ct. May 6, 2013), *aff'd*, 15 N.Y.S.3d 173 (N.Y. App. Div. 2015).  One witness,

like Murray, had a criminal record and was demonstrably dishonest; the other's testimony

would have, at best, been duplicative. *Id.* at *4. Both witnesses could have been discredited

in cross-examination. *Id.*

Here, Reed Smith considered whether to pursue discovery from the Three Uncalled

Witnesses. Raymond Dep. 118:11-119:6, 134:21-135:11, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶¶ 19-

24. Reed Smith then made a strategic decision to present evidence about Jackson's state of mind

using Jackson himself and to present evidence about other postings of the video through

Jackson's own employees. Raymond Dep. 83:10-86:7, 134:2-11, 209:9-210:9, Ex. 3; *see* Rule

56(a)(1) Stmt. ¶¶ 16-18; *see also* Ex. 42 ¶ 123 ("Reed Smith exercised the careful reflection and

considered judgment that I would hope all attorneys of the New York State Bar would employ in

the circumstances presented by their case."). There can be no genuine dispute that Reed Smith

considered the options available to prove Jackson's case, assessed the value and risks of calling

additional witnesses, and decided against doing so. Raymond Dep. 128:10-129:20, 191:19-

192:12, 262:8-263:18, Ex. 3; *see* Rule 56(a)(1) Stmt. ¶¶ 19-24.

Even if it were assumed that seeking discovery from the Three Uncalled Witnesses would

have been a "better" strategy—which it was not—Reed Smith's decision not to do so is not

malpractice. This was "a conscious and reasonable decision regarding trial strategy," not an

oversight. *Lok Prakashan*, 349 F. App'x at 642. As a matter of law, it is not malpractice if an

attorney chooses to present a case using evidence that is less problematic than alternatives.

*Brookwood*, 49 N.Y.S.3d at 15; *Iocovello v. Weingrad & Weingrad, LLP*, 772 N.Y.S.2d 53, 53-

54 (N.Y. App. Div. 2004). Nor is it malpractice when a lawyer decides not to call non-party

witnesses who had the potential to offer favorable and unfavorable testimony. *McCord v.*

*O'Neill*, 369 F. App'x 237, 239 (2d Cir. 2010) (affirming summary judgment for defendant-

attorney who did not pursue a prospective witness because that witness's testimony risked undermining plaintiff's argument); *see LIC Commercial Corp. v. Rosenthal*, 609 N.Y.S.2d 301 (N.Y. App. Div. 1994) (affirming summary judgment for defendant-attorney when the attorney had reason to believe that the testimony of the uncalled witness would have been unfavorable).

Reed Smith concluded that the Three Uncalled Witnesses were too risky for Jackson's case. *See* Rule 56(a)(1) Stmt. ¶¶ 20, 22, 24. Ross and Jackson appeared to hate each other. Raymond Dep. 128:10-129:15, Ex. 3. Ross could have destroyed Jackson's defense if he testified that the publication of the video had a commercial purpose, or if he offered testimony about the psychological damage to his daughter or to Leviston. Farber Dep. 106:24-107:22, Ex. 4. And Ross or NING could have testified that Ross did not have anything to do with the posting on ThisisSabrinasSin. Raymond Dep. 220:18-221:9, Ex. 3. Murray must have known that he lacked Leviston's permission to use the video; this fact would have been damaging to Jackson when exposed on cross. *Id.* at 256:14-257:12, 262:8-263:2, 263:15-18, 278:15-20. To protect himself, Murray could have denied that he ever told Jackson he had Leviston's consent. *Id.* at 263:12-14, 278:15-20. Even if Murray testified that he gave Jackson permission, the jury may have taken a negative attitude toward Jackson for having sponsored such a vile witness. *See* Farber Dep. 200:5-22, Ex. 4.

Reed Smith likewise concluded it did not need to take the risk of calling the Three Uncalled Witnesses in the Leviston Matter. Murray was unnecessary because Jackson was able to testify as to his intent in posting the video. Raymond Dep. 83:10-84:20, 257:9-12, 278:15-20, Ex. 3; Farber Dep. 200:23-201:15, Ex. 4. As for Ross and NING, there was no need for discovery to determine that *Jackson* did not control ThisisSabrinasSin—Jackson could testify to that. As Jackson's standard-of-care expert admitted, Jackson's employees could "absolutely"

testify that they first saw the full video on a website that Jackson did not own.  Lupkin Dep.

