# EXHIBIT 58

```
                                                              1

 1         IN THE UNITED STATES BANKRUPTCY COURT

 2            FOR THE DISTRICT OF CONNECTICUT

 3                  NEW HAVEN DIVISION

 4   --------------------------X
     IN RE :
 5   CURTIS JAMES JACKSON, III  :

 6   DEBTOR :   CHAPTER 11

 7                              :   Case No.

 8 :   15-21233 (AMN)
     --------------------------X
 9   CURTIS JAMES JACKSON, III :

10         Plaintiff,     :  Case No.

11      v. :  17-02005 (AMN)

12   REED SMITH LLP, and :

13   PETER RAYMOND, :

14         Defendants.    :
     --------------------------X
15                VOLUME II

16      REMOTE VIDEOTAPED DEPOSITION OF

17         WILLIAM LEONARD ROBERTS, III

18                Atlanta, GA

19            Friday, April 24, 2020

20                 10:02 a.m.

21

22   Job No.:  2020-84891

23   Pages:  1 - 92

24   STENOGRAPHICALLY REPORTED BY:

25   GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR
```

```
 1         Just -- I'm repeating for respect of
 2      Your Honor here, and the Court.  It is my
 3      testimony, for the Court, that I have
 4      never been contacted by Reed Smith during
 5      the Lastonia Leviston, Curtis James
 6      bankruptcy.  And I'll go back to 2007.
 7             And it's my statement for the
 8       Courts, that no, I do not recall, in
 9       2007, meeting Reed Smith, or anyone from
10       Reed Smith.
11                 JUDGE TANCREDI:  All right,
12      Mr. Ansari.  I think you have an answer
13      now from several different angles.
14                 MR. ANSARI:  Thank you,
15      Your Honor.
16   BY MR. ANSARI:
17      Q.   And, Mr. Roberts, Lastonia Leviston
18   is the mother of your child.  Right?
19      A.   Correct.
20      Q.   So, during the Lastonia Leviston
21   versus Curtis Jackson action, had you had any
22   discussions with Lastonia Leviston regarding
23   that case?
24      A.   When -- not during the case.  Not at
25   all during the case.  When the situation first
```

1   came about, you know, I let her know that, you
2   know, he was a -- he was a buffoon. It would
3   be entertainment. And, you know, most
4   definitely, don't put her heart into it.
5          But as it moved on to a civil
6   litigation, no, we had no discussions.
7       Q. When did you first become aware that
8   there was a sex tape of Lastonia Leviston?
9       A. I don't recall.
10      Q. Okay. Was it before the posting of
11  the sex tape?
12      A. Curtis James posted the sex tape, if
13  that's what you're insinuating. But I don't
14  recall when -- or where. It's been a long
15  time ago.
16      Q. So, Mr. Roberts, had you discussed
17  the Lastonia Leviston action with
18  Theo Sedlmayr during the course of that
19  litigation?
20      A. No, I do not. I do not recall that.
21  I had no interest in it.
22      Q. Mr. Roberts, are you aware of a
23  person by the name of "Maurice Murray?"
24      A. It doesn't ring any bells.
25      Q. Did you ever have any discussion

```
 1    with Ms. Leviston as to an individual named
 2    "Maurice Murray?"
 3         A.   It doesn't ring any bells.
 4         Q.   Did you know -- withdrawn.
 5              Were you aware of anyone with
 6    the nickname, "Capone?"
 7         A.   Yeah.  Al Capone, gangster.  Chicago
 8    legend.  He never told.
 9         Q.   Other than Al Capone, in regards to
10    the Leviston action, were you aware of anyone
11    by the name of "Capone?"
12         A.   It was a rap group out of New York.
13    Capone and Noreaga.
14         Q.   Yeah, I'm familiar.  Did they have
15    any -- withdrawn.
16              The "Capone" who was part of
17    that rap group, Capone and Noreaga, did he
18    have any part of the Lastonia Leviston sex
19    tape?
20         A.   I have no idea.
21         Q.   Okay.  So, other than the "Capone"
22    from Capone and Noreaga, you weren't aware of
23    any other Capone that may have had some sort
24    of involvement with the making of this sex
25    tape?
```

77

```
 1        sparring is entertaining, but not
 2        appropriate for a deposition.
 3                MR. ANSARI:  Thank you,
 4        Your Honor.
 5   BY MR. ANSARI:
 6        Q.   So, Mr. Roberts, did you provide an
 7   affidavit in regards to this case?
 8        A.   I did provide an affidavit.  And if
 9   you have any questions referring to my
10   affidavit, refer to my answers on my
11   affidavit.  That's what my affidavit was for.
12        Q.   Did you prepare the affidavit
13   yourself?
14        A.   No, I did not.
15        Q.   Did you draft the wording in the
16   affidavit yourself?
17                MR. ROGERS:  Object to form.
18                 You can answer.
19        A.   There's no need to draft the
20   wording.
21        Q.   Did you provide the information to
22   your attorneys in the affidavit?
23                MR. ROGERS:  I'm going to make
24        an objection, to the extent there was
25        attorney/client communications, Imran.
```

 1    BY MR. ANSARI:
 2         Q.   Without telling me what
 3    conversations you had, did you provide the
 4    information in the affidavits to your
 5    attorneys?
 6              MR. ROGERS:  I'm going to
 7         object to form.  Do you want to ask him
 8         something specific -- it's a three -- I
 9         think it's a three-page affidavit.  Some
10         of which is just his name.  Some of which
11         is cursory.
12            Do you want to ask a specific
13          question?  I think that would probably
14          be more appropriate than a generalized
15          question about the entire affidavit.
16              JUDGE TANCREDI:  And, counsel,
17         why don't we address Mr. Ansari as "Mr.
18         Ansari," or "Attorney Ansari," please?
19              MR. ROGERS:  Yes, Your Honor.
20    BY MR. ANSARI:
21         Q.   So, Mr. Roberts, in your affidavit,
22    did you say that you had no ill will towards
23    Curtis personally?
24              MR. ROGERS:  Object to form.
25         The document speaks for itself.

1    A.    The document speaks for itself.
2    Q.    Did you say that?  Or did you not
3    say that within your affidavit?
4    A.    The document speaks for itself.  I
5    won't repeat, word for word, my entire
6    document.  That's why I did the written
7    document.  Did it for the Courts.  Not just
8    for your personal satisfaction.  I did it for
9    the Courts.
10   Q.    How -- withdrawn.
11         In your affidavit, you state
12   that:
13         "Engaging in the beef with him
14   was always supposed to be professional and
15   about business."
16         Were those your words,
17   Mr. Roberts?
18         MR. ROGERS:  Object to form.
19   Again.
20   A.    Just for the record, regardless if
21   they were my words or not, it was
22   professional.  I sold records.  I sold
23   records.  And --
24   Q.    And Mr. --
25   A.    That's what it was for, for me.  I

1    made it clear, that's what it was for, for me.
2        Q.   Mr. Roberts, did you say, "Our beef
3    was meant to be fought primarily with words
4    and rap artistry?"  Do you remember -- were
5    those your words?
6             MR. ROGERS:  Object to form.
7        The document speaks for itself.
8        A.   The document speaks for itself.
9        Q.   I'm -- respectfully, Mr. Rogers, I'm
10   permitted to inquire as to the content of the
11   affidavit with your client.  It's routinely
12   done.  And you know it.
13                So, I'm simply trying to verify
14   the information that your client has sworn
15   to --
16             THE WITNESS:  It's very clear.
17       It's very clear.
18             JUDGE TANCREDI:  Mr. Ansari,
19       let me weigh in here for a minute.  There
20       is a bit of ambiguity in your
21       questioning.
22            The document does say whatever it
23        says.  And asking the witness whether or
24        not it says this, that, and the other
25        thing, we can all discern by looking at

```
 1          the document.
 2                  If you're asking him a different
 3          question -- slightly different question,
 4          whether or not those were his words, or
 5          words that were crafted by his lawyer,
 6          or interpreted by his lawyer, that --
 7          that may be helpful.
 8                  But to go through every line of the
 9          document that is in front of you, and
10          presumably in front of everybody else, I
11          don't think is either appropriate or
12          helpful here.
13                  It's only making this more tedious
14          than it has to be.
15                      MR. ANSARI:  Sure.  Thank you,
16          Your Honor.  And I will take your words
17          as guidance.  Thank you, Your Honor.
18                      MR. ROGERS:  And can we -- if
19          you're going to ask him about the
20          affidavit, can you put a copy on the
21          screen so he can see it?  I think that
22          was some time ago that he did that
23          affidavit.
24                      THE WITNESS:  I need to take a
25          break.
```