**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | |
|---|---|
| In Re: | : |
| CURTIS JAMES JACKSON, III, | : CHAPTER 11 |
| Debtor. | : CASE NO. 15-21233 (AMN) |
| _____ | : |
| CURTIS JAMES JACKSON, III, | : |
| Plaintiff, | : ADVERSARY PROCEEDING |
| | : CASE NO. 17-02005 (AMN) |
| v. | : |
| REED SMITH LLP AND PETER RAYMOND, | : APRIL 30, 2020 |
| Defendants. | : |

**REED SMITH LLP AND PETER RAYMOND'S**
**LOCAL RULE 56(A)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56(a)(1) and Local Bankruptcy Rule 7056-1, Defendants Reed Smith LLP and Peter Raymond (together, "Reed Smith") respectfully submit the following statement of undisputed material facts in support of Reed Smith's Motion for Summary Judgment.

    **A.**    **The Leviston Matter**

    1.    On February 24, 2010, Lastonia Leviston sued Plaintiff Curtis James Jackson, III in New York Supreme Court (the "Leviston Matter"), alleging that Jackson posted an explicit sex video of Leviston without Leviston's permission. Ex. 2 ¶¶ 5-11.[1]

    2.    Leviston did not sue Maurice Murray (who appeared in the video with Leviston)

---

[1] References to exhibits are to the exhibits annexed to the Declaration of Craig M. Reiser in Support of Reed Smith LLP and Peter Raymond's Motion for Summary Judgment, dated April 30, 2020.

in New York, and she did not sue William Leonard Roberts, II, a/k/a Rick Ross (the father of Leviston's child). *Id.* ¶¶ 2-3; Aff. of William Leonard Roberts, II ¶ 8, Ex. 17 ("Ross Aff."); Leviston Dep. 25:15-18, 67:3-14 (Feb. 22, 2011), Ex. 7; Jackson Dep. 10:23-11:11, 21:5-17 (Aug. 15, 2019), Ex. 5 ("Jackson Dep.").

3. Leviston asserted two intentional tort claims against Jackson alone in the Leviston Matter: (1) violating New York Civil Rights Law Sections 50 and 51; and (2) intentional infliction of emotional distress ("IIED"). Ex. 2 ¶¶ 15-23.

4. From late February 2010 until discharged and replaced on March 27, 2015, Jackson's longtime litigation counsel at Reed Smith prepared Jackson's defense in the Leviston Matter. Raymond Dep. 19:13-16, Ex. 3; Jackson Dep. 34:21-35:2, Ex. 5. The lead Reed Smith attorney on the case was Peter Raymond. Raymond Dep. 270:3-6, Ex. 3.

**B.    The Video in the Leviston Matter**

5. Prior to the Leviston Matter, Murray gave Jackson a videotape of Leviston engaged in sexually explicit activity with Murray. Jackson Dep. 7:22-8:3, 21:5-17, Ex. 5; Jackson Dep. 13:3-8 (Oct. 11, 2011), Ex. 6 ("Jackson Leviston Matter Dep."). According to Jackson, Murray verbally told Jackson that Leviston had given consent to Jackson's public use of the video. Jackson Dep. 8:16-21, 11:2-25, Ex. 5; Jackson Leviston Matter Dep. 33:5-8, Ex. 6. In the Leviston Matter, however, Leviston testified that she had never given such consent. Leviston Dep. 69:7-70:6, 71:5-18, 84:21-88:13 (Feb. 22, 2011), Ex. 7; Leviston Matter Trial Tr. ("Trial Tr.") 654:10-24, Ex. 8.

6. Murray, who had a criminal record during the pendency of the Leviston Matter, did not provide Jackson with Leviston's written consent to publish the video. Ex. 55 at 2-4 (Sept. 1, 2011); Raymond Dep. 252:20-253:2, Ex. 3; Jackson Dep. 61:9-11, Ex. 5.

7. Jackson edited the video Murray gave him to include Jackson, in costume, making

commentary. Jackson Dep. 21:9-17, Ex. 5; Jackson Leviston Matter Dep. 35:2-36:20, Ex. 6; Singh Dep. 38:18-21, 46:8-12, Ex. 10; Ex. 11; Ex. 12 (transcript attached as Ex. 13).

8. Jackson posted on his website an edited "trailer" featuring Leviston naked and having sex while Jackson is seen mocking her. Jackson Dep. 61:17-24, 66:2-8, Ex. 5; Ex. 11.

9. In March 2009, Ross, who was engaged in a public feud with Jackson, appeared in an interview and explained that his feud with Jackson was all about business. Ross Aff. ¶¶ 4-5, 9-10, Ex. 17. When told Jackson would be posting the video, Ross responded by suggesting that he would post the video on DeeperThanRap.com. *Id.* ¶ 9.

10. In March 2009, after Jackson had posted the trailer, the full version of the edited video appeared on a website ThisisSabrinasSin.com or ThisisSabrinasSin.Ning.com (together with ThisisSabrinasSin.com, "ThisisSabrinasSin"). Burgess Dep. 98:5-8, Ex. 15; Singh Dep. 50:20-25, Ex. 10.

11. Jackson contends in this adversary proceeding that the internet provider for ThisisSabrinasSin was NING Interactive, Inc. ("NING"). Jackson Dep. 62:19-23, Ex. 5.

12. After the edited video had been posted to ThisisSabrinasSin, Jackson's employees streamed it to Jackson's non-commercial website, BooBooTV, from ThisisSabrinasSin. Jackson Dep. 59:19-60:11, 63:5-19, Ex. 5; Singh Dep. 83:25-84:13, 96:4-9, Ex. 10; Villemeur Dep. 60:14-23, Ex. 14.

### C. Reed Smith's Defense Strategy in the Leviston Matter

13. Because Leviston never gave Jackson her written consent to publish the private sex tape between her and Murray, Reed Smith concluded that Jackson's best defense to Leviston's Civil Rights Law claim turned on whether Jackson posted the video for commercial purposes. Raymond Dep. 84:24-85:19, 259:2-13, Ex. 3; Farber Dep. 216:10-13, Ex. 4. In structuring Jackson's defense, Reed Smith concluded, in its professional judgment, that the best

way to prove Jackson's state of mind would be through Jackson's own testimony about his purposes in posting the video.  Raymond Dep. 85:7-19, Ex. 3.

14.     As to the IIED claim, Reed Smith also determined that Jackson would be the best witness to testify on the required element of his "intent" in posting the video.  Raymond Dep. 83:10-84:20, Ex. 3; Jackson Dep. 12:8-14, Ex. 5.

15.     Reed Smith planned that Jackson would testify that Murray told Jackson that Jackson was free to use the video and that both Murray and Leviston consented to that use. Raymond Dep. 83:13-84:6, 209:9-16, Ex. 3; Jackson Dep. 12:8-14, Ex. 5.  Reed Smith also intended that Jackson would testify that he believed what he was told by Murray because Jackson was told by Tia Kemp (who knew Leviston) that Leviston posed nude, was a topless dancer, and was a "call girl."  Raymond Dep. 84:6-14, 209:17-210:6, Ex. 3; Jackson Dep. 11:13-17, Ex. 5; Jackson Leviston Matter Dep. 57:9-58:5, Ex. 6.

16.     To introduce evidence of the of the full video's first posting, Reed Smith planned to call two of Jackson's employees: Christopher Singh a/k/a Broadway and Corentin Villemeur. Raymond Dep. 92:9-17, 94:21-95:15, 133:20-134:11, Ex. 3.

17.     Singh and Villemeur would testify that before they posted the full video on BooBooTV, they saw it on ThisisSabrinasSin, which they believed was owned by Rick Ross. They would testify that they then streamed the video to BooBooTV from ThisisSabrinasSin. Raymond Dep. 92:9-17, 94:21-95:15, 133:20-134:11, Ex. 3; Jackson Dep. 57:23-58:15, Ex. 5; Singh Dep. 50:20-25, 84:6-13, 96:4-9, Ex. 10; Villemeur Dep. 60:14-23, 114:18-116:24, 161:16-21, Ex. 14.

18.     This testimony was supported by Leviston's own expert, Steven Burgess, who opined in deposition (and, later, at trial) that the video on BooBooTV streamed from

ThisisSabrinasSin.  Raymond Dep. 92:17-23, 134:2-11, 183:18-184:5, Ex. 3; Burgess Dep. 108:17-20, Ex. 15; Trial Tr. 273:18-22, Ex. 16.

19. Reed Smith considered the options available to prove Jackson's case, assessed the value and risks of calling additional witnesses, and decided against doing so.  *See* Raymond Dep. 118:11-119:6, 128:10-129:20, 191:19-192:12, 262:8-263:18, Ex. 3.

20. Reed Smith considered pursuing discovery from Ross but decided not to do so because, in Reed Smith's view, Ross's testimony was unnecessary and potentially harmful: Ross and Jackson appeared to hate each other; Ross could have undermined Jackson's defense if he testified that the publication of the video had a commercial purpose, or if he offered testimony about the psychological damage to his daughter or to Leviston; Ross could have testified that he did not have anything to do with the posting on ThisisSabrinasSin; there was no need for discovery to determine that *Jackson* did not control ThisisSabrinasSin—Jackson could testify to that; and Jackson's employees could testify that they first saw the full video on a site that Jackson did not own.  Raymond Dep. 118:11-22, 128:10-129:15, 220:18-221:9, Ex. 3; Farber Dep. 106:24-107:22, Ex. 4.

21. Jackson testified under oath that, to the best of his knowledge, Ross could have testified that "this whole thing of posting the video was for a trade purpose."  Jackson Dep. 24:14-21, Ex. 5.

22. Reed Smith considered pursuing discovery from Murray but decided not to do so because, in Reed Smith's view, Murray's testimony was unnecessary and potentially harmful: Reed Smith could prove Jackson's state of mind through Jackson's own testimony, without fear that some other witness might contradict Jackson's account; Murray would have known whether he actually had Leviston's permission, and his admission that he lacked permission would have

5

been damaging to Jackson's case; to protect himself, Murray could have denied that he ever told Jackson he had Leviston's consent; and even if Murray testified that he gave Jackson permission, the jury may have taken a negative attitude toward Jackson for having sponsored Murray as a witness. Raymond Dep. 256:14-257:12, 262:8-263:18, 278:15-20, Ex. 3; Farber Dep. 200:5-201:15, Ex. 4.

23. Jackson testified that he was capable of testifying to what Murray told him and was prepared to do so. Jackson Dep. 10:14-22, Ex. 5. When asked if he "would be the best person to be able to explain to the jury what was in [his] head at the time," Jackson testified that he was. Jackson Dep. 13:3-6, Ex. 5.

24. Reed Smith did not believe it would be productive to seek discovery from an internet provider because "there were better ways of proving the facts;" and, based on Raymond's experience, "you can subpoena the internet provider and . . . in probably 100 percent of the cases you don't find out who was behind the website." Raymond Dep. 134:20-135:11, 191:19-192:12, Ex. 3. In addition, ThisisSabrinasSin enabled third-parties to add videos, so identifying the owner of the website would not necessarily reveal who posted the video on that website. Burgess Dep. 102:6-8, Ex. 15; *Leviston v. Jackson*, 980 N.Y.S.2d 716, 722 n. 1 (N.Y. Sup. Ct. 2013).

### D. Jackson Hires New Lawyers to Try the Leviston Matter

25. On March 27, 2015, months before the trial in the Leviston Matter was scheduled to begin, Jackson decided to fire Reed Smith and replace it with Bickel & Brewer P.C. ("Bickel"). Jackson Dep. 25:17-23, Ex. 5; Ex. 23; Ex. 34 at 3.

26. After replacing Reed Smith as counsel in the Leviston Matter, Bickel submitted a witness list that identified the following witnesses: Jackson, Singh, Villemeur, and two

psychological experts. Ex. 27. Bickel never tried to submit a witness list containing Ross, Murray, or NING (the "Three Uncalled Witnesses"). *See id.*

27. Bickel confirmed on May 21, 2015, that "Defendant will not call any witnesses at trial other than Mr. Jackson, Correntin [sic] Villemeur, Christopher Singh, [and two psychological experts]." Ex. 33 at 1. Bickel clarified that "[t]hese are the only witnesses that we included in our trial witness list." *Id.* at 2.

28. Bickel never informally interviewed the Three Uncalled Witnesses. Ex. 1, Response No. 4.

29. On April 23, 2015, Bickel, on behalf of Jackson, filed a motion to adjourn the trial date in the Leviston Matter, to add Ross as a third-party defendant, and to allow additional discovery of Ross and NING. *See* Ex. 34 at 2, 5-7.

30. On May 1, 2015, the trial court denied that multifaceted motion to adjourn the trial date and add a new party. Ex. 24 at 43:11-46:25. In so doing, the court never stated that Bickel was precluded from calling whatever witnesses it wanted to at trial. *Id*. at 5:6-27:23, 43:11-46:25.

31. On May 14, 2015, Jackson appealed the trial court's May 1, 2015 ruling, including on the grounds that Jackson needed more time to prepare for trial. The appeal did not address the question of Bickel being able to take discovery of Ross or NING prior to the scheduled trial date, without adding them as parties to the case. *See* Ex. 35 at 1; Ex. 36 ¶¶ 1, 7, 23-24, 59. Bickel did not move to clarify the trial court's order denying Bickel's motion to adjourn the trial date and add Ross as a party, by seeking a ruling that Bickel could take non-party discovery before the trial date (without moving the date or adding parties). *See* Ex. 35 at 1; Ex. 36 ¶¶ 1, 7, 23-24, 59.

7

32. Bickel never moved to depose Murray or to call him at trial. Jackson Dep. 29:2-4, Ex. 5. Likewise, Bickel never moved to take discovery of non-parties NING or Ross (without tethering such a request to a broader motion to adjourn the trial date and add parties) or to call NING or Ross as witnesses. *Id.* at 29:5-12; Ex. 33 at 2.

33. On May 21, 2015, Jackson sued Ross in a separate action for "contribution on a proportionate basis towards any and all amounts Jackson may have to pay" Leviston in the Leviston Matter. Ex. 19 ¶ 16; s*ee* Jackson Dep. 31:7-16, Ex. 5.

### E. Trial in the Leviston Matter

34. Trial in the Leviston Matter commenced on June 15, 2015. Trial Tr. 1, Ex. 46.

35. During trial in the Leviston Matter, Bickel told the jury that "this whole fiasco was precipitated by a pack of lies from Maurice Murray," who was "an ex-convict." Trial Tr. 1266:17-19, 1287:24, Ex. 28.

36. During trial in the Leviston Matter, Bickel told the jury that "[b]efore any public use of this video could be made, Mr. Jackson and Mr. Singh discovered that it had been downloaded and appearing on another website called thisissabrinassin, a website that was not controlled, owned or managed by Mr. Jackson or his organization." *Id.* at 1271:9-14.

37. During trial in the Leviston Matter, Bickel did not call Jackson to the stand as a live witness. Jackson Dep. 33:4-34:4, 57:16-22, Ex. 5. Bickel also did not call Singh to the stand as a live witness. *See* Trial Tr. 1271:7-18, Ex. 28.

38. Bickel did not make a motion to add the Three Uncalled Witnesses to its witness list at trial. In that regard, Bickel never alerted the trial court that it was not going to put Jackson on the stand and needed the opportunity to substitute new witnesses. Trial Tr. 1208:11-19, Ex. 31.

39. Bickel called only two live witnesses in Jackson's case: a psychiatrist and Corentin Villemeur. *See* Trial Tr. 1089:14-1107:9, Ex. 29. Bickel then rested, without Jackson taking the stand as a live witness. Trial Tr. 1176:6-1177:7, Ex. 30.

40. After Jackson did not testify as a live witness, the trial court gave a missing witness instruction, allowing the jury to draw a negative inference against Jackson as to his motive and intent. Trial Tr. 1210:25-1211:26, Ex. 31; Trial Tr. 1366:6-22, Ex. 32.

41. The trial court refused to give an apportionment charge to the jury because "comparative fault does not apply to intentional torts." Trial Tr. 1238:8-19, Ex. 28. The court also instructed the jury that it could only assess damages against Jackson for those postings that were proved to be on Jackson's website. Trial Tr. 1364:17-1365:8, Ex. 32.

42. On July 10, 2015, the jury in the Leviston Matter entered a verdict awarding Leviston $2.5 million compensatory damages for the Civil Rights Law claim and $2.5 million compensatory damages for the IIED claim. Ex. 37 at 2, 8; Trial Tr. 1407:9-1409:25, Ex. 32.

43. During the punitive damages phase of trial, the trial court permitted Jackson to add an additional witness. *See* Trial Tr. 1478:18-1492:4, 1497:2-13, Ex. 47; Trial Tr. 1634:2-10, Ex. 48. Bickel did not attempt to call any of the Three Uncalled Witnesses in the punitive damages phase.

44. On July 24, 2015, the jury in the Leviston Matter entered a verdict awarding Leviston $2 million in punitive damages. Ex. 38 at 1-2; Trial Tr. 1820:6-26, Ex. 56.

    **F.**    **Jackson Seeks Post-Trial Relief but Ultimately Settles with Leviston**

45. Jackson filed a post-trial motion attacking the jury's conclusions on numerous grounds, including that the $2.5 million compensatory damages awards on both the Civil Rights Law and IIED claims were duplicative, and that the $2 million punitive damages award was excessive. Jackson Dep. 66:25-67:22, Ex. 5; Ex. 39 at 2-16; *see also* Ex. 40 at 1-4, 9-10. No

relief was sought complaining about any ruling that prohibited Bickel from calling the Three Uncalled Witnesses at trial. Ex. 39 at 1.

46. As both parties' experts agree, there was a "very good argument" that the $5 million in compensatory damages should be reduced to $2.5 million because the $2.5 million award under the Civil Rights Law claim and the $2.5 million IIED award were duplicative. Lupkin Dep. 223:4-224:3, Ex. 41; Ciparick Report ¶¶ 119-122, Ex. 42.

47. Jackson told this Court that there was "certain to be an appeal in the Leviston case," because he had "significantly meritorious appellate issues, evidentiary and ruling wise." Ex. 53 at 98:14-17.

48. Jackson settled the Leviston Matter for a $6 million allowed claim in his bankruptcy. ECF No. 485 at 22; ECF No. 552 at 6.

49. In settling, Jackson voluntarily abandoned his post-trial relief. ECF No. 485 at 22; Jackson Dep. 70:6-25, Ex. 5.

50. Jackson had the opportunity to try to reduce his exposure for the amount awarded to Leviston by pursuing his complaint for contribution from Ross. *See* Ex. 19. He was unable to do so because he decided to settle with Leviston, knowing that this decision would require him to abandon post-trial relief and would doom his contribution claim. Jackson Dep. 71:15-72:8, Ex. 5; *see* Ex. 43 at 15:17-21; Ex. 44, Response No. 3.

51. In other words, as Jackson testified, Jackson "chose to settle the case when [he] had motions pending that would have reduced [his] judgment by at least half and where [he] had a claim for contribution," even though he understood that entering that settlement would "wipe it all out." Jackson Dep. 72:9-16, Ex. 5.

52. Jackson ultimately paid Leviston no more than $4.32 million of the $6 million allowed claim. ECF No. 742 ¶ 11; ECF No. 742-1 at 1.

### G. Jackson Has No Evidence that the Three Uncalled Witnesses Would Have Helped Him

53. Neither Jackson nor his trial counsel in the Leviston Matter interviewed or communicated with the Three Uncalled Witnesses before commencing this action. Ex. 1, Response Nos. 4-6, 10-12; Ross Aff. ¶ 14, Ex. 17.

54. On July 2, 2015, in response to the contribution action that Jackson commenced before trial began in the Leviston Matter, Ross denied Jackson's allegations that Ross posted the video. *See* Ex. 20 ¶ 11; Ex. 19 ¶ 11.

55. If Ross had been called in the Leviston Matter trial, he would have testified that:

   (i) he never had possession of the video;

   (ii) he did not post the video;

   (iii) he did not own ThisisSabrinasSin; and

   (iv) hip-hop artists such as Jackson publicized their "beefs" for commercial purposes, namely self-promotion and generating fan interest.

   Ross Aff. ¶¶ 15-16, Ex. 17. *See also* Roberts Dep. 34:14-17, 43:4-5 (Apr. 22, 2020), Ex. 57; Roberts Dep. 22:7-13, 77:6-12, 79:4-9 (Apr. 24, 2020), Ex. 58.

56. There is no evidence of what Murray would have said if called to testify in the Leviston Matter. *See* Jackson Dep. 13:3-22, Ex. 5; Ex. 1, Response Nos. 16,18, 19, 21; Ex. 44, Response No. 1.

57. The only information Jackson produced as to NING is a letter to Jackson's counsel, purportedly from NING, stating that NING has no documents describing the ownership of ThisisSabrinasSin. *See* Ex. 45 at 1; Ex. 1, Response No. 25; Ex. 44, Response No. 1.

58. Jackson has admitted that he does not know how much the testimony of the Three Uncalled Witnesses would have mitigated his alleged damages. *See* Ex. 44, Response No. 1.

59. Jackson's standard of care expert testified that he cannot quantify Jackson's damages or the purported mitigation amount. Lupkin Dep. 52:9-10, 180:15-19, 181:21, Ex. 41.

### H. **Jackson Has No Evidence that Reed Smith's Fees Were "Excessive"**

60. Jackson objected that the fees Reed Smith is seeking in its proof of claim are "excessive," and informed the Court that he would be providing supporting expert testimony to that effect. *See* ECF No. 660 ¶ 18.

61. Jackson has not presented expert testimony on the reasonableness of Reed Smith's fees. *See* Lupkin Dep. 6:22-7:20, Ex. 41 (testifying that opinion is limited to standard of care); Green Dep. 133:10-13, Ex. 54 (testifying that opinion does not include that the fees charged by Reed Smith were excessive).

Dated: April 30, 2020

AXINN, VELTROP & HARKRIDER LLP

/s/ Thomas G. Rohback
Thomas G. Rohback (ct01096)
Drew Alan Hillier (ct30252)
90 State House Square
Hartford, CT 06103
Tel: 860.275.8100
Fax: 860.275.8101
Email: trohback@axinn.com
      dhillier@axinn.com

Craig M. Reiser, admitted *pro hac vice*
114 W 47th St
New York, NY 10036
Tel: 212.728.2200
Fax: 212.261.5654
Email: creiser@axinn.com

*Attorneys for Defendants*
*Reed Smith LLP and Peter Raymond*

## **CERTIFICATE OF SERVICE**

      I, Thomas G. Rohback, certify that on April 30, 2020, I caused Reed Smith LLP and Peter Raymond's Local Rule 56(a)(1) Statement of Undisputed Material Facts to be served via CM/ECF on the following counsel of record:

Joseph P. Baratta
Imran H. Ansari
Baratta, Baratta & Aidala, LLP
546 Fifth Avenue, 6th Floor
New York, NY 10036
Email: jpbaratta@barattalaw.com
       iansari@aidalalaw.com

John L. Cesaroni
Zeisler & Zeisler PC
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Email: jcesaroni@zeislaw.com

                                                      /s/ Thomas G. Rohback
                                                      Thomas G. Rohback (ct01096)