63:3-7, Ex. 41.  Likewise, neither Ross nor NING were needed for Villemeur and Singh to testify

that they first saw the video on a website that was not owned or controlled by Jackson.

Raymond Dep. 191:19-192:12, Ex. 3.  Moreover, even if there were evidence that definitively

proved that ThisisSabrinasSin was Ross's site—and there was and is no such proof—that

evidence would still not prove who uploaded the video.  As the trial judge in the Leviston Matter

noted, "there is an 'add video' button on that site which enables *other people* to upload videos,

so it is unknown who actually uploaded the Videotape to thisissabrinassin.com." *Leviston*, 980

N.Y.S.2d at 722 n.1 (emphasis added); *see also* Burgess Dep. 102:6-8, Ex. 15 (opining that "it is

technologically possible a third party posted the video in question on This Is Sabrina's Sin

website"); Rule 56(a)(1) Stmt. ¶ 24.  And, confirming the wisdom of the strategic judgment Reed

Smith made, Ross has now denied under oath that he posted the video.  Ross Aff. ¶¶ 10, 16,

Ex. 17; *see* Rule 56(a)(1) Stmt. ¶ 55.  *See also* Ross Dep. I 34:14-17, 43:4-5 Ex. 57.

As this Court held, "either an error in judgment or a selection of one among several

reasonable courses of action fails to state a claim for malpractice."  AP-ECF No. 62 at 14

(quoting *Kirk v. Heppt*, 532 F. Supp. 2d 586, 592 (S.D.N.Y. 2008)).  The undisputed evidence

shows that Reed Smith made a judgment call—and that is not malpractice.  Accordingly, as a

matter of law, Jackson cannot meet his burden of showing that Reed Smith was negligent by

deciding not to pursue discovery from the Three Uncalled Witnesses.

## II.    JACKSON CANNOT MEET HIS BURDEN OF PROVING THAT REED SMITH WAS THE BUT FOR OR PROXIMATE CAUSE OF HIS ALLEGED DAMAGES

To establish his malpractice claim, Jackson also bears the burden of demonstrating that

Reed Smith was the proximate and but for cause of his alleged damages—i.e., that he would

have fared better in the underlying Leviston Matter if not for the alleged malpractice.  *See Rudolf*

*v. Shayne, Dachs, Stanisci, Corker & Sauer*, 867 N.E.2d 385, 387 (N.Y. 2007) (explaining that a plaintiff "must show that he . . . would have prevailed in the underlying action or would not have incurred any damages, *but for* the lawyer's negligence" (emphasis added)).  To make this showing, Jackson must prove case-within-a-case causation: a re-presentation of the trial, including the specific testimony of the Three Uncalled Witnesses, that would have occurred if not for Reed Smith's alleged negligence.  *See Russo v. Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, LLP*, 750 N.Y.S.2d 277, 281-82 (N.Y. App. Div. 2002) (affirming summary judgment for defendant-attorney because plaintiff failed to prove that additional evidence would have changed the outcome of the underlying case).

Jackson cannot meet his burden of establishing causation—and Reed Smith is therefore entitled to judgment as a matter of law—for three separate reasons.  First, Jackson cannot prove that Reed Smith was the but for cause of his alleged injury because he cannot prove what the Three Uncalled Witnesses would have said that would have reduced his alleged damages by an ascertainably lower amount.  Second, Jackson's replacement counsel broke the chain of causation by adopting a radically different trial strategy and by failing to present the testimony Jackson now claims to have been "critical."  Third, Jackson broke the chain of causation by settling the Leviston Matter and abandoning a meritorious post-trial motion and appeal.

A.    **Jackson Has No Proof That Testimony From the Three Uncalled Witnesses Would Have Reduced His Alleged Damages**

Jackson must prove that Reed Smith is the but for cause of Jackson's alleged damages. *Rudolf*, 867 N.E.2d at 387; *Weil, Gotshal & Manges LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 2004).  This standard of causation is more "rigorous" than merely proving that the attorney's conduct was a "substantial factor" in the outcome of the underlying litigation. *Weil, Gotshal & Manges*, 780 N.Y.S.2d at 596.  Mere

arguments about what *could* have happened do not suffice to survive summary judgment. *See Sevey v. Friedlander*, 920 N.Y.S.2d 831, 833 (N.Y. App. Div. 2011) (affirming summary judgment for defendant-attorney because plaintiff failed to provide evidence that he would have obtained a more favorable outcome at trial); *Russo*, 250 N.Y.S.2d at 281 (affirming summary judgment for defendant-attorney because plaintiff's argument "was mere surmise, and a legal theory of causation cannot be sustained on surmise"); *see also Baptist v. Global Holding & Inv. Co., L.L.C*, C.A. No. 04-CV-2365 (DGT), 2007 WL 1989450, at *6 (E.D.N.Y. July 9, 2007) ("attorney argument" is "insufficient" to defeat summary judgment); *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 191 (S.D.N.Y. 2011) (granting defendant's motion for summary judgment based on "the lack of (non-hypothetical) evidence" supporting plaintiff's claim).  But mere argument is all Jackson has.  He has no evidence that the testimony of the Three Uncalled Witnesses would have resulted in a lower verdict or that Leviston would have settled for less.

To the contrary, until Ross provided his April 13, 2020 affidavit to all parties, there was no evidence at all as to the testimony that would have been offered by any of the Three Uncalled Witnesses.  Jackson has admitted that neither he nor his trial counsel in the Leviston Matter interviewed or communicated with the Three Uncalled Witnesses before commencing this action.  Ex. 1, Response Nos. 4-6, 10-12; *see* Rule 56(a)(1) Stmt. ¶ 53.  To this day, there is no evidence of what Murray would have said if called as a witness in the Leviston Matter. *See* Rule 56(a)(1) Stmt. ¶ 56.  The only information Jackson produced as to NING is an inadmissible letter to Jackson's counsel, purportedly from NING, stating that NING has no documents describing the ownership of ThisisSabrinasSin—and therefore possesses no information supporting Jackson's theory that NING would have helped prove that Ross posted the video first.  Ex. 1, Response No. 25; Ex. 45 at 1; *see* Rule 56(a)(1) Stmt. ¶ 57.  And after

multiple extensions of the discovery period, Ross's testimony in this case refutes Jackson's allegations about what Ross would have said if called as a witness in the Leviston Matter. *See* Ross Aff. ¶¶ 7, 9-10, 14-16, Ex. 17; Ross Dep. I 34:14-17, 43:4-5, Ex. 57; Ross Dep. II 22:7-13, 77:6-12, 79:4-9, Ex. 58; Rule 56(a)(1) Stmt. ¶ 55.  Far from offering helpful testimony that would support Jackson's defenses, Ross's testimony would have undercut Jackson's ability to argue that Ross posted the video first and would have undermined Jackson's defense that the video was not posted for a business purpose.  *See id.*; Ross Aff., Ex. 17; Rule 56(a)(1) Stmt. ¶ 55.

Nor is there evidence of what impact, if any, the hoped-for testimony of the Three Uncalled Witnesses would have had on the jury.  Because there is no evidence to support Jackson's speculative assertion that testimony from the Three Uncalled Witnesses would somehow have led the jury to award less and caused Leviston to settle for less, Jackson's claim fails as a matter of law.  *See Rudolf*, 867 N.E.2d at 388; *McCord*, 369 F. App'x at 239 (affirming summary judgment for defendant because plaintiff "adduced no evidence in response suggesting that O'Neill's failure to contact Lawrence . . . could have proximately resulted in the court's unfavorable decision in *Hill*"); *see also Geraci v. Munnelly*, 924 N.Y.S.2d 693, 696 (N.Y. App. Div. 2011) (affirming summary judgment for defendant-attorney because plaintiff failed to demonstrate issue of fact that, but for alleged failure to add non-party, defendant would have been entitled to a more favorable settlement).

**B.    Jackson Cannot Prove Proximate Causation
Because Successor Counsel Broke the Chain of Causation**

As this Court has stated:  "There are no facts suggesting that Replacement Counsel did not have sufficient opportunity to protect Mr. Jackson's rights or was unable to settle the case after March 27, 2015 and before the start of trial on June 15, 2015."  AP-ECF No. 62 at 29;

*accord Somma v. Dansker & Aspromonte Assocs.*, 843 N.Y.S.2d 577, 578 (N.Y. App. Div. 2007) (affirming dismissal of malpractice claim because successor counsel had sufficient opportunity to protect plaintiff's rights); *Perks v. Lauto & Garabedian*, 760 N.Y.S.2d 231, 232 (N.Y. App. Div. 2003) (same). Indeed, upon taking over the case ███████████████████████ ██████████, Bickel adopted and implemented a radically different trial strategy—namely, to defend Jackson, without Jackson attending the trial or testifying.

Bickel chose not to call Reed Smith's planned witnesses to establish Jackson's defenses—yet failed to put in place alternative evidence to fill the vacuum it had created. Thus, "the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of" Reed Smith, "but rather the intervening and superseding failure of plaintiff's successor attorney." *Boye v. Rubin & Bailin, LLP*, 56 N.Y.S.3d 57, 64 (N.Y. App. Div. 2017) (quoting *Pyne v. Block & Assocs.*, 760 N.Y.S.2d 30, 30 (N.Y. App. Div. 2003)).

1.    Jackson Cannot Prove Proximate Causation Because
Successor Counsel Implemented a Radically Different Trial Strategy

Bickel took over in March 2015. Jackson Dep. 25:17-23, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 25. The trial in the Leviston Matter did not begin until June 15, 2015. Trial Tr. 1, Ex. 46; *see* Rule 56(a)(1) Stmt. ¶ 34. Bickel not only had the time to make changes, it adopted a drastically different trial strategy. Without having other witnesses prepared to testify at trial, Bickel chose *not* to call Jackson to the stand to testify about his motivation and intentions. Jackson Dep. 33:4-34:4, 57:16-22, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 37. Bickel also chose not to call Singh. *See* Trial Tr. 1271:7-18, Ex. 28; Rule 56(a)(1) Stmt. ¶ 37. Instead, Bickel rested after conducting only a perfunctory examination of a single fact witness, Corentin Villemeur. *See* Trial Tr. 1089:21-1107:9, Ex. 29; Trial Tr. 1176:6-1177:7, Ex. 30; *see* Rule 56(a)(1) Stmt. ¶ 39.

During a charging conference outside the presence of the jury, Leviston's counsel indicated that Leviston would request a missing witness charge if Jackson did not testify at the trial. The trial court responded that it "consider[ed] the issue of the missing [witness] charge on the defendant to be crucial." Trial Tr. 1181:2-26, Ex. 30. It was so crucial, in fact, that the trial court offered Bickel the opportunity to call Jackson even after Bickel rested Jackson's case. Trial Tr. 1210:5-24, Ex. 31. Once Bickel confirmed that Jackson would not testify, the trial court observed that Bickel had been given an opportunity to "discuss [its] strategy, [and] to address any possible negative inference from a missing witness charge." *Id.* at 1211:2-5. Only then did the court grant Leviston's request for a missing witness instruction. *Id.* at 1210:25-1211:26. Consistent with that ruling, the trial court instructed the jury that it could draw a negative inference against Jackson as to his motive and intent. Trial Tr. 1366:6-22, Ex. 32; *see* Rule 56(a)(1) Stmt. ¶ 40. If Reed Smith's plan had been followed, Jackson (and Singh) would have testified, and there would have been no missing witness instruction. These changes break the causal chain. *See Boye*, 56 N.Y.S.3d at 64 ("[T]he proximate cause of any damages sustained by plaintiff was caused by the intervening and superseding failure of plaintiff's successor attorney . . . .").

Here, the case that Bickel tried was not the case Reed Smith had prepared. There is no causation attributable to Reed Smith for the result at trial when Jackson—who was going to be Reed Smith's star witness—was kept out of the courthouse and off the stand by Bickel, with no witness lined up to replace him. Jackson cannot prove that Reed Smith was the proximate cause of his alleged loss.

2.    Jackson Cannot Prove Proximate
Causation Because Successor Counsel
Could Have Cured the Alleged Negligence but Failed to Do So

Bickel breaks the chain of causation in another way.  At no time did Jackson's trial

lawyers ever attempt to do what Jackson claims Reed Smith should have done: pursue evidence

from Ross, Murray, or NING.  Bickel never moved to depose Murray or to call him at trial.

Jackson Dep. 29:2-12, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 32.  Likewise, Bickel never moved to

take discovery of non-parties NING or Ross (without tethering such a request to a broader

motion to adjourn the trial date and add parties) or to call NING or Ross as witnesses.  Jackson

Dep. 29:5-12, Ex. 5; Ex. 34 at 2; Rule 56(a)(1) Stmt. ¶ 32.  Further, Bickel never informally

interviewed the Three Uncalled Witnesses.  Ex. 1, Response No. 4; Rule 56(a)(1) Stmt. ¶ 28.

Nor did Bickel make a motion to add the Three Uncalled Witnesses to its witness list at trial.  In

that regard, Bickel never alerted the trial court that it was not going to put Jackson on the stand

and needed the opportunity to substitute new witnesses.  Trial Tr. 1208:11-19, Ex. 31; Rule

56(a)(1) Stmt. ¶ 38.  To the contrary, Bickel confirmed on May 21, 2015, that "Defendant will

not call any witnesses at trial other than Mr. Jackson, Correntin [sic] Villemeur, Christopher

Singh, [and two psychological experts]."  Ex. 33 at 1; *see* Rule 56(a)(1) Stmt. ¶ 27.  Bickel

clarified that "[t]hese are the only witnesses that we included in our trial witness list."  Ex. 33

at 2; *see* Rule 56(a)(1) Stmt. ¶ 27.  Even when the trial court denied Bickel's motion to adjourn

the trial date, it never stated that Bickel was precluded from calling whatever witnesses it wanted

to at trial.  Ex. 24 at 5:6-27:23, 43:11-46:25; Rule 56(a)(1) Stmt. ¶ 30.

Notably, Bickel never moved to clarify the trial court's order denying the motion to

adjourn the trial date and add Ross as a party by seeking a ruling that Bickel could take non-party

discovery before the trial date (without moving the date or adding parties) or appealed the trial

court's ruling to the extent Bickel construed it to prohibit such discovery.  See Ex. 35 at 1; Ex. 36

29

¶¶ 1, 7, 23-24, 59; Rule 56(a)(1) Stmt. ¶ 31.  At the conclusion of trial, no relief was sought

complaining about any ruling that prohibited Bickel from calling the Three Uncalled Witnesses

at trial.  See Ex. 39 at 1; Rule 56(a)(1) Stmt. ¶ 45.

Carmen Beauchamp Ciparick, formerly of the New York Court of Appeals, has opined

that neither the Compliance Conference Order, dated February 22, 2012—nor any other action or

omission by Reed Smith—precluded Jackson's replacement counsel at Bickel from calling the

Three Uncalled Witnesses at trial if they wished to do so.  Ex. 42 ¶¶ 108-114.[7]  Jackson has no

contrary evidence—only speculation that a court might have denied the request if it were made.

But the argument that the court might have denied a simple request that was never made is too

speculative to establish proximate causation.  See Somma, 843 N.Y.S.2d at 578 ("Plaintiff's

claim that the federal court in the underlying action would not have permitted amendment of a

---

[7] New York practice liberally permits trial counsel to add witnesses based on a wide variety of factors, particularly where the adversary could be protected from unfair surprise by allowing a pre-trial deposition, either a few days before trial or even during the course of a trial.  *See, e.g.*, *Breen v. Laric Entm't Corp.*, 769 N.Y.S.2d 270, 271-72 (N.Y. App. Div. 2003); *Guzman v. Spring Creek Towers, Inc.*, 882 N.Y.S.2d 278, 278-79 (N.Y. App. Div. 2009); Ex. 42 ¶ 113 ("In my experience, most New York judges prefer that cases be decided on a full and complete record, and will take seriously a claim that a particular witness is critical to a party's claim or defense.").  Jackson's own expert admitted that judges can—and do—let parties depose and call last-minute witnesses.  Lupkin Dep. 217:6-17, Ex. 41.  Indeed, in the underlying Leviston Matter, the trial court permitted Jackson to add an additional witness during the punitive damages phase of trial.  *See* Trial Tr. 1478:18-1492:4, 1497:2-13, Ex. 47 (ordering Jackson and Leviston to meet and confer, during trial, on Jackson's attempt to call an accountant he had disclosed only days before); Trial Tr. 1634:2-10, Ex. 48 (swearing in that accountant); Rule 56(a)(1) Stmt. ¶ 43.

Instead of filing a witness list identifying the Three Uncalled Witnesses, moving to amend the witness list, or seeking permission to depose any of the Three Uncalled Witnesses without tying that request to an adjournment of the trial date, Jackson's team of replacement counsel spent its time on motions for adjournments, motions to add parties, motions to dismiss, interlocutory appeals of those motions, and unsuccessful removals to federal court.  *See* Ex. 34 at 4-7; Ex. 35 (appealing denial of the motion for adjournment); Ex. 49 at 1 (moving to dismiss under the Communications Decency Act); Ex. 50 (appealing denial of the motion to dismiss); Ex. 51 at 2-3 (attempting removal based on the bankruptcy of SMS Promotions, LLC); Ex. 52 ¶ 5 (claiming to have just learned of claim exceeding the jurisdictional amount); Rule 56(a)(1) Stmt. ¶¶ 26, 29-31.

pre-trial order filed by defendants is speculative."). For this reason, too, Reed Smith is entitled to summary judgment.

### C. Jackson Cannot Prove Proximate Causation Because Jackson Chose to Settle the Leviston Matter Instead of Challenging the Verdict and Pursuing His Claim for Contribution

Jackson also cannot meet his burden of proving proximate causation because he chose to settle the case with Leviston and to abandon a meritorious appeal. A former client who foregoes post-trial motions, appeals, or other judicial relief in order to settle a case cannot bring a claim against his lawyers for legal malpractice. *See Buczek v. Dell & Little, LLP*, 7 N.Y.S.3d 558, 561-62 (N.Y. App. Div. 2015) (reversing denial of summary judgment for defendant-law firm where plaintiff was likely to succeed on unpursued appeal); *Freeman v. Brecher*, 64 N.Y.S.3d 13, 14 (N.Y. App. Div. 2017) (affirming dismissal of malpractice claim because plaintiff settled the underlying case).

Here, Jackson abandoned a meritorious post-trial motion regarding duplicative and excessive damages, which could have reduced by half the damages awarded by the jury. Specifically, as Jackson argued in his post-trial motion, the $2.5 million for pain and suffering under the New York Civil Rights Law claim was duplicative of the $2.5 million awarded under the IIED claim. Ex. 39 at 2-16; *see* Rule 56(a)(1) Stmt. ¶ 45. As both parties' experts agree, there was a "very good argument" that the $5 million in compensatory damages should be reduced to $2.5 million. Lupkin Dep. 223:4-224:3, Ex. 41; Ex. 42 ¶ 121; Rule 56(a)(1) Stmt. ¶ 46. Nevertheless, Jackson abandoned his meritorious motion by settling the case. Jackson Dep. 66:25-70:25, Ex. 5 (testifying that Jackson decided to abandon his post-trial motion and appeal by settling the case); *see* Rule 56(a)(1) Stmt. ¶¶ 48-49. Jackson also had "significantly meritorious appellate issues, evidentiary and ruling wise," which may have permitted Jackson to

avoid liability or damages entirely and which he also abandoned by settling.  Ex. 53 at 98:14-17; *see* Rule 56(a)(1) Stmt. ¶ 47, 49.

In addition, Jackson had the opportunity to try to reduce his exposure for the amount awarded to Leviston by pursuing his complaint for contribution from Ross.  *See* Ex. 19; Rule 56(a)(1) Stmt. ¶¶ 33, 50.  He was unable to do so because he decided to settle with Leviston, knowing that this decision would require him to abandon post-trial relief and would doom his contribution claim.  *See* Ex. 43 at 15:17-21; Ex. 44, Response No. 3; Rule 56(a)(1) Stmt. ¶ 50. As Jackson admitted, he voluntarily chose to "wipe it all out" by settling.  Jackson Dep. 72:9-16, Ex. 5; *see* Rule 56(a)(1) Stmt. ¶ 51.

Having settled the underlying case and chosen to abandon any post trial relief—including a meritorious post-trial motion, a meritorious appeal, and a contribution claim—Jackson cannot show that Reed Smith's strategic decision not to pursue discovery from the Three Uncalled Witnesses caused him to pay even a penny more than what he would have paid if Reed Smith had done so.  Even if Jackson could establish negligence—and he cannot—Jackson has barred his own claim by his settlement.  *See Buczek*, 7 N.Y.S.3d at 561 ("The failure to pursue an appeal in an underlying action bars a legal malpractice action where the client was likely to have succeeded on appeal in the underlying action"); *Somma*, 843 N.Y.S.2d at 578 (affirming dismissal of malpractice claim because plaintiff settled case after discharging defendant firm); *see also Boye*, 56 N.Y.S.3d at 64.  Accordingly, for this reason too, Jackson cannot meet his burden of proving proximate causation.

### III.    JACKSON CANNOT MEET HIS BURDEN OF PROVING AN ACTUAL AND ASCERTAINABLE MITIGATION AMOUNT

The Court has already held that Jackson cannot claim that Reed Smith's conduct caused Jackson to *lose* at trial.  AP-ECF No. 62 at 19-23; *see Grasson v. Bd. of Educ. Of Town of*

*Orange*, 24 F. Supp. 3d 136, 153 & n. 122 (D. Conn. 2014) (applying the court's determination at the motion to dismiss stage to summary judgment under the law of the case doctrine).  Now, Jackson must prove that the testimony of the Three Uncalled Witnesses would have reduced the amount he paid Leviston by a specific amount of "actual and ascertainable damages" with the addition of that unknown testimony.  AP-ECF No. 62 at 24.

To "present[] a valid claim for legal malpractice," those actual and ascertainable damages must be "clearly calculable."  *Gallet, Dreyer & Berkey, LLP v. Basile*, 35 N.Y.S.3d 56, 58 (N.Y. App. Div. 2016).  Summary judgment is appropriate when the plaintiff fails to prove such damages.  *Id.* at 59; *New Kayak Pool Corp. v. Kavinoky Cook LLP*, 5 N.Y.S.3d 625, 627 (N.Y. App. Div. 2015).  For example, if a former divorce client cannot offer evidence that specific assets would have been recovered or assigned higher valuations, summary judgment should be entered.  *See Allen v. Krna*, 723 N.Y.S.2d 730, 732 (N.Y. App. Div. 2001).  Concrete figures, not speculation or conclusory claims, are required.  *Rudolf*, 867 N.E.2d at 388; *see Sierra Holdings, LLC v. Phillips, Weiner, Quinn, Artura & Cox,* 977 N.Y.S.2d 751, 752 (N.Y. App. Div. 2013) (no damages from failure to notify client of a foreclosure sale because the unknown result of the sale was speculative); *Hashmi v. Messiha*, 886 N.Y.S.2d 712, 714 (N.Y. App. Div. 2009) (holding the consequences of attorney's delay in moving to dismiss were "too speculative to permit a trier of fact to find that such failure caused 'actual and ascertainable damages'").

Here, Jackson has offered nothing but speculation that he would have paid Leviston less if the Three Uncalled Witnesses had testified.  Jackson has admitted that he does not know how much the testimony of the Three Uncalled Witnesses would have mitigated his alleged damages. *See, e.g.*, Ex. 44, Response No. 1 (stating that the testimony of the Three Uncalled Witnesses is "hypothetical"); Rule 56(a)(1) Stmt. ¶ 58.  No expert has come forward to opine on the

theoretical amount of mitigation. To the contrary, Jackson's standard of care expert testified that he cannot quantify Jackson's damages or the purported mitigation amount. Lupkin Dep. 52:9-10, Ex. 41 ("I'm not opining on damages."); *id.* at 180:15-19 ("I don't know that there is any way of knowing that."); *id.* at 181:21 ("I can't quantify that."); Rule 56(a)(1) Stmt. ¶ 59.

Reed Smith cannot be liable for any amount paid to Leviston without evidence about what quantifiable impact specific, unoffered testimony would have had on what Jackson ultimately paid, in a settlement, following the jury's secret deliberations concerning an award for pain and suffering as emotional damages. *See Perkins v. Am. Transit Ins. Co.*, No. 10 Civ. 5655(CM), 2013 WL 174426, at *18-19 (S.D.N.Y. Jan. 15, 2013) (granting summary judgment to defendant because there was no evidence that calling a witness would have resulted in a more favorable jury verdict); *see also, e.g.*, *Gallet*, 35 N.Y.S.3d at 59 ("Basile essentially speculates that the information he lacked would have provided him with better leverage in negotiations, but he fails to show exactly how . . . the outcome of the litigation would have been more favorable to him."); *Allen*, 723 N.Y.S.2d at 732 (affirming summary judgment for defendant-attorney because plaintiff failed to offer evidence of specific effect on trial outcome). Jackson has no such evidence—whether in the form of an expert opinion or otherwise. He cannot prevail. The Court should accordingly enter summary judgment in Reed Smith's favor.

## IV.   JACKSON CANNOT MEET HIS BURDEN OF PROVING THAT REED SMITH'S OUTSTANDING LEGAL FEES WERE EXCESSIVE

Jackson has objected to Reed Smith's claim for outstanding legal bills on the ground that the fees charged by Reed Smith in those bills were excessive, but failed to meet his burden of adducing any evidence in support of that objection. A properly executed and filed proof of claim is prima facie evidence that the claim is valid and enforceable. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000). Once presented, the burden of production shifts to the debtor to introduce

34

evidence rebutting the claim. *In re Eternal Enter., Inc.*, 558 B.R. 47, 56 (Bankr. D. Conn. 2016). If the debtor fails to introduce evidence that the claim is unenforceable, the claimant "need offer no further proof of the merits of the claim." *In re Residential Capital, LLC*, 513 B.R. 856, 864 (Bankr. S.D.N.Y. 2014) (quoting Collier on Bankruptcy ¶ 502.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2013)).

Here, Jackson has not presented any evidence to rebut Reed Smith's prima facie case that it is entitled to fees for services rendered. Despite objecting that the fees Reed Smith is seeking in its proof of claim are "excessive," and informing the Court that he would be providing supporting expert testimony to that effect, *see* ECF No. 660 ¶ 18, Jackson has failed to do so. *See* Lupkin Dep. 6:22-7:20, Ex. 41 (testifying that opinion is limited to standard of care); Green Dep. 133:10-13, Ex. 54 (testifying that opinion does not include that the fees charged by Reed Smith were excessive); Rule 56(a)(1) Stmt. ¶¶ 60-61. Nor is there evidence to create a genuine issue of material fact as to the reasonableness of Reed Smith's hours, rates, or total bills. Accordingly, Jackson has failed to meet his burden of proving that Reed Smith's fees and costs were "excessive," and Reed Smith is entitled to judgment as a matter of law on this point. *See In re Feinberg*, 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010) (granting summary judgment on claim to defendant because objector had no evidence to rebut prima facie case).

## <u>CONCLUSION</u>

For the reasons discussed above, Reed Smith respectfully requests that the Court enter an Order granting Reed Smith summary judgment, dismissing with prejudice Jackson's remaining claim for malpractice, dismissing Jackson's Objection to Proof of Claim to the extent Jackson objects to alleged excessiveness, awarding Reed Smith its legal fees and costs, and granting such other and further relief as this Court deems just and proper.

Dated:  April 30, 2020                           AXINN, VELTROP & HARKRIDER LLP


                                                 /s/ Thomas G. Rohback
                                                 Thomas G. Rohback (ct01096)
                                                 Drew Alan Hillier (ct30252)
                                                 90 State House Square
                                                 Hartford, CT 06103
                                                 Tel:  860.275.8100
                                                 Fax:  860.275.8101
                                                 Email: trohback@axinn.com
                                                         dhillier@axinn.com

                                                 Craig M. Reiser, admitted *pro hac vice*
                                                 114 W 47th St
                                                 New York, NY 10036
                                                 Tel:  212.728.2200
                                                 Fax: 212.261.5654
                                                 Email: creiser@axinn.com

                                                 *Attorneys for Defendants*
                                                 *Reed Smith LLP and Peter Raymond*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas G. Rohback, certify that on April 30, 2020, I caused the Memorandum of Law of Reed Smith LLP and Peter Raymond in Support of Motion for Summary Judgment to be served via CM/ECF on the following counsel of record:

Joseph P. Baratta
Imran H. Ansari
Baratta, Baratta & Aidala, LLP
546 Fifth Avenue, 6th Floor
New York, NY 10036
Email: jpbaratta@barattalaw.com
         iansari@aidalalaw.com

John L. Cesaroni
Zeisler & Zeisler PC
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Email: jcesaroni@zeislaw.com

/s/ Thomas G. Rohback
Thomas G. Rohback (ct01096)