UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

In Re                          *   Case No. 15-21233(AMN)
                               *
                               *
CURTIS JAMES JACKSON, III,     *
                               *
            Debtor.            *
                               *

CURTIS JAMES JACKSON, III,     *   Adv. Proc. No. 17-02005
                               *
            Plaintiff,         *
                               *   New Haven, Connecticut
      v.                       *   April 13, 2021
                               *
REED SMITH, LLC, et al.,       *
                               *
            Defendants.        *
                               *
* * * * * * * * * * * * * * *  *


TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE ANN M. NEVINS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:             JOSEPH P. BARATTA, ESQ.
                               Baratta, Baratta & Aidala, LLP
                               546 Fifth Avenue, 6th Floor
                               New York, NY  10036

                               IMRAN H. ANSARI, ESQ.
                               Aidala Bertuna & Kamins
                               546 Fifth Avenue
                               New York, NY  10036

                               JOHN CESARONI, ESQ.
                               Zeisler & Zeisler PC
                               10 Middle Street, 15th Fl
                               Bridgeport, CT  06604


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore  Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES: (Cont'd)

For the Defendants:              THOMAS G. ROHBACK, ESQ.
                                 CRAIG M. REISER, ESQ.
                                 DREW A. HILLIER, ESQ.
                                 Axinn Veltrop & Harkrider
                                 90 State House Square
                                 Hartford, CT  06103

1          (Proceedings commenced at 11:10 a.m.)

2          THE CLERK:  17-2005, Jackson, III, versus Reed

3    Smith, LLP, et al.

4          THE COURT:  Okay.  Good morning.  I'm going to take

5    appearances.  I'm going to ask each of you to just put your

6    appearance on the record, please.

7          I'm going to start with plaintiff's counsel, Mr.

8    Baratta.

9          MR. BARATTA:  Joseph P. Baratta (indiscernible).

10         THE COURT:  Thank you.  Mr. Baratta, I think the

11   echo -- I thought that wasn't heard during the check-check.

12   Mr. Baratta, you might have two sources of audio happening.

13   And as we go along, when you want to speak, we'll address

14   that and take care of that for you the next time you want to

15   speak.  All right?  All right.

16         May I have the appearance of Mr. Ansari, please.

17         MR. ANSARI:  Good morning, Your Honor.  Imran H.

18   Ansari of the law office of Aidala Bertuna & Kamins, current

19   of counsel to Baratta, Baratta & Aidala, 546 Fifth Avenue,

20   New York, NY, for the plaintiff Curtis James Jackson, III.

21         THE COURT:  Okay.  Good morning.

22         And do I have Attorney Cesaroni?

23         MR. CESARONI:  Yes.  Good morning, Your Honor.

24   John Cesaroni on behalf of the plaintiff Curtis James

25   Jackson.

4

1           THE COURT:  Okay.  Good morning.

2           I want to note, sometimes I say mister and

3    sometimes I say attorney.  I don't mean any -- there's no

4    difference to me between those names.  I don't mean to imply

5    that, so I just want to say that.  I notice I did it here and

6    it doesn't mean anything other than -- it's not meant to mean

7    anything.

8           Attorney Reiser, may I have your appearance,

9    please.

10          MR. REISER:  Good morning.  Good morning, Your

11   Honor.  Craig Reiser for defendants Reed Smith, LLP and Peter

12   Raymond.

13          THE COURT:  Okay.  Good morning.

14          And do I have Attorney Rohback?

15          MR. ROHBACK:  Yes, Your Honor.  Thomas Rohback from

16   the firm of Axinn Veltrop & Harkrider on behalf of defendants

17   Peter Raymond and Reed Smith.

18          THE COURT:  Thank you.  All right.

19          And do I have Attorney Hillier?

20          MR. HILLIER:  Good morning, Your Honor.  This is

21   Drew Hillier on behalf of Peter Raymond and Reed Smith, LLP.

22          THE COURT:  Okay.  Good morning.  All right.

23          So we're here to address a number of things from my

24   perspective.  And then I suppose, you know, I want to hear

25   from each of you on your perspectives.

1          This is obviously about the motion for summary

2     judgment that's been pending for a number of months now.  I'm

3     at a point where I'm ready to issue a decision pretty quickly

4     after today's hearing -- I would hope -- but I have a number

5     of questions about the record.  I have a number of questions

6     about some of the substances of the arguments and some of the

7     substances of the facts that have been submitted as part of

8     the record on summary judgment.

9          The first thing that -- and so I guess what I would

10    like to do is go through what my concerns are rather than

11    hear you present your motion unless you would prefer to

12    present your motion.

13         So, you should rest assured that I've read the

14    entire at this point with the exception that I have not

15    viewed the video, which we'll talk about, and that I have --

16    I'm very familiar with your legal memoranda.

17         I've also read the documents that you filed this

18    past Friday including the statements regarding final orders

19    that was filed by the plaintiff, and the memoranda and motion

20    to strike regarding some of the exhibits, and the issue of

21    sealing, which I had asked you to address in the scheduling

22    order I had recently issued.

23         So thank you for attending to those items.  And I

24    have reviewed them and considered them and I'm ready to talk

25    about them today.

6

```
1              Having said that, Mr. Ansari, are you speaking for
2     the plaintiff today?
3              MR. ANSARI:  Yes, Your Honor.
4              THE COURT:  Okay.  And then in terms of how you
5     want to proceed, do you wish to make a presentation about
6     your -- I thought we really should start with the movant.
7     Actually, I'm going to peg it to Mr. Rohback.
8              Mr. Rohback, are you presenting for the defendants
9     today?
10             MR. ROHBACK:  I am, Your Honor.
11             THE COURT:  Okay.  And do you wish to make a
12    presentation about your motion or would you prefer that I go
13    through what my questions are?
14             MR. ROHBACK:  Actually, Your Honor, I have prepared
15    long and hard to make a presentation.
16             THE COURT:  Okay.
17             MR. ROHBACK:  But I have to think I'm smart enough
18    to ask for your questions and your concerns instead because
19    those to my mind are the most relevant.
20             THE COURT:  Okay.  And it may be helpful to know
21    too that there's always an opportunity for presentation at
22    then end of the hearing today to the extent that there's
23    something that I decide wanted to present.  I'm happy to
24    listen for as long as you want to talk.  I say that with a
25    little bit of trepidation because I know that we're all
```

```
 1    capable of speaking for a long period of time, but I'm here

 2    to -- you know, I want to have a full hearing today.  All

 3    right.

 4           And let me start -- and this is maybe directed to

 5    both Mr. Rohback and Mr. Ansari -- with what I view as the

 6    mysterious missing page 7 of the Wooten transcript in the

 7    Leviston case.  My understanding is that both defendants'

 8    exhibit 24 and plaintiff's exhibit 14 are missing page 7.

 9    That's the page that I think is talking about counterclaims

10    against Mr. Ross or some kind of a third-party complaint

11    against Mr. Ross.  Anyone have that page?  Or is there a

12    reason it was omitted?

13           MR. ANSARI:  Your Honor, I can't articulate a

14    reason why it was omitted at this point from plaintiff.  If

15    Your Honor wishes we can look for that page and supplement

16    it.

17           THE COURT:  I mean that's it.  You know.  And you

18    know which transcript I'm talking about, right?  It's the

19    Wooten transcript from the Leviston case where the request is

20    being made by plaintiff, sorry, by the plaintiff here,

21    defendant there, Mr. Jackson, to do three things.  One is to

22    take additional discovery.  One is to postpone the trial.

23    And the third is to be able to bring a counterclaim or

24    additional claim against Mr. Ross.

25           You know, both parties have cited to that in their
```

8

1    memoranda, but it's incomplete.  And I didn't know if that

2    was intentional or if that is inadvertent, so that was my

3    question.

4         So, Mr. Ansari, you don't know or you think you're

5    missing page 7 (indiscernible) have it.

6         Mr. Rohback, is your position the same?

7         MR. ROHBACK:  Yes, Your Honor.

8         THE COURT:  Okay.  Okay.  So let's move on then.

9    So that's one thing.  I think that's interesting.

10        Number two, I want to address the sealing issue.

11   If I were to -- and this is a question for Mr. Rohback as the

12   movant -- if I were to deny the motion for summary judgment

13   and we went to trial, would you be presenting the videos at

14   trial?

15        MR. ROHBACK:  Yes, Your Honor.  And the reason

16   would be, if we're talking about the attorney judgment rule

17   and look at what we've been facing, we would need to show

18   what was -- what Mr. Raymond was facing, why --

19        THE COURT:  Let me ask you a question.

20        MR. ROHBACK:  Yes.

21        THE COURT:  Let me ask you a question.  How are the

22   videos relevant?  And by that, I'm really focusing on the

23   federal rules of evidence and the definition in 401.

24        If I had the transcript of these videos, if I have

25   -- I don't think that the -- I don't think the things that

1    are essential about the video are disputed and maybe we

2    should sort that out.  If I have all of that -- and I'll go

3    through what all of that is in just a moment -- I'm not clear

4    -- it's not clear to me why you need the video.

5           The video seems salacious and cumulative to the

6    extent that there's no dispute that the video depicts -- it's

7    been described as a sex tape.  It depicts Ms. Leviston and

8    Mr. Murray engaged in, you know, an intimate situation.  It

9    includes Mr. Jackson appearing in the video wearing a

10   costume, appearing in character as it were, and Mr. Jackson

11   says what's in the transcript.  Right?

12          Is there a reason I need to view the video?  How is

13   its relevant to view the video?  That is -- as you point out

14   in your supplemental memorandum and arguably throughout your

15   motion and memorandum for summary judgment that, you know,

16   what was being faced was a pretty -- it's not a subtle thing,

17   right?

18          It's pretty clear that this was a really bad video

19   that was not provided by Ms. Leviston to Mr. Jackson and for

20   which Mr. Jackson had no written permission from Ms.

21   Leviston.  In fact, had no oral permission to use it from Ms.

22   Leviston.

23          Let me ask, Mr. Ansari, is any of what I just said

24   disputed by Mr. Jackson?

25          MR. ANSARI:  No, Your Honor.  He did not have

1   written permission or oral permission from Ms. Leviston.

2           THE COURT:  And is it fair to say that the

3   description I gave of the video is accurate?  Is it fair to

4   say that the video depicts a couple, Ms. Leviston and Mr.

5   Murray, engaged in a sexual situation and with Mr. Jackson

6   appearing in the video to narrate in a -- not in a

7   complimentary way about the video?  Is that fair to say?

8           MR. ANSARI:  Yes, Your Honor.  The video -- that is

9   fair to say -- it speaks for itself.  Yes.

10          THE COURT:  Okay.  So, you know, that's what the

11  jury dealt with in the *Leviston* case.

12          And I think, Mr. Rohback, you're trying to

13  introduce that.  You're telling me it's relevant because I

14  should understand the salacious aspect of the video that was

15  presented to the jury and the things -- the nature and

16  character and difficulty of defending Mr. Jackson given that

17  that's what the video was.  Is that right?

18          MR. ROHBACK:  It's not just the salacious aspect of

19  the video itself.  If this were simply a video of two people

20  having sex, that would be a different issue.

21          The thing that the Court -- and, again, as we've

22  stated in our papers, to rule on summary judgment in our

23  favor you don't need to look at the video.  But if this were

24  to go to a jury, the jury should have afford that video and a

25  couple of reasons.  It shows not so much the two people

1    having sex.  What it shows is Mr. Jackson, not Mr. Ross --

2                THE COURT:  Right.

3                MR. ROHBACK:  -- Mr. Jackson --

4                THE COURT:  Right.

5                MR. ROHBACK:  -- and the way he's dressed and the

6    way he shrieks and screams, you can't -- that doesn't

7    translate on a written transcript.

8                The other thing -- and I want to point this out --

9    there's been a lot of discussion about who posted it first,

10   did Mr. Ross post it first.

11               I know in Mr. Ansari's motion to strike he makes it

12   clear that, quote, "The full Leviston sex tape is in

13   substance a duplicate of the Leviston sex tape trailer."  And

14   he says again, "The Leviston sex tape trailer submitted as

15   exhibit 11 contains practically the same footage found within

16   the full Leviston sex tape submitted as exhibit 12."

17               That's the only (indiscernible) seeing the two of

18   them -- or this way Mr. Ansari just said it in papers -- and

19   that shows how immaterial this first posting by Ross

20   supposedly is because it's undisputed that the trailer went

21   up first by Mr. Jackson.

22               MR. ANSARI:  Your Honor, I think there's no further

23   issues before the Court that defendants very strongly

24   (indiscernible) now.  I don't think there's any reason for a

25   video, which as you described is salacious.  I don't think it

1    would help the trier of fact in their determination as to the

2    (indiscernible) practice of claims against Reed Smith and of

3    Peter Raymond.

4         The substance of the video as I've stated now

5    speaks for itself.  It's described in full.  You have the

6    transcript.  It would do nothing more but serve to just

7    inflame and be prejudicial to my client.  He's already gone

8    through a trial for that video.

9         If this is about whether he was able to put on a

10   proper defense in order to mitigate damages but for the

11   inactions or actions of the defendants in this case.

12        At trial I think it has no probative value and it

13   would serve nothing but to be prejudicial and salacious

14   especially when there's ample material before the Court in

15   terms of describing the video and, in fact, the transcript.

16        THE COURT:  Okay.  All right.  Let's move on to

17   some of the other sealed items.

18        I'm going to take the defendants' sealed documents

19   first because there are fewer of them frankly.

20        So do defendants include -- and I'm going to --

21   it's going to bring me back to the plaintiff in just a moment

22   here -- is that there are three documents that I understand

23   are sealed, have been sealed at the request of the

24   defendants, that were filed as defendants' exhibits, and the

25   reason is that they were marked as confidential.  And there's

13

1    this pending confidentiality order by the plaintiff.  And,

2    therefore, to honor that marking they've been marked that

3    way.  So I think it's defendants' exhibits 23, 26 and 57.

4         So 23 is the letter from Mr. Jackson to Mr. Raymond

5    that fired him.  Why is that sealed?

6         And, Mr. Ansari, I think I could --

7         Mr. Rohback, first let me ask you, am I correct

8    that you sealed it because it was marked as confidential by

9    the plaintiff.

10        MR. ROHBACK:  That's correct.  All three of those,

11   we are just having them sealed because that was confidential

12   by the plaintiff.  Yeah.  We have no need to seal.

13        THE COURT:  Okay.  So you're honoring the

14   confidentiality agreement by sealing it?

15        MR. ROHBACK:  Yes.

16        THE COURT:  Okay.  And, Mr. Ansari, let's talk

17   about the substance then.  You've marked them as

18   confidential.  Why should they be confidential?  And the

19   first one, I want to -- I just want to go one by one.

20        So the letter from Mr. Jackson to Mr. Raymond,

21   defendants' exhibit 23, why is that something that should be

22   sealed?

23        And I want to note that, you know, I'm really

24   relying on just the -- generally on principles that this is a

25   public matter, this is something that's pending in federal

1    court, and that generally the records should not be sealed.

2    So there's a burden to seal a document.

3            To maintain it under seal, I would need to include

4    particular -- and I'm reading from the district court's local

5    rule 5(e)(3) which I referenced in my order asking for

6    briefing -- that my order sealing the documents shall include

7    particularized findings demonstrating that sealing is

8    supported by clear and compelling reasons and is narrowly

9    tailored to serve those reasons.

10            Now, certainly there's no attorney/client privilege

11    that attaches here, so I assume it's not a privilege issue.

12    What's the issue?

13            MR. ANSARI:  Your Honor, I have no objection to

14    that being unsealed.

15            THE COURT:  Okay.  So I'm going to unseal.  Thank

16    you.  I'm going to unseal defendants' 23.

17            Defendants' 26, that is an email from Nicky Martin

18    to Michael Oppenheim at GSO I believe.

19            MR. ANSARI:  Correct.

20            THE COURT:  Okay.  What's the basis for that

21    document being sealed?

22            MR. ANSARI:  Your Honor, that's internal

23    communications between members of G-Unit, which is Curtis

24    Jackson's broker entity, a record company, and a production

25    company, et cetera.  It also references other matters that

1   are not part of -- it's representing the Sleek settlement --

2          THE COURT:  But why should that be confidential,

3   the fact that she referenced Sleek?  The Sleek Audio matter

4   was -- you know, it was a big deal in the bankruptcy case,

5   that is what I call the named case here, the chapter 11 case

6   of Mr. Jackson.

7          It's since been resolved and settled and the whole

8   settlement's been paid.  What's so secret about it?  What

9   needs to be -- why would it need to be sealed?

10         MR. ANSARI:  Well, Your Honor, I was thinking it's

11  putting forth certain financial considerations among clients,

12  communications with his then (indiscernible) accountant.

13         THE COURT:  So communication with an accountant is

14  not privileged.  What's the basis -- what is the basis to

15  seal based on the fact that it's the accountant?

16         MR. ANSARI:  To the extent that it discusses

17  financial considerations of the settlement.  I don't know --

18         THE COURT:  What's interesting is that Mr. Jackson

19  went through this very, you know, invasive chapter 11 process

20  where his financial -- all of his, you know, all of his

21  financial matters.  You know, if they were rocked, they were

22  all picked up and turned over.  We know what's under all the

23  rocks at this point, so why is it confidential at this time?

24         MR. ANSARI:  Also just after some -- it has

25  discussions between -- just to the extent, Your Honor, not

16

1    based on any (indiscernible) the fact that it discusses my

2    client's financial matters, we would request that it remain

3    (inaudible).  And also to the extent that it references

4    communication with his successor counsel.  I recognize that

5    (indiscernible) so perhaps that's not a strong argument.

6    That would remain on the financial reasons.

7         THE COURT:  Well, let me ask you, Nicky Martin is

8    not an attorney, is that right?

9         MR. ANSARI:  Correct, Your Honor.

10        THE COURT:  Okay.  So it references communication

11   with an attorney, but it's not a communication between the

12   client and the attorney.

13        MR. ANSARI:  Sure.  Your Honor, (indiscernible)

14   discussion.  I don't have a problem at all.

15        THE COURT:  Okay.  All right.  Thank you.

16        That brings us next to defendants' exhibit 57,

17   which are excerpts of the Ross deposition that took place.

18   As I'm sure you all remember extremely well in April of 2020.

19   What's the basis to -- and this is a -- this is going to be a

20   recurring question that I have for you, Mr. Ansari, about

21   deposition transcripts.  Why should the excerpts of the last

22   deposition be sealed?

23        MR. ANSARI:  Your Honor, the request was made to

24   the Ross transcript specifically.  To the extent that it

25   contains defamatory and offensive material, particularly

17

1    directed at myself questioning my ability as an attorney,

2    (indiscernible) racist remarks calling me a deli counter

3    operator and a sandwich maker because I'm a South Asian.  I

4    have a feeling that (indiscernible) fact that a lot of Subway

5    shops are owned by South Asians.

6            And just the whole course of the deposition where

7    he attacks myself, my ability as an attorney, and he even

8    says he's going to write a song about me at one point,

9    attacks my client's son and his relationship with his son,

10   attacks my client's mother, but more so myself and just the

11   pervasive offensiveness and I would say defamation to the

12   point where I considered -- if it was publicly made and he

13   did, in fact, write a song about me, he would be staring at a

14   defamation suit (indiscernible).  That's my reasons.

15           THE COURT:  Okay.  I hear you.  Thank you.  All

16   right.

17           So those are the documents that were sealed at the

18   request of the plaintiff by the defendant.

19           With respect to defendants' exhibit 50, I reviewed

20   that exhibit.  It's a memorandum from Edwards -- excuse me,

21   Andrews International, Inc. to Evan Farber dated September 1,

22   2011.

23           And I agree with the statement that that -- I think

24   it's set forth in the original motion to seal filed by

25   defendants when they filed the motion for summary judgment

1    that that document contains a lot of personal identifying

2    information and is of a nonparty -- I guess a nonparty non-

3    witness -- and I'm going to keep that sealed.  Defendants'

4    exhibit 50, I think there is no public interest that it

5    serves by unsealing that document.  And I think that it falls

6    within the nature of what should be sealed.  I'll enter an

7    order that makes a more particularized finding about that.

8            I'll also enter an order ruling on the other things

9    we talked about, Attorney Ansari.

10           And now we're going to turn to the scope -- to the

11   other exhibits under seal by the plaintiff.  And when I'm

12   done with this hearing, I'm going to enter an order that

13   changes the scope of the sealing.  Okay.  And I'll explain my

14   reasons for each one.

15           But No. 50 by defendants will remain under seal.

16           I grouped the remaining exhibits that are under

17   seal that are all filed by the plaintiff into categories.

18   Okay.  And I'll tell you what my categories are.

19           First of all, the first category is documents filed

20   in this court or in other courts that are not under seal in

21   those courts, so I'm not sure why they're under seal in this

22   motion for summary judgment.  So we'll go through those in a

23   moment.

24           The other -- the next category is deposition

25   testimony.  This doesn't just relate to Mr. Ross', Mr.

19

1    Roberts' deposition, but to others as well.  So we'll go

2    through that.

3            There are a few documents, just two, that appear to

4    be from the internet, from the public domain.  I'm not sure

5    why they're sealed.

6            There are documents that don't seem to fall within

7    a reason for being sealed that I can identify, so I've

8    grouped those together.

9            And then I have a group of documents that might

10   fall into a recognized category for sealing but there's no --

11   I'm not really confident that they do.  I don't think they

12   do.  I think that -- so I want to go through them each and

13   identify where we are.

14           With regard to documents that are filed in this

15   court or in other courts, I'm going to read out what the

16   numbers of those are and then we can go through them.  So

17   these are all plaintiff's exhibits.

18           Plaintiff's exhibit 1 is the Leviston complaint in

19   the *Leviston* case.  Plaintiff's exhibit 11, the *Leviston* case

20   answer.  Plaintiff's exhibit 13, the *Leviston* case memorandum

21   of law filed on April 23rd, 2015.  Plaintiff's exhibit 14 is

22   the so-ordered transcript.  That's the one that's missing

23   page 7.  Plaintiff's exhibit 15, the notice of motion that's

24   filed in the *Leviston* case.  Plaintiff's exhibit 18 is a

25   transcript from the *Leviston* case.  Plaintiff's exhibit 19 is

20

1    the jury verdict sheet from the *Leviston* case.  Those are all

2    from the *Leviston* case, right?

3            Is there any basis to keep those under seal?

4            MR. ANSARI:  No, Your Honor.  No opposition to

5    unsealing.

6            THE COURT:  Okay.  So all of those will be

7    unsealed.  So just to repeat, it's No. 1, 11, 13, 14, 15, 18

8    and 19.  Okay.

9            Then turning to things that are filed other places.

10   There is plaintiff's exhibit 20, which is the general,

11   unsecured claim summary that was filed on February 23, 2018

12   in the main case, so the chapter 11 case here.  I assume

13   there's no problem unsealing that?

14           MR. ANSARI:  No, Your Honor.  And, Your Honor, this

15   was filed in a very -- in the height of COVID remotely and

16   many documents we erred on the side of caution because we

17   were in scattered places.

18           THE COURT:  That's okay.  That's okay.  We're just

19   going to go through it now, so it's fine.  Thank you.

20           Plaintiff's exhibit 48 is a New Jersey Department

21   of Corrections Offender Profile.  That's confidential?

22           MR. ANSARI:  No, Your Honor.

23           THE COURT:  That's regarding Mr. Murray.  Yeah.

24   Okay.  So that will be unsealed.

25           Plaintiff's 50, different from defendants' 50.  So

21

1    plaintiff's 50 is an excerpt from the transcript of a trial

2    in the *Leviston* case dated July 20, 2015.

3              MR. ANSARI:  No objection.

4              THE COURT:  All right.  Thank you.  All right.  So

5    I'm gong to unseal all of those.  All right.

6              Then I'm going to turn to deposition testimony.  I

7    hear you and I'm going to take under consideration your

8    argument regarding the deposition that has been sealed at

9    plaintiff's -- I'm sorry, at defendants' request -- which is

10   document -- it's defendants' exhibit 50.

11             But I want to turn to some other depositions

12   including an excerpt from the Roberts deposition that was

13   filed as plaintiff's exhibit 40.  Is that different?  Are the

14   same concerns present, do you know, regarding plaintiff's

15   exhibit 40?

16             And I'm going to go back in light of your comment

17   and reread that and make sure I understand what that excerpt

18   was about.  There were a number of -- you know, there were

19   different excerpts.  So that applies to plaintiff's 40 and

20   also plaintiff's 7.  I'm going to review them in light of

21   your comments.  I don't know if you know presently if you

22   have the same concerns about those two.

23             MR. ANSARI:  Your Honor, I would have the same

24   concerns at this time for any of the (indiscernible) of

25   William Roberts' testimony in this case.

22

1          THE COURT:  Okay.  I'm gong to review them for that

2     basis.  Okay.

3          And then with regard to Mr. Jackson's deposition,

4     he was deposed on August 15th.  This is plaintiff's exhibit

5     2, Mr. Jackson's deposition August 15, 2019.  What's the

6     basis to seal that?

7          MR. ANSARI:  I would -- to the extent that -- Your

8     Honor, with Mr. Jackson's testimony, to the extent that it

9     would reference any commercial or proprietary information, I

10    would request sealing.  However, (indiscernible) exhibit

11    (indiscernible), I don't see any of that to --

12         THE COURT:  Okay.  All right.  So No. 2 will be

13    unsealed.

14         And then regarding Mr. Singh -- and I'm going to

15    not be able to pronounce this name, Mr. Villemeur -- I'm not

16    sure how to say that -- I'm sorry, I took Spanish, not French

17    -- those are two -- plaintiff's No. 3 and No. 4, plaintiff's

18    3, plaintiff's 4, are depositions from the *Leviston* case in

19    2011?  What's the basis to seal those?

20         MR. ANSARI:  Again, to the extent that they

21    reference the inner workings of G-Unit, I would request that

22    they remain sealed.

23         THE COURT:  Okay.  So for those two depositions,

24    what I am going to ask you to do is to -- is to file, after

25    today's hearing, an explanation of -- I believe there are,

1    you know, line numbers through those.  Let me just make sure

2    those exhibits have those.  But I'd like you to really be

3    more surgical in your request to keep those under seal.  So

4    if there are -- you know, if it's the bottom of page 2, top

5    of page 3, that's fine, but there's a lot of other

6    information in there that's certainly not any type of

7    proprietary, commercial information.

8              MR. ANSARI:  Okay.

9              THE COURT:  So I'd like to ask -- all right.  So

10   that's regarding plaintiff's 3 and 4, I'm going to ask you in

11   a subsequent scheduling order to file a more -- you know,

12   what I would call a more surgical request, a more

13   (indiscernible) request, for what portions of those

14   deposition excerpts you are requesting to be sealed and I'd

15   like you to explain why.

16             And when you do, I would like you to be mindful

17   that my job is to make particularized findings demonstrating

18   that sealing is supported by clear and compelling reasons and

19   is narrowly tailored to serve those reasons.  I don't think

20   you've demonstrated that presently, so I want to give you the

21   opportunity to do that.  Okay?

22             MR. ANSARI:  Thank you.

23             THE COURT:  All right.  So moving on to plaintiff's

24   exhibit 9, the Farber deposition from October 2019, that's of

25   Evan Farber.  Anything to report?

24

1          MR. ANSARI:  I don't.

2          THE COURT:  Okay.  So that will be unsealed.

3          Same question on the Raymond deposition,

4     plaintiff's exhibit 10?

5          MR. ANSARI:  I don't oppose unsealing.

6          THE COURT:  Okay.  So Loopkin's deposition,

7     plaintiff's exhibit 17?

8          MR. ANSARI:  I don't oppose unsealing.

9          THE COURT:  Okay.  Plaintiff's 26, the Sedlmayer

10    deposition?

11         MR. ANSARI:  I don't oppose unsealing.

12         THE COURT:  Okay.  Plaintiff's 27, the Ciperic

13    deposition.  I think I said that right.

14         MR. ANSARI:  Ciperic, Your Honor?

15         THE COURT:  Ciperic, yeah, okay.

16         MR. ANSARI:  Likewise, I don't oppose unsealing.

17         THE COURT:  Okay.  Then there's Mr. Roberts'

18    deposition, plaintiff's 40.  I'm going to review that as

19    taking into consideration I think what you said.  And I

20    believe that is regarding language and comments regarding

21    yourself and others, including Mr. Jackson and Mr. Jackson's

22    family.

23         MR. ANSARI:  Correct.

24         THE COURT:  Okay.  Plaintiff's exhibit 41 is

25    excerpts of the Steven Burgess deposition?

1          MR. ANSARI:  Don't oppose, Your Honor, unsealing.

2          THE COURT:  Okay.  Plaintiff's 51, excerpts from

3     Bruce Green's deposition?

4          MR. ANSARI:  I don't oppose unsealing.

5          THE COURT:  Okay.  All right.  Good.  Thank you.

6     All right.

7          So now we come to -- those are all the deposition

8     questions.

9          The next one is documents from the public domain.

10     So here we have plaintiff's 6 and plaintiff's 8.  Plaintiff's

11     6?  Go ahead.

12          MR. ANSARI:  Your Honor, documents in the public

13     domain, I don't oppose.

14          THE COURT:  Okay.  I just want to make sure that

15     I'm interpreting it right, that that's what they are.  So

16     plaintiff's 6 is the transcription of a portion of a March

17     12, 2009 interview of Mr. Roberts on radio station WPGQ 95.5?

18          MR. ANSARI:  No objection.

19          THE COURT:  Okay.  And then plaintiff's 8 is an

20     online news article that was marked as exhibit 1 from Mr.

21     Roberts' deposition?

22          MR. ANSARI:  Correct, Your Honor.  I don't oppose

23     it.

24          THE COURT:  Okay.  All right.  Next I'm going to go

25     through a category of documents that don't seem to be subject

26

1    to sealing in my view, but I could be completely missing the

2    point, so I want to run through those.

3              Plaintiff's exhibit 5, which is Mr. Jackson's

4    declaration dated June 5, 2020 that's part of the response to

5    the motion for summary judgment?

6              MR. ANSARI:  I don't oppose unsealing.

7              THE COURT:  All right.  Thank you.  Plaintiff's

8    exhibit 12, the declaration of Ms. Gase -- I don't know how

9    to say her name either, I'm sorry -- June 3rd, 2020?

10              MR. ANSARI:  Stephanie Gase.  I don't --

11              THE COURT:  Gase?

12              MR. ANSARI:  Yeah.  I don't oppose unsealing.

13              THE COURT:  Okay.  Thank you.  And then Stephen --

14    I think it's Stephen Savva?

15              MR. ANSARI:  Correct, Your Honor.

16              THE COURT:  His declaration, also June 5?

17              MR. ANSARI:  Your Honor, to the extent that it

18    contains attorney/client privilege because he is a current

19    attorney for Mr. Jackson, along with Craig Weiner who also

20    submitted a declaration who is or at least was an attorney

21    for Mr. Jackson, if I would have the same opportunity just to

22    give you a feedback on those two, I would appreciate it in

23    the same brief as the other one.

24              THE COURT:  Yes.  That's no problem.  All right.

25    So that will be -- that will also apply to plaintiff's 16

27

1    then, the scheduling order that I'll enter about that.

2             MR. ANSARI:  Sure.  It's just I had the thought

3    now, both Mr. Jackson and Ms. Gase's declarations for the

4    same reason maybe referencing, I don't want to sit here going

5    line by line and wasting time, but if I could also just hold

6    in abeyance I guess that my prior --

7             THE COURT:  Sure.  So plaintiff's 5, 12 and 16, the

8    declarations of Jackson, Gase and Savva, and then plaintiff's

9    23, the declaration of Mr. Weiner, is that right?

10            MR. ANSARI:  Perfect.

11            THE COURT:  Okay.  Okay.  Let me just make a note

12   here.  Okay.

13            Plaintiff's 22 is Boulevard Management expense

14   summary.  It's filed in the chapter 11 -- well, it's

15   regarding chapter 11.  I'm not sure it was -- if it was filed

16   or not, but why should that be sealed?

17            MR. ANSARI:  Well, Your Honor, it's referencing

18   fees to attorneys for my client --

19            THE COURT:  But I approved all the fees, they're

20   all public.

21            MR. ANSARI:  So to the extent, Your Honor, that

22   these are already public record within the Bankruptcy Act,

23   then I would not -- I'm just looking at the document again as

24   to refresh my recollection whether this was pulled from the

25   docket or (indiscernible).

1          THE COURT:  Okay.  Why don't I wrap that into the

2     scheduling order for the response.  Okay?

3          MR. ANSARI:  Thank you.

4          THE COURT:  And that way you can take a look at it,

5     you know, when I'm not grilling you.  All right.

6          So the next is a little subcategory here which are

7     the expert reports.  So each of you had two expert reports.

8     The defendant has not -- the defendants have not sought to

9     seal them.  The plaintiff has.  What is the basis to seal

10    them?  So it's plaintiff's 25, 28, 29 and 30, and it's the

11    opinions, the expert reports of Mr. Green, Mr. Lufkin,

12    Ciperic and Mr. Gillers?

13         MR. ANSARI:  No objections to unsealing, Your

14    Honor.

15         THE COURT:  Okay.  All right.  Thank you.  All

16    right.

17         And then -- and now we come to my last category,

18    which I'm sure is going to relieve all of you that I'm almost

19    done with the categories here, and this is going to be a

20    category of documents that maybe there's a reason to see

21    them, but I'm not really sure what it might be.

22         So plaintiff's exhibit 31 is an email from Mr.

23    Raymond to Mr. Sedlmayer, Mr. Farber and Ms. Martin dated

24    January 24 of 2011?

25         MR. ANSARI:  No objection to the document.

1         THE COURT:  Okay.  Plaintiff's exhibit 32 is an

2    email from Mr. Raymond to Mr. Farber, Mr. Cranston and Ms.

3    Leviston from March of 2015?

4         MR. ANSARI:  No objection to unsealing.

5         THE COURT:  Thank you.  Plaintiff's exhibit 33 is a

6    draft subpoena?

7         MR. ANSARI:  No objection to unsealing.

8         THE COURT:  Okay.  Plaintiff's 34, the mock jury

9    report?

10         MR. ANSARI:  No objection to unsealing.

11         THE COURT:  Plaintiff's 35, an email from Evan

12    Farber to Elias Mansapolo and Alexander Omar dated January of

13    2015?

14         MR. ANSARI:  No objection to unsealing.

15         THE COURT:  Okay.  Plaintiff's 36, an email from

16    Ms. Leviston to Mr. Raymond January 2015?

17         MR. ANSARI:  No objection to unsealing.

18         THE COURT:  Okay.  And plaintiff's 37, draft

19    opening statement?

20         MR. ANSARI:  No objection to unsealing.

21         THE COURT:  Okay.  Plaintiff's 38, an email from

22    Mr. Farber to Mr. Cranston and Ms. Leviston from March of

23    2016?

24         MR. ANSARI:  No objection.

25         THE COURT:  Okay.  Plaintiff's 39, an email from

1    Mr. Lovelace to Mr. Farber in June of 2011?

2            MR. ANSARI:  No objection to unsealing.

3            THE COURT:  Okay.  Page 42 -- sorry, plaintiff's

4    42, a letter from Ming Interactive, Inc. in response to Mr.

5    Jackson's subpoena dated -- with the letter being dated

6    December 18 of 2019?

7            MR. ANSARI:  No objection to unsealing.

8            THE COURT:  Okay.  Plaintiff's 43, an email from

9    Nicky Martin to Peter Raymond and Evan Farber from January 12

10    of 2015?

11            MR. ANSARI:  No objection, Your Honor.

12            MR. BARATTA:  Okay.  Plaintiff's exhibit 44, an

13    email from Mr. Raymond to Mr. Sedlmayer, Ms. Martin, Mr. Neal

14    and Mr. Farber from January of 2011?

15            MR. ANSARI:  No objection, Your Honor.

16            THE COURT:  Okay.  Plaintiff's 45, a draft subpoena

17    prepared by the defendant?

18            MR. ANSARI:  No objection, Your Honor.

19            THE COURT:  Okay.  Plaintiff's 46, an investigative

20    memorandum dated September of 2011?

21            MR. ANSARI:  No objection, Your Honor.

22            THE COURT:  Okay.  Plaintiff's 47, an email from

23    Mr. Farber to Mr. Raymond from January of 2015?

24            MR. ANSARI:  No objection, Your Honor.

25            THE COURT:  Okay.  And plaintiff's 49, an email

1   from Mr. Weiner to Mr. Farber and Mr. Savva dated December of

2   2014?

3         MR. ANSARI:  No objection, Your Honor.

4         THE COURT:  Okay.  All right.  So all of those will

5   be unsealed.

6         So the ones that are not being automatically --

7   well, not unsealed as a result of this hearing -- are

8   plaintiff's 3 and 4, which are the Singh deposition and I'm

9   going to call it Mr. V's depo, okay, which is Villemeur depo,

10  plaintiff's 5, 12, 16, 23 and 22, those are the declarations

11  that were filed in June of 2020, signed in 2020 by Mr.

12  Jackson, Ms. Gase, Mr. Savva and Mr. Weiner, and then the

13  Boulevard Management chapter 11 expense summary, and then

14  let's see, and then also defendants' exhibit 57, which are

15  excerpts of the Roberts' deposition that I'm going to review

16  for the reasons that you stated.  All right.

17        I think those are -- just so that there's no

18  mystery, I think that those are valid reasons.  Okay.  All

19  right.  So that's where we are.  All right.

20        I want to move on to substance now.  So that's

21  about sealing and my obligation to make sure we have a public

22  record.  So I'm going to follow up with a scheduling order

23  regarding the additional things that I'm going to ask you to

24  do to try to more narrowly tailor the sealing requests, and

25  then I'm going to unseal the other documents that we've

32

1    discussed.  All right.

2          Now, I want to talk about sort of substance.  So I

3    think a big piece of the summary judgment request, Mr.

4    Rohback, is that your argument that here that the attorneys

5    had set a plan of action and had decided on a strategy, a

6    trial strategy, a pretrial strategy, and they used their

7    judgment to do that to come up with that strategy.

8          My question for you is why -- and your point is

9    that under the attorney judgment rule why doesn't that shield

10   them from a finding of negligence, and if there's no

11   negligence, then the other things that flow from that don't

12   need to be heard.

13         So if I -- my question to you is why shouldn't I

14   hear testimony to assess the credibility of the timing and

15   the reasons for the strategy choices that were made by the

16   defendant?

17         MR. ROHBACK:  Your Honor, a few reasons.  Number

18   one, an overarching issue under every theory for granting

19   summary judgment is the fact that plaintiff has failed to

20   come forward with evidence of what these three uncalled

21   witnesses would have said had they testified.  That is the

22   only issue that was left after your decision on the motion to

23   dismiss.  For them to come forward --

24         THE COURT:  Well -- okay.

25         MR. ROHBACK:  -- and show.  And that's what you

33

1    said, that the defendants committed malpractice by failing to

2    conduct and preserve discovery of Mr. Ross, Mr. Murray or the

3    unit provider which it conducted would have mitigated the

4    amount of damages award and that's the issue.  They needed to

5    come forward with that and they have not.

6         They have not -- they have not taken the deposition

7    of Mr. Murray.  They have not submitted an affidavit from Mr.

8    Murray.  They have not submitted an affidavit from Ming.  And

9    as far as Mr. Ross, it was one year ago today that they got

10   an affidavit from him which refutes everything in their

11   allegations about what he would have said.  So whatever --

12        THE COURT:  But I guess -- don't I have to decide

13   that the strategy choices that were made by the lawyers were

14   reasonable?

15        MR. ROHBACK:  Your Honor, there's --

16        THE COURT:  And you're saying that subsequent

17   events have shown them to be reasonable because there's no

18   evidence that Mr. Ross would have been supported?

19        MR. ROHBACK:  No.  No.  It's not that they were

20   right.  It's not simply they were right by subsequence

21   proving that.

22        It's number one, the plaintiff cannot prove and has

23   failed to prove, come forward with proof, that the testimony

24   that they said would have been offered by these three

25   individuals would have reduced the amount of their damages.

1    They can't prove that because they don't have what that

2    testimony would have been.

3          THE COURT:  Okay.  So let's just run through that.

4    So the three witnesses are Mr. Roberts, also known as Mr.

5    Ross, as well as the Ming internet provider, and Mr. Murray.

6    So there's no -- there's nothing in the record before me on

7    summary judgment that shows what Mr. Murray would have said?

8          MR. ROHBACK:  Correct.

9          THE COURT:  And there's nothing before me that

10   shows what the internet provider would have said other than

11   that there's information that the -- that whatever evidence

12   existed no longer existed at least in December of 2019?

13         MR. ROHBACK:  Yes.

14         THE COURT:  Okay.  And so do I not need to

15   determine reasonableness?

16         MR. ROHBACK:  You absolutely do not.  Because in

17   this case, given these facts now that they have not come

18   forward with -- the attorney judgment rule really focuses on

19   a decision made at a point in time and was it one of several

20   reasonable alternatives.

21         And basically it says you don't need to do a full

22   examination of the lawyer and his judgment or her judgment if

23   there's a reasonable basis for following one strategy as

24   opposed to another one.

25         Now that we have the facts in summary judgment,

35

1    discovery is over, we know that the plaintiff has no

2    testimony from Murray that would help to mitigate damages.

3    There's nothing there.  So they haven't provided evidence to

4    support the allegations in the complaint.

5         Same with Ming.  They haven't come forward with

6    evidence to support the allegations in their complaint.

7         And in the case of Ross, they took the deposition

8    and got the affidavit and that information tells us that she

9    would have destroyed them had he been called as a witness or

10   at deposition or at trial.  So they had no case to go

11   forward.

12        And the attorney judgment rule really is a way of

13   preventing every decision that a lawyer makes, a strategic

14   decision, from being subject to that type of analysis.  Well,

15   was it the right decision and did you really think this.  We

16   don't need to go into that.  If they had reasonable basis for

17   doing something, that's enough.  But that attorney judgment

18   rule is only one defense we have or one argument we have.

19        Really the biggest thing in this case is complete

20   failure to come forward and have proof to support those

21   allegations about what these three uncalled witnesses would

22   have said to help mitigate damages.  They can't prove that

23   that lack of testimony had an impact because they don't know

24   what that testimony would have been.  Except for Mr. Ross, it

25   would have been devastating.

1          THE COURT:  But I think --

2          Mr. Ansari, let me ask you.  I don't know if I

3    adopt the word devastating, but I do agree that Mr. Ross'

4    testimony seems unhelpful to Mr. Jackson's purported strategy

5    of showing that, you know, you shouldn't blame me.  You

6    should blame this other guy because he put this video on his

7    website first.  But that somehow I should not be found to

8    have caused the damages significantly or, you know, the

9    damages should be mitigated.

10          Do you agree with that general proposition that Mr.

11   Ross' testimony is unhelpful to Mr. Jackson?

12          MR. ANSARI:  Your Honor, I respectfully disagree

13   with that.  In fact, I think Rick Ross would be a phenomenal

14   witness for Curtis Jackson.  Any trial attorney can tell you

15   that is someone (indiscernible) and testifies adversely,

16   falsely in regards to claims and defenses by your client, you

17   can use that very easily to support your client's case.

18          In this case, there was ample public domain records

19   --

20          THE COURT:  So in this record, based on this record

21   -- let's look in the record before me on summary judgment as

22   opposed to what any trial attorney might tell me.  Okay.

23   Because that's not in the record frankly.

24          So in the record what I have is Mr. Ross -- I agree

25   that he offers (indiscernible) testimony about certain things

1    and I -- both from my understanding of the effort to get the

2    deposition to actually occur as well as teeing some of the

3    testimony in the exhibits that have been filed, I agree that

4    he was a difficult witness and that he gave inconsistent

5    testimony.  But isn't his testimony essentially denying --

6    he's denying that he had any involvement with the video and

7    that he posted the video to a website that he owned?

8          So I understand that you would -- at trial if you

9    had been the attorney you would have asked the jury to make

10   an inference about that, but -- and wasn't the premise of the

11   complaint that Mr. Ross would have demonstrated that he

12   posted it to a website that he controlled and that that

13   posting was prior in time to Mr. Jackson's posting of either

14   the video or links to the video on his website?  Wasn't that

15   the premise?

16         MR. ANSARI:  Well, Your Honor, that testimony would

17   have been elicited by (indiscernible).  But she was not going

18   to admit (indiscernible) by confronting this witness with the

19   various statements that he made, his voice, in the public

20   domain where he admits to ownership of thisissabrinassin

21   where he states he posted the video first (indiscernible).

22         And, Your Honor, also coupled with the forensic

23   data which is now unfortunately not available, but was

24   available to Reed Smith and Peter Raymond at the time of

25   their defense of this case from Ming, would have shown that

38

1      this was a website which was maintained by Rick Ross.  But

2      there's -- it is incredible to be confronted with one's own

3      voice claiming that they were posted (indiscernible) to their

4      website, thisissabrinassin.com, and then to come and testify

5      differently.  And that is supportive of the claim.

6              Even though he is not coming out and admitting to

7      it, we all know that a witness, particularly one who may be

8      with an axe to grind, may not testify (indiscernible).

9      However, when you have other evidence to cross-examine this

10     individual with to show with forensic evidence as to the

11     website with their own statement, that was evidence that

12     could have been used at trial to mitigate the damages.

13             However, we have to see -- and malpractice law in

14     New York supports this -- that any reasonable decision or

15     purported reasonable decision under the attorney judgment

16     rule or strategy cannot be said to be reasonable because it

17     was not informed.  There was no discovery taken as to Rick

18     Ross, to Maurice Murray or to Ming.  It was completely

19     abandoned.

20             And, Judge, you have the record before you, you

21     have our briefs and the exhibits, you see an email where they

22     are acknowledging the importance of Rick Ross.  The email

23     (indiscernible) trial where they're saying a deposition of

24     Rick Ross would solve all the problems.  Their strategy

25     failed.  But the problem is is that they foreclosed the

1    ability to take discovery of these individuals because they

2    did not do so.

3           Of course there's the argument also in the record,

4    Your Honor, that I believe that we argue on behalf of Curtis

5    Jackson that one of the reasons why there was this gross

6    conflict of interest with Theo Sedlmayer.  He's representing

7    Rick Ross.  They attempt at one point to ask if he'd accept

8    service.  He said, no.

9           The testimony of Evan Farber who was no longer a

10   Reed Smith employee, he very uncomfortably -- because I think

11   he knew what he was going to -- testified as to those

12   circumstances, that there was a -- that Peter Raymond, that

13   there would be an issue for Theo Sedlmayer

14   in terms of getting a subpoena to Rick Ross.  That was a

15   conversation between Theo Sedlmayer and Peter Raymond that

16   went nowhere.

17          If the adjustment -- if the attorney just was lousy

18   on sufficient investigation, discovery, and thought and not

19   tainted, then perhaps it would be a valid argument.  However,

20   the record here -- and the testimony and the (indiscernible)

21   discovery that we elicited during the course of this

22   investigation does not support that.

23          New York law recognizes that the failure of an

24   attorney to seek discovery (indiscernible) negligence to

25   support a legal malpractice claim.  The fact that they failed

40

1    objectively to pursue any of these avenues, while at the same

2    time corresponding amongst themselves and to the client that

3    this is the best defense we have that if we prove that Rick

4    Ross posted this video then that would take the sting out of

5    Leviston's claim.  But they didn't do that.  And we have a

6    big question mark.

7         And also conflicting testimony between Theo

8    Sedlmayer and Peter Raymond as to what happened, what

9    happened with that conversation about Rick Ross?  What

10   happened with that conversation --

11        THE COURT:  Okay.  So I think we're going -- I

12   think we're going a little farther than my question was

13   directed, but I think you've answered it.

14        Mr. Rohback, do you want to -- anything else you

15   want to tell me about my earlier question if you recall where

16   we were at that point?

17        MR. ROHBACK:  Some of the points just now that

18   counsel made.  We're looking at the internet postings, one of

19   them had a legend above it that said this is complete rumor

20   and things we hear on the street is classic hearsay.  That's

21   not something that's going to mean anything.

22        The other one is, to be clear, the reference that

23   Mr. Ansari just made was not to Sabrina Singh.  Rick Ross had

24   an interview with Big Tigger who then told him about this

25   tape, which he apparently didn't know about, he said, wow.

1    And then he -- I'm going to post it.  And he said go to

2    deeperthanrap.  And he said the reason to tell people that is

3    because that was an album he was coming out with and he

4    wanted to generate fan interest.  It had nothing -- he didn't

5    post it to deeperthanrap.  And there's no evidence in this

6    record that he did post it.  There is evidence that he did

7    not.  He testified to that effect.

8          And also, he answered before this complaint was

9    filed, before the *Leviston* case went to trial, Jackson sued

10   Ross for contribution.  And in that answer to the complaint,

11   Ross denied that he posted it or owned Sabrinas Sin.  So we

12   have record statements, under oath statements, that he did

13   not post it.  He did not own that.

14         And all we have on the other side are these semi-

15   comprehensible internet ramblings, some of which can't even

16   be attributed to Ross where he just says things.

17         And I would note that one of the cases we cite was

18   *Leviston against Jackson*.  And in *Leviston against Jackson*,

19   in ruling on the summary judgment motion, Judge Wooten said

20   (indiscernible) to a (indiscernible).

21         And you will recall, Your Honor, that the defense

22   to the New York civil rights law claim was that it was not

23   for commercial purposes.  Well, Judge Wooten states, quote,

24   "On the tape Jackson states that he paid for the videotape

25   which he reasserted in a radio interview with Tim Westwood

42

1    that he paid a few dollars." However, at his deposition, he

2    denied paying for it.

3           And there's an example of in this area of hip-hop

4    entertainment, they'll say a lot of things on an internet

5    show. And there's Jackson doing it. But he denied it in his

6    deposition.

7           Even in his bankruptcy proceeding we were aware of

8    internet postings about him having a crib in Africa, which he

9    denied under oath, him having -- floating around in cash,

10    which he said, well, that was just a show. So the strength

11    of this internet, you know, something was up there, that's

12    not enough to come forward with now and say no one would

13    believe him.

14           MR. ANSARI: Your Honor, may I (indiscernible)?

15    (Indiscernible) and perhaps a lack of understanding

16    (indiscernible) Mr. Rohback as to the internet and

17    (indiscernible), and also the statements that --

18           THE COURT: But isn't there -- is it fair to say

19    that -- and this is something that did come up in the

20    bankruptcy context, in the context of the named case -- but

21    there is a difference between what one says in a court

22    proceeding when you're under oath and what one says when

23    you're not under oath for public consumption through social

24    media or on the internet? That's fair to say, right?

25           MR. ANSARI: Well, Your Honor, you don't have to

43

1    make that determination.  It's a prior --

2              THE COURT:  So here what we have -- what we have is

3    -- and so what would you -- so let's talk about that a little

4    bit.  What would you do at trial to show that there's some

5    material fact in issue?  You would call Mr. Ross as a

6    witness, is that what you're proposing?

7              MR. ANSARI:  Your Honor, I would call Mr. Ross.

8    I'd call Mr. Roberts.  I would confront him with the

9    statements.  And although Mr. Rohback surprisingly says that

10   they weren't his, the trier of fact is able to hear his

11   voice, (indiscernible) postings --

12             THE COURT:  So let's back up for a second.  So if

13   Mr. Ross comes -- if Mr. Roberts comes and testifies at trial

14   and is consistent with his deposition testimony, let me ask

15   you, does it matter if he is consistent with his deposition

16   testimony, or if he's not, does it matter?

17             Does it matter if Mr. Roberts -- to your case, are

18   you creating a material issue of fact by demonstrating that

19   Mr. Roberts, in fact, owns the website or posted the video

20   first when the issue before the Leviston jury was whether Mr.

21   -- not who was first, but whether Mr. Jackson -- and the jury

22   instruction was pretty clear, right, that Mr. Jackson -- the

23   question for the jury was did Mr. Jackson post the image and

24   voice of Ms. Leviston without written consent, not whether he

25   was first, last of 100th?

44

1          MR. ANSARI:  Your Honor --

2          THE COURT:  So why would I need -- why is it

3     material to hear what Mr. Ross would say?

4          MR. ANSARI:  The fact that we have evidence and

5     it's evidence that the jury should have heard but for the

6     fact that they were excluded because of the stipulation and

7     all these lack of preservation of discovery from Rick Ross

8     that would have deflected, deflected the blame on Curtis

9     Jackson.

10         I think all they would have to see is the way he

11    testified in the deposition (indiscernible) versus the way my

12    client testified during his deposition.  They are night and

13    day.  You cannot run away before the eyes of a jury or the

14    trier of fact when confronted with evidence that directly

15    conflicts from what you say.

16         But when you put that into context (indiscernible)

17    before the Court, this was evidence that was so strong in

18    favor of our client's case to mitigate damages to bring in

19    Rick Ross (indiscernible), whether or on the witness stand or

20    a third party, they were not able to do so.  They did not do

21    so because of -- because of the actions or inactions of Reed

22    Smith.

23         And it's before Your Honor.  I don't need to go

24    through each point, but the emails do.  (Indiscernible)

25    recognition of the importance of his testimony.

45

1            The mysterious abandoning of (indiscernible) is

2       representing both Jackson and Ross and Peter Raymond

3       (indiscernible) to this day.  And then they abandon

4       (indiscernible) discovery there.  And then going to trial

5       years later, there's suddenly an aha moment when they're --

6       and they say, wow, we needed this.  But they couldn't do it

7       because of the stipulation.  They knew they entered into that

8       stipulation.  They even say it before (indiscernible).

9            Anyone who knows New York practice knows that those

10      (indiscernible) discovery can be very, very hard to try to do

11      discovery at that point (indiscernible).

12           THE COURT:  And what evidence is in the record

13      before me about the ascertainable nature of the mitigation

14      that Mr. Jackson claims would have occurred?

15           MR. ANSARI:  Sure.  And before I answer that, Your

16      Honor, you talked about the jury instructions regarding the

17      liability on 5051.  The jury instructions, you know, was

18      (indiscernible) a unified trial, a New York County

19      (indiscernible) unified trial, versus a Brooklyn bifurcated,

20      they were instructed that it is not disputed defendant owns

21      or controls (indiscernible).

22           And there is testimony regarding a (indiscernible)

23      website thisissabrinassin.com.  The defendant asserts that he

24      does not own or control thisissabrinassin.com, the crux of

25      the defense.  But the plaintiff asserts that he does.  They

46

1    were affirmatively (indiscernible) that website.

2            You may consider any evidence (indiscernible)

3    website that you have found to have been established by

4    either direct or circumstantial evidence is owned or

5    controlled by (indiscernible).

6            However, the plaintiff's claim of a New York civil

7    rights law in (indiscernible), you are to disregard any

8    evidence regarding the publication of the videotape on any

9    website that you find had been established is owned or

10   controlled by defendant.

11           This was an argument put forth from the inception,

12   from when Peter Raymond, at that point Theo Sedlmayer, saying

13   if he can prove that Rick Ross posted it first on

14   thisissabrinassin (indiscernible), that would take a great

15   deal of sting out of the defendants' case.  This was

16   recognized.  It was not followed.

17           And as New York law mandates, the failure to

18   investigate and pursue discovery in New York can give rise to

19   a cognizable claim of malpractice.  We see that that this was

20   the proof of the poisonous tree.

21           The proof is the verdict against -- and I'm using a

22   criminal law analogy here -- because at the inception, the

23   actions or inactions of the (indiscernible) which was the

24   poison percolated up to the branches to a point at trial

25   basically blackjacked and stonewalled the defense by

1   successor counsel which they try to now point the blame at,

2   and that was the poisonous tree.  The proof was the verdict.

3   But --

4            THE COURT:  What is it the -- what is the measure

5   by which I would determine that if you had established of if

6   plaintiff's counsel at trial had established, had called Mr.

7   Ross and he testified the way that he testified in his

8   deposition, and the lawyer made the argument you suggest

9   that, gee, you can't believe this guy, obviously everything

10  he said is a lie, and he owns the website and he posted it

11  first, how am I supposed to determine what the jury would

12  have done with that and how much it would have mitigated the

13  damage to Mr. Jackson?

14           MR. ANSARI:  Sure.

15           THE COURT:  So where in the record is the support

16  for any determination of mitigation?

17           MR. ANSARI:  So first we could take it in -- as for

18  the punitive damages, having -- let me backtrack.  Can I just

19  respond (indiscernible) on the reasonable standard.

20           I'm sorry, Your Honor, before I forget, there

21  really is no argument as to Ming, whether Ming would have

22  been hostile or not.  Ming is a total web-hosting service

23  which now we know had information regarding that website,

24  thisissabrinassin.com, at least at the time when we

25  (indiscernible).

48

1          They have known that -- Peter Raymond's excuse for

2     not sending a subpoena to these -- to the actual website was

3     that a lot of times you don't get a response.

4          I submit that's not a reasonable excuse for not

5     doing that if you're trying to establish that this was posted

6     on a different website and the emails support that they

7     recognize thisissabrinassin.com.

8          THE COURT:  Where in the record -- where in the

9     record does it show that Ming had information that would have

10    been helpful to Mr. Jackson prior to 2012?

11         MR. ANSARI:  Yes.  Well, Your Honor --

12         THE COURT:  Isn't the information in the record

13    right now that Ming said in 2019 we destroyed it all?

14         MR. ANSARI:  They destroyed it.

15         THE COURT:  Whatever it was.  Whatever it was.  So

16    no one knows what it was.

17         MR. ANSARI:  Your Honor, that's their retention

18    policy.  Because my client should not be prejudiced in this

19    case when we're alleging that they did not take the

20    appropriate or reasonable steps to pursue certain evidence to

21    present during the litigation and at trial simply because

22    they didn't do that.  So we're --

23         THE COURT:  So should you prevail simply because

24    the records are gone?

25         MR. ANSARI:  We have a totality of circumstances

1    here, Your Honor.  The trier of fact can hear from -- on a

2    number of issues.  The records are gone, but we don't

3    necessarily lose out on the argument that they should have

4    preserved that material.  And if we --

5         THE COURT:  Okay.  So if they had preserved it or

6    if you have it some way, some other -- I don't know how --

7    but if you had -- if you have information from Ming that

8    showed that Mr. Ross owns the website that he denies owning

9    and that he posted the video that he denies posting, then how

10   am I to ascertain the measure by which the jury would have

11   found, you know, Mr. Jackson less liable?  How do I -- how do

12   I quantify that?

13        MR. ANSARI:  Well, Your Honor, you can quantify it

14   in the sense that A, punitive damages may have not been

15   awarded.  And the case law in my brief, Your Honor, shows

16   that when you take a base -- this is common malpractice

17   (indiscernible) -- the Court has to make that inquiry as well

18   (indiscernible).

19        And we also have to take (indiscernible) which

20   directly -- I would (indiscernible) report.  I would provide

21   you a copy of (indiscernible) because it controls his

22   statement on so many levels and so many arguments.

23        But as to damages, (indiscernible) -- answering the

24   question, Your Honor, just before I go astray -- the damages

25   in terms of the (indiscernible) nature of the verdict, the

1   punitive damages would not have been or may have not been

2   awarded.  More so, he would not have been (indiscernible)

3   bankruptcy.  He would not have had to settle.  He would not

4   have had to incur the costs that he is incurring today.  He

5   wouldn't have had to incur the costs that he expended in

6   bankruptcy.  And the case law supports that (indiscernible)

7   based on a jury verdict (indiscernible) you don't have to do

8   that.

9          THE COURT:  Let me ask you a different question.

10  Go ahead.  I'm sorry.  Go ahead.

11         MR. ANSARI:  (Indiscernible) quantified

12  (indiscernible) at the summary judgment stage the plaintiff

13  has alleged (indiscernible).  (Indiscernible) holds defendant

14  next argues that it is speculative, that the (indiscernible),

15  whether the jury would have awarded plaintiff (indiscernible)

16  damages.  These arguments are for the jury.  (Indiscernible.)

17  Once again, however, defendant appears (indiscernible) the

18  inquiry at trial to the summary judgment standard.

19         The plaintiff is not required to give any

20  particular amount of damages at this stage of the case.  He

21  is merely required to produce a showing of how real damages

22  resulting from malpractice could be ascertained.  The

23  possibility of plaintiff's accounts are null and void and

24  (indiscernible) is an issue for trial.

25         So at this stage, because we are at the summary

51

1    judgment stage, Your Honor, the inquiry is not there.  But I

2    am going to say that we do have (indiscernible) because the

3    case law -- and I'm not going to -- there is case law in my

4    brief, Your Honor, that would show that mitigation is

5    (indiscernible) if occurred in an attempt to avoid, minimize

6    or reduce the damage done by (indiscernible) unlawful conduct

7    (indiscernible) malpractice case.  That is (indiscernible).

8    Also (indiscernible) that's in my brief, Your Honor.  And

9    (indiscernible) which I'm happy to provide by email or

10   whatever you prefer.

11        Those support that at this stage we have made the

12   showing.  We have made a showing that the punitive damages

13   may have not been awarded, the amount of damages that were

14   awarded may have been lower.  And how do we do that?  Well,

15   we (indiscernible).

16        At the early stages of this case, it was recognized

17   what would be the strongest defense.  It was recognized by

18   the jury consultant that they hired prior to trial what would

19   be the strongest defense.  Mock jurors pointed to Rick Ross.

20   Murray -- that fact that (indiscernible) posted on another

21   site.  They didn't do anything to preserve that discovery.

22   They foreclosed my client from doing so.  When Professor

23   Thompson came in, they did everything they could to reopen

24   it.  And again, if you argue in the New York Supreme Court,

25   you should know the culture.

52

1        (Indiscernible) what they did.  I mean, I don't

2    want to impose my own view on things to the expense of

3    opining, but they did what they could.  So the rules didn't

4    let them.  And they (indiscernible) because of some of the

5    sins of the predecessor.

6        My client, Your Honor --

7        THE COURT:  That page 7 I think is important in

8    that regard.  I'm not sure that the record shows what you

9    think it shows and I'd like to see that page 7.

10       With regard to the main information, why was the --

11   did you subpoena Ming prior to 2019?  (Indiscernible) was

12   commenced in -- first of all, I have the (indiscernible)

13   decision, 2006 decision (indiscernible).

14       MR. ANSARI:  Correct, Your Honor.

15       THE COURT:  Okay.  I have that decision.

16       The adversary was commenced in 2017.  Why didn't

17   you subpoena Ming at that time?  Would that have made a

18   difference?

19       MR. ANSARI:  I'm sorry, Your Honor.  I have to look

20   at the dates.  It would not have made a difference if it was

21   already destroyed.

22       THE COURT:  Okay.  So it was already gone.  Okay.

23   So you waited two years before you subpoenaed them.  Okay.

24   Just checking.  Okay.

25       MR. ANSARI:  Your Honor, may I speak to that?

53

1          THE COURT:  Sure.

2          MR. ANSARI:  We chased Ming because Ming I do not

3    believe is operating in the same manner that he did back in

4    2012.  I think they are still a legal entity, but it's not an

5    active for -- I'm sorry, 2010, when the video was posted

6    (indiscernible).

7          It's not to say an active website in the manner say

8    of, you know, Facebook and all that.  I think it had its

9    moments of time and then it's not necessarily active.  So

10   when I did speak to representatives there, he was sort of

11   surprised that (indiscernible) Ming (indiscernible)

12   maintaining Ming to this date.

13         THE COURT:  Okay.  So to support the argument that

14   having the testimony of either someone from Ming, Mr. Murray

15   or Mr. Ross would be -- would have mitigated damages, what

16   would you do at trial that you haven't already done at the

17   summary judgment stage?

18         So you said you would call Mr. Ross.  You've

19   already deposed Mr. Ross.  And that's in the record to a

20   degree, not the full transcript, but excerpts of that

21   deposition transcript.  What would you do at trial that you

22   haven't been able to do at summary judgment?

23         MR. ANSARI:  Your Honor, this is a case which

24   largely -- it's a case that rests on credibility in many ways

25   from Peter Raymond to Theo Sedlmayer.  In fact, we started --

54

1          THE COURT:  Okay.  One of the issues, the way that

2     the plaintiff, sorry, defendant framed this is that Mr.

3     Raymond and Reed Smith made a judgment about how to proceed

4     with the trial strategy, right?

5          And there's no information in the record that shows

6     that that trial strategy was not, in fact, what it was.

7     There's no, you know, sub-rosa trial strategy.  There's no

8     other trial strategy that's there.

9          So that's -- how is that disputed in the record or

10    how is there material facts that's in dispute about that?

11    You're saying -- you're bringing in a different issue which

12    is the alleged conflict of interest.

13          MR. ANSARI:  Sure.  Well, Your Honor, I mean,

14    defendants' trial strategy would have been to call Ross and

15    maintain the preservation -- preserving his testimony for --

16    and the discovery for trial along with the witness

17    (indiscernible) that he testified falsely using --

18          THE COURT:  So you think the strategy was wrong?

19          MR. ANSARI:  The strategy wasn't thought through.

20    The strategy wasn't valuable in form.

21          THE COURT:  Where is that in the record?  Where

22    does that show -- can you point me to in the record where

23    that is shown?  Because there is information in the record

24    that Mr. Raymond articulated exactly why he didn't -- just

25    taking them one by one -- why he didn't depose Mr. Ross.  And

1    it was that he was -- I mean, just to paraphrase, he was

2    essentially afraid that Mr. Ross would testify exactly as he

3    did which would undermine the -- potentially.

4            Now, maybe he's wrong, but he gave a reason which

5    was that Mr. Ross didn't seem friendly to Mr. Jackson and

6    would testify in a way that would not support Mr. Jackson's

7    version of the story, which is that, you know, that Mr.

8    Jackson did not post it first.  Of course none of that goes

9    to the real issue which is whether there was written

10   permission.

11           MR. ANSARI:  Yeah.

12           THE COURT:  It's just about deflecting, right?

13   It's not about -- I think it's fair that it's not about

14   whether this was going to be a zero-dollar loss, right, but

15   Mr. Jackson was going to 100 percent defend?  It was about

16   whether he was going to deflect and have lower damages.  Is

17   that accurate?

18           MR. ANSARI:  Well, Your Honor, that's the issue

19   currently before the Court at this motion to dismiss

20   (indiscernible).  And I still believe to this day --

21           THE COURT:  Are you maintaining -- let me ask you a

22   different question, Mr. Ansari.  Are you maintaining that

23   there is some universe in which Mr. Jackson was going to walk

24   away from a jury trial in this case and not have liability?

25           MR. ANSARI:  Not necessarily.  Your Honor, to some

56

1    extent, the testimony and the evidence that came out through

2    Rick Ross, I don't (indiscernible) may have absolved him of

3    some liability --

4            THE COURT:  I don't think that's probably likely.

5            MR. ANSARI:  Well, I'm sure that would be a subject

6    to appeal if that happen (indiscernible).

7            To get back to the question about the record, Your

8    Honor, well, there is testimony and an expert report which is

9    part of the record which opines that this was not a

10   reasonable strategy.

11           THE COURT:  Okay.  Let's talk about that.  So where

12   is that in the record?

13           MR. ANSARI:  That is the expert report of Mr.

14   Lufkin.

15           THE COURT:  Mm-hmm.  Okay.  And what exactly does

16   Mr. Lufkin say on that point?

17           MR. ANSARI:  Mr. Lufkin opined that (indiscernible)

18   failing to cure even make any attempt to procure discovery

19   from witnesses and/or entities, that once (indiscernible) the

20   defense of Mr. Jackson fell below the standard of care and

21   was not reasonable.

22           THE COURT:  Let's just talk about that.  Let's just

23   talk about that.  One of the things that he bases his opinion

24   on is that Ross and Ming have evidence to determine when the

25   video was first posted and who was responsible for Sabrinas

1    Sin.  That's one of the premises of his expert opinion,

2    right?  That's part of what it's based on?

3                MR. ANSARI:  That the defense had knowledge as to?

4                THE COURT:  No.  That his view that the failure to

5    pursue discovery of Ross and Ming was based on certain

6    assumptions that he was provided by plaintiff's team, right?

7                One of those assumptions was that Ross and Ming had

8    evidence to determine when the video was posted first and who

9    was responsible for Sabrinas Sin.  His view is that Ross

10   could have helped mitigate the jury's blame of Jackson.

11               I mean, tell me what in his opinion you're relying

12   on I guess.  I need to understand that.

13               MR. ANSARI:  Your Honor, I mean, his opinion

14   started off (indiscernible) and also by the ample amount of

15   evidence they concede in emails between themselves that it

16   was posted.  Evan Farber references the video in which Rick

17   Ross admits to ownership of Sabrinas Sin.  It's part of our

18   exhibits.

19               He references (indiscernible) Rick Ross.  He

20   questions why Peter Raymond is holding up taking discovery of

21   Rick Ross between him and another associate.  It's in the

22   record that we (indiscernible) discover an email, the

23   testimony of Evan Farber and of Peter Raymond whose

24   explanation is (indiscernible) he knows the answer to this.

25   He keeps going back to the (indiscernible) about these emails

1    that are contemporaneous with the decisions being made,

2    decisions that were made without reasonable forethought which

3    cost them the malpractice.  He (indiscernible).

4          They knew that this evidence was out there.  They

5    knew that this evidence would help Curtis Jackson.  They

6    didn't pursue it.

7          They signed a stipulation which foreclosed the

8    calling of witnesses after the close of discovery.  They did

9    not challenge the (indiscernible) issue.  They did not move

10   to vacate the certificate of (indiscernible).  They did

11   nothing.

12         And then after eve of trial there's the lightbulb

13   moment when they're confronted with certain arguments of

14   plaintiff and they cannot do anything because they have

15   foreclosed that ability.

16         And the Court and the trier of fact cannot ignore

17   that there's evidence in this record which paints a picture

18   that a reasonable jury, a reasonable trier of fact can find

19   that the conduct fell below the acceptable standard of care.

20         Defendants' own expert, Judge (indiscernible), who

21   was a New York attorney, has a great reputation of a former

22   court of appeals judge, we all know her, conceded that if the

23   rationale behind not pursuing discovery was not to create an

24   issue with Theo -- and that is what -- that's not my words,

25   that's (indiscernible) -- that's the words of Evan Farber

1    talking about discussions with Peter Raymond -- if that was

2    the reason, that would not be a valid reason.

3         These are questions that should go before the trier

4    of fact, evidence to go before the trier of fact, and if

5    they, meaning the trier of fact, find that this was not

6    malpractice then that is (indiscernible).

7         But the expressions of fact supported by probative

8    evidence that Reed (indiscernible) need to go to a jury

9    and/or trier of fact, whether it be a judge or otherwise.

10        THE COURT:  Okay.  Thank you.

11        MR. ROHBACK:  Your Honor, may I respond to some of

12   that?

13        THE COURT:  Yes.  I just wanted to just review my

14   own notes for myself if you just give me one moment.

15        Okay.  Go ahead.  Thank you.

16        MR. ROHBACK:  We start again that's the operative

17   complaint in this case, and at this point the allegation

18   where the defendants committed malpractice by failing to

19   conduct and preserve discovery of Mr. Ross, which it

20   conducted, his testimony would have mitigated the amount of

21   damages awarded.  They can't prove that.

22        What they're arguing now is, well, if we called

23   Ross, he would have said everything that hurt us.  His

24   testimony would hurt us.  But through burning cross-

25   examination the jury wouldn't have believed him, that's

60

1    argument of counsel.  That isn't evidence to support the

2    allegation in the complaint.

3            And this complaint wouldn't have gotten so far if

4    they said we don't have anything to back this up except some

5    internet postings here and there.

6            The next question would have been, okay, get the

7    testimony, see if it supports it or not.  And if it does, you

8    have nothing to bring to the jury.  So there is no case

9    there.

10           Don't forget the question is -- I think Your Honor

11   pointed this out -- Judge Wooten charged the jury you can

12   only -- you can only put damages on Jackson for those sites

13   that have been proved to be owned by Jackson.  And if there

14   was a question about Sabrinas Sin, who owned it, you can't

15   put any damages on him for that.  It was clear from the

16   judge's instruction.

17           And Raymond and Reed Smith had Christopher Singh

18   and this guy, Corentin Villemeur, who were prepared to

19   testify that Jackson did not own thisissabrinassin.  That's

20   easy for them to testify.

21           At trial, Bickel never called Singh.  Bickel never

22   called Jackson.  Bickel put Villemeur on the stand.  And if

23   you look at the transcript, they ask some basic questions

24   about what do you do and then they adjourn for the day.  The

25   next day they come back and the judge says, all right, Mr.

61

1    Villemeur is on the stand and they say, no, we're through

2    with him.  Counsel for Leviston said, in that case, we have

3    no cross.  And then the judge said, your next witness,

4    please.  It's not Singh.  It's not Jackson.  They said, we

5    rest.

6         How are these people ever going to show that the

7    lack of testimony from Ross that hurts them had an impact

8    that would have helped them, where the a case that went to

9    trial has no Jackson testifying, not even in court.  They

10   don't have Singh testifying.  They don't get anything, even

11   the simplest thing from Villemeur like Jackson doesn't own

12   thisissabrinassin.  That was a problem that they had at

13   trial.

14        And how you can think of a way to quantify an

15   ascertainable damage that's related to that testimony, you

16   can't do it.  And absolutely you can't do it for Ross or Ming

17   because they don't have any testimony.  This is the time they

18   should have gone forward and gotten that testimony if it was

19   going to help them.

20        The conclusion you can make is either --

21        THE COURT:  You mean for Murray or Ming, right?

22        MR. ROHBACK:  For Murray or Ming, yeah.  For

23   Murray, Ming, they haven't gone any place.  They never did

24   that which they said Reed Smith should have done.  They

25   didn't interview Murray.  They didn't take his deposition.

62

1          And just confirming the wisdom of Peter Raymond,

2     when they did take Ross' deposition, they got an affidavit

3     from him that said, I didn't own it, I didn't post it.  And

4     his deposition said the same thing.

5          So that kind of goes out the window this basic

6     failure of their proof.

7          And the different case that Bickel put on, to get a

8     missing witness instruction, that's pretty powerful stuff.

9     To tell the jury Mr. Jackson didn't show up for trial and he

10    didn't testify, you can take the strongest possible inference

11    that if he had testified that it would have hurt his case.

12    That wasn't Reed Smith's game plan.  That was Bickel and that

13    broke the chain of causation.

14         And then if you look at them settling the cases, in

15    settling the *Leviston* case -- and they settled the *Leviston*

16    case before the punitive damage phase -- and they settled the

17    case, they wiped out their post-trial appeal that could have

18    had the damages easily --

19         THE COURT:  No.  No.  I don't think they -- I just

20    want to go back.  They didn't settle the *Leviston* case before

21    punitive damages happened.

22         MR. ROHBACK:  I'm sorry.

23         THE COURT:  The filed bankruptcy -- yes.  He filed

24    bankruptcy in between the jury verdict.

25         MR. ROHBACK:  The bankruptcy was filed between the

63

1    two.

2           THE COURT:  Yeah.

3           MR. ROHBACK:  That's the point.  So it couldn't

4    have caused that.  But all of that.

5           And this reference to what Ming would have said and

6    would have done, they don't have the evidence.  The fact that

7    it may no longer be available doesn't mean that you can take

8    an inference and say, well, that means it could have been

9    this or it could have been that.  You don't go to trial with

10   it could have been this or it could have been that.  Now is

11   your time to come forward and say here is the evidence that

12   entitles us to go to trial and they don't have that.  They

13   don't have --

14          THE COURT:  Let me ask you about the evidence that

15   was submitted by both parties through their expert testimony.

16   Why shouldn't I hear from the experts about their view at a

17   trial?  Why do you think I should or should not hear from the

18   experts?

19          MR. ROHBACK:  The simple reason, Your Honor, if you

20   look at what they say, even Mr. Lufkin, who's the standard of

21   care expert for Mr. Jackson, he came in and he admitted that

22   he can't quantify the damages, he's not a damage expert.

23          And then he goes on and he said, it is common in

24   New York for courts to allow witnesses to be added at the

25   time of trial, change the -- add witnesses.  And Judge

64

1    Ciparick said that also.  Does all the time.  You think about

2    it.

3         The compliance order, just the compliance order was

4    in 2012.  It's three years later.  Most judges are going to

5    understand we may have some changes in the witnesses, maybe

6    somebody's not around anymore.  If you let us propose new

7    witnesses for trial, go ahead.

8         In this case, we didn't get that.  Bickel never

9    came in and said, we want to add them to the witness list.

10   As late as May 2015, just before the trial started, they

11   said, we're not adding any witnesses.  We're going to have

12   Jackson, Singh and Villemeur testify.

13        And then of course when they went to trial, they

14   didn't have Jackson or Singh testify.  And Villemeur, they

15   made a non-issue because they didn't get anything out of him.

16        So what happened?  That compliance order first of

17   all never prevented them from calling Jackson and Singh at

18   trial.  They had nobody else lined up.

19        If they wanted Ross, they could have said, we want

20   to have him as a trial witness.  And the other side would

21   have said, well, Your Honor, we're going to be prejudiced.

22   We haven't had a deposition.  And the judge would have said,

23   well, then take his deposition.  I'll give you time to get

24   that deposition so you're not surprised at trial.  That's the

25   way it's done all the time.

1          And there's a perfect excuse when they came in in

2     March of 2015 to say we're new counsel, we're looking at this

3     a different way.  And they didn't even need to -- they didn't

4     ask for time.  They didn't have to ask for time to take

5     depositions.  They could have just said we want to add them

6     to our witness list.  We want to try a different case.

7          And it would have been the other said who said,

8     well, we need to take a deposition.  They could have said, we

9     want to put Murray on the witness list.  Okay.  Put Murray on

10    the witness list.  You guys on the other side, do you want to

11    take his deposition?  Get it done.  We've got a few months

12    before trial.  They didn't do that.

13         So this is really an enormous failure of proof.

14    They can't prove the case that they've alleged.  And the case

15    that they're now talking to us about that is going to hinge

16    on, well, there are all sorts of inferences you can draw from

17    an internet posting, or there are all sorts of things, Ming

18    might have had this, or Murray might have done that.  They

19    don't have it.  Why didn't they get something from Murray?

20         It's probably their -- it's probably their attorney

21    judgment that Murray is going to either offer testimony that

22    was terrible for them if they got it or it wouldn't be

23    believed.  They didn't even bother to --

24         THE COURT:  My understanding -- let me -- I see

25    that Mr. Ansari wants to be heard on that -- and I have a

66

1    question -- my understanding of the record of this adversary

2    proceeding is that at one point the discovery orders in the

3    case did allow for time for the plaintiff to seek discovery

4    from Mr. Murray, from Ming and from Mr. Ross.

5         And then at a certain point, the request to, you

6    know, continue that discovery period regarding Mr. Murray,

7    you know, was dropped from the request and that Mr. Ross was

8    the only remaining piece of the puzzle that the plaintiff was

9    trying to put together.

10        So, Mr. Ansari, why didn't you depose Mr. Murray in

11   this case?

12        MR. ANSARI:  We can't find him.  But at the time

13   that Reed Smith and the defendants were defending the

14   underlying actions, he was in jail.  Even though he told us

15   and Peter Raymond told us --

16        THE COURT:  That was true at a certain point,

17   right?  At a certain point, that was true.  It wasn't true

18   the entire pendency of the case.

19        MR. ANSARI:  Well, Your Honor, the expert -- the

20   first investigative report from the PI in 2011 that they

21   commissioned, Reed Smith, at that point, he had an open case

22   in Newark or in Essex County Superior Court, a criminal case

23   (indiscernible), so he would have had a return date.  He

24   would have (indiscernible) return date --

25        THE COURT:  But he wasn't in custody at that time.

67

1          MR. ANSARI:  No.  But all you have to do --

2     especially if you're hiring a PI -- is look at the next court

3     date.  If you want to find someone, you can find them there.

4          Secondly, he was incarcerated (indiscernible).  It

5     was the same case he had open and that ultimately he was

6     incarcerated for I think about two or three years after that.

7     So he was readily available.

8          THE COURT:  Did you want to -- did you want to

9     respond to other things that Mr. Rohback said?

10         MR. ANSARI:  Yes, please.

11         THE COURT:  Go ahead.

12         MR. ANSARI:  So the notion that they were going to

13    provide compelling evidence or even admit compelling evidence

14    regarding the posting of the video on thisissabrinassin

15    through interested witnesses such as an employees, such as

16    Singh and Corentin Villemeur, and also a less-favorable

17    testimony from an adverse expert witness is not reasonable

18    attorney strategy, and I'll tell you why, Your Honor.

19         Christopher Singh --

20         THE COURT:  Let's go back.  Why didn't Mr. Jackson

21    testify at trial?

22         MR. ANSARI:  On the liability?

23         THE COURT:  Yeah.  He didn't testify at all, right?

24    He didn't testify on the liability stage or the punitive

25    stage.

68

1          MR. ANSARI:  He testified (indiscernible).

2          THE COURT:  Did he?

3          MR. ANSARI:  He did.  Yes.

4          THE COURT:  Okay.

5          MR. ANSARI:  So he didn't testify on the liability

6     stage.

7          THE COURT:  Is that testimony in evidence before

8     me?

9          MR. ANSARI:  I do not think that it's part of the

10    record.

11         THE COURT:  Okay.  So why didn't he testify during

12    the liability stage?

13         MR. ANSARI:  Well, Your Honor, I believe at that

14    point --

15         THE COURT:  I guess maybe that doesn't matter.

16    It's not before me, right?

17         MR. ANSARI:  Correct, Your Honor.

18         THE COURT:  Okay.

19         MR. ANSARI:  So, Your Honor, let me collect my

20    thoughts.  I apologize.

21         So there's an argument posited by the defendants

22    that sufficient -- there was sufficient attorney strategy on

23    behalf of the defendants to elicit testimony to support their

24    main defense that it was posted on Rick Ross' website first

25    through the testimony of Singh, Corentin Villemeur, and also

69

1    some testimony from the plaintiff's expert witness.

2            Christopher Singh, during his deposition, when

3    asked about the video testified:

4            Question:  So to this day, have you ever figured

5    out what happened and how the video got out?

6            Answer:  No.  I mean, I'm not an IT administrator,

7    so I don't really know what to look for, but I have my

8    hunches.  But, you know, other than that --

9            Question:  Do you have any evidence to support any

10   of the hunches that you have?

11           Answer:  No.  I'm not a forensic type of guy.

12   Forensic evidence is (indiscernible).  Corentin Villemeur

13   once had a degree in business.  He was not an internet,

14   forensic specialist whatsoever.

15           (Indiscernible) both employees agreeing at the

16   time.  They're interested witnesses.  I mean, any

17   (indiscernible) capitalize on that alone.

18           Now, eliciting testimony from Burgess.  The

19   defendants incorrectly state in their motion that there was

20   -- that they were able to elicit testimony from Burgess

21   regarding the posting on thisissabrinassin.com.

22           Also, they're propounding that this is the main

23   crux, that thisissabrinassin was a ripoff website.  They're

24   now backtracking this action and saying -- somewhat

25   disingenuous -- but the testimony from Burgess specifically

70

1    states -- and it's part of the plaintiff's motion -- that he

2    could not link the website to Ross and he was not willing to

3    do so.  Why did he rely on an adverse expert witness --

4              THE COURT:  Let me ask you, no one has linked Ross

5    to thisissabrinassin yet, right?  There's no evidence before

6    me that that was done by anybody?

7              MR. ANSARI:  Himself.  Mr. Ross in his testimony.

8    Yeah.

9              THE COURT:  Mr. Ross -- excuse me.  Mr. Ross did

10   not link himself to thisissabrinassin as his website during

11   his testimony?

12             MR. ANSARI:  That's a credibility determination for

13   the jurors.  I have to -- I have transcripts (indiscernible)

14   this is Curly.  I got thisissabrinassin.com.  He's bragging

15   about it because Sabrina is Curtis Jackson's mother who was

16   murdered.  He admitted to it.  A prosecutor could take that

17   evidence (indiscernible).  But here, we're in civil court --

18             THE COURT:  I'm not sure that's accurate.

19             But let me go back to the movant's counsel.  Mr.

20   Rohback, anything else you want to tell me?

21             MR. ROHBACK:  No, Your Honor.  I think those are

22   the major points.  It really is a failure of proof.  The

23   allegations that they made in this complaint, they have

24   nothing to back that up with.  They've had plenty of time for

25   discovery and they haven't come forward with it.

71

1          THE COURT:  Okay.  Now, I want to talk about burden

2    of proof --  and I'm going to hear from Mr. Ansari to respond

3    to anything that Mr. Rohback has said -- so no worries, I'm

4    going to hear everybody's further statement or argument.

5          But I want to talk about burden of proof.  So here

6    there's -- it is the defendants' burden to show there's no

7    material issue of fact to be entitled to summary judgment,

8    and that is as to two things.

9          One is the allegations of the complaint insofar as

10    they relate to the attorney malpractice claim (indiscernible)

11    my decision in the motion to dismiss.

12          And then second is regarding the proof of claim.

13    So we haven't talked about the proof of claim today.  The

14    proof of claim is interesting because it sort of is brought

15    up in the context of this adversary proceeding but it's

16    normally or usually thought of as something that is a claims

17    adjustment process in the context of a bankruptcy case.

18          In the bankruptcy case, the initial filing of the

19    proof of claim acts as prima facie evidence of the claim

20    until it is challenged.  If the defendant here, the debtor in

21    the bankruptcy case, or any party in interest in the

22    bankruptcy case challenges the proof of claim, there's an

23    objection, the burden then shifts to the claimant to

24    establish the claim.

25          And so -- and the mystery -- I don't think that on

72

1    this record I can determine that a claimant has established a

2    proof of claim, has met their burden to establish the amount

3    due under the proof claim.

4            So if we get to the point where that's what we're

5    talking about, then that will have to be developed more fully

6    by some means, either by testimony or by further evidentiary

7    record regarding exactly what was done, what the time spent

8    was.

9            You know, typically in bankruptcy cases the

10   evaluation of attorneys' fees is met when -- by, you know, an

11   accounting of what attorneys worked on the case, on what

12   days, for how many hours, and what did they do.  And that's

13   simply lacking in the record here so that's something that we

14   can address in the future.

15           But I think you should expect that that aspect of

16   the motion for summary judgment will be denied for the reason

17   that we need to go through that in more detail.

18           Having said that, Mr. Jackson has not articulated

19   much of a reason why the fees are unreasonable.  And to the

20   extent that it rests on the idea that there was an attorney

21   malpractice in the *Leviston* case, it doesn't address the

22   other portion of the (indiscernible), which is a completely

23   unrelated case.  I know nothing about that case.  Some other

24   case that we would have to address.  So we need more on that.

25           Let's see.  All right.  So I want to give each

73

1    side, you know, the ability to kind of wrap up here and tell

2    me anything that you want to think about or you filed or that

3    my remarks might have triggered.

4          And, Mr. Rohback, you were just speaking.  I'm

5    going to let Mr. Ansari speak and then I'll hear from you.

6          So, Mr. Ansari.

7          MR. ANSARI:  Thank you, Your Honor.  Your Honor,

8    I'm going to address -- I'm going to sort of pick up --

9    rather than start and rehash my arguments -- and it's very

10   clear that Your Honor has taken the time to be diligent and

11   go through our briefs and exhibits, so I'm not going to

12   rehash them for the sake of doing so.

13         I do want to address though Mr. Rohback had made

14   some comments regarding (indiscernible) intervening

15   (indiscernible) and Bickel & Brewer.

16         THE COURT:  I think that would be helpful.  Thank

17   you.

18         MR. ANSARI:  Sure.  It has to be recognized by the

19   Court or should be, respectfully, Your Honor, that Brewer --

20   or Bickel (indiscernible) -- Bickel did not enter -- it did

21   not break the chain of (indiscernible).  Case law in New

22   York, Your Honor, has confirmed that when you have a case of

23   malpractice, whether it's a successor counsel and a

24   predecessor counsel, the sins of the predecessor counsel are

25   not absolved by whatever action is taken by the successor

74

1      counsel.

2              This is all the more relevant in this case because

3      successor's counsel's action was stymied or hindered by the

4      actions of the defense in this case.  And why I say that,

5      Your Honor, is because, as you know, at the time of trial

6      they were given a case that was devoid of adequate discovery

7      and investigation to support the main thrust of the defense.

8      And the main thrust of the defense did not change.  It was

9      still that the video was first posted on

10     thisissabrinassin.com by Rick Ross.  That never changed from

11     --

12             THE COURT:  Was that the -- well, was that really

13     what Reed Smith was doing though?  I mean, I thought Reed

14     Smith, according to my read of the testimony of Mr. Raymond

15     and some of the other information in the record, is that Reed

16     Smith's strategy was to show that Mr. Jackson did not post

17     the video first, that it was posted on thisissabrinassin,

18     whoever owns it, it was a different website.  It was not

19     posted on Mr. Jackson's website first.  I thought that that

20     was a piece of it.

21             And that the second piece was that Mr. Jackson did

22     not intend to post the video for advertisement or commercial

23     purposes.

24             MR. ANSARI:  Well, Your Honor, conveniently that's

25     what they argue now.

1          THE COURT:  Okay.  So I've understood what's being

2     argued.  You're saying that that's not accurate.  And where

3     in the record is there support for the idea that wasn't

4     really what the strategy was, and that the strategy was just

5     -- there wasn't a strategy or it was negligent in some way?

6          MR. ANSARI:  Your Honor, that you could -- again,

7     contemporaneous documents, emails, correspondence, briefs and

8     memos are indicative of what they were thinking at that time.

9     And I point to the opening statement, the draft opening

10    statement, as one example where that is found.  And I'm

11    looking for it now.

12         I don't want to lose my flow here.  But the opening

13    statement essentially states that it was posted on Rick Ross'

14    website.  They reference Rick Ross.  They reference

15    (indiscernible), the other mother of another baby.  They

16    intervene Rick Ross as the narrator.

17         The defense said that he posted it, not someone

18    else, Rick Ross posted it first on his website

19    thisissabrinassin.com and it wasn't Curtis Jackson.  And

20    Curtis Jackson simply then (indiscernible) it later on from

21    thisissabrinassin.  That theory, okay, was propounded in

22    emails discussing it.  Peter Raymond saying we can prove Rick

23    Ross posted it first (indiscernible).  From all the emails

24    from Evan Farber that are part of the record discussing

25    seeking discovery from Rick Ross.  And more so from the

76

1    opening statement.  That is indicative of this draft opening

2    statement that they had drafted.

3           What theory of case they intended to show the jury,

4    not that someone posted it, or on another website, but that

5    it was posted by Rick Ross.

6           How the steps or lack thereof they took to preserve

7    the most probative, admissible evidence to support that

8    theory over the time of the filing of the summons of

9    complaint to the date that they were discharged and

10   ultimately (indiscernible) were grossly negligent.

11          We have the supporting opinion that the trier of

12   fact (indiscernible) from our expert witness which conflicts

13   but at some point aligns with the expert witness, Judge

14   Ciparick, for the plaintiff.  That is also (indiscernible).

15   You can't necessarily divorce ethics from malpractice in

16   certain instances.

17          And in the opinion of our expert, Professor Green,

18   versus Professor Gillard, ethics also intervenes into this

19   narrative here or the argument.  It's indicative that when --

20   to go back, to jump back to the causation, so that at was the

21   theory of the case all along.

22          Now to get back into the function of the defense by

23   Bickel.  Bickel entered the case and -- it is incorrect to

24   say that they did not take the rest of the steps to address

25   the deficiencies that they were dealt with from predecessors.

1          They immediately moved to open discovery so they

2     could take discovery from specific entities and individuals.

3     And who is that?  It's Rick Ross, and also from the internet

4     provider Ming.  They recognized as an issue when they get the

5     case that this was evidence they needed to support the

6     defense for Curtis Jackson.

7          They make the motion.  It's denied by Judge Wooten.

8     Understandably so, we're on the eve of trial.  Discovery had

9     gone on for years.  There was a known issue that was never --

10    and in New York practice, if there's discovery that has to be

11    had, you've got to move to vacate (indiscernible), that was

12    not done for in the years prior.

13         There was that stipulation.  As much as counsel

14    wants to argue that it did not have (indiscernible) effect,

15    you have to just look at the language of the stipulation and

16    have an understanding of New York practice that if you do

17    that it's going to have ramifications, which is why we don't

18    stipulate willy-nilly to what the other side may want.

19         So they're blackjacked.  They're given a fate which

20    is not on a strong footing.  And they do everything they can

21    to go back and say we need this discovery, we need to reopen

22    discovery, take Rick Ross, take Ming.  It's denied as a

23    ruling.  (Indiscernible) because it's very close to trial.

24    They take it up on appeal.

25         I don't know where the argument is that they didn't

78

1    bring it up on appeal (indiscernible), which is a witness

2    that the trier of fact needs to hear from because her

3    testimony conflicts with what the defendant is saying.  Set

4    the date.  Explain that in their motion which they ask for

5    that relief.  You'll have to look at the motion in there --

6    the appeal I mean.  That's denied.

7         They also move to serve party Rick Ross in.  That

8    is the strategy which I think was reasonable strategy.  They

9    needed to get Rick Ross somehow.  They're not going to get

10   him by reopening discovery.

11        They need to bring him as a party.  It's harder to

12   deny a party seeking nonparty -- I mean, it's (indiscernible)

13   deny a party that is not a party to (indiscernible) than to

14   now summons third parties in, deny that discovery

15   (indiscernible).  (Indiscernible.)  They try to third party

16   Ross in.  They immediately take all these measures when they

17   get the case.

18        So to say that Bickel & Brewer didn't take --

19        THE COURT:  Well, not immediately.  They waited a

20   week, a month, right?  They waited about a month?

21        MR. ANSARI:  Well, during that month, Your Honor,

22   that was the moment in time where there's a retaining lien

23   that Reed Smith is seeking to enforce on a file and they're

24   not handing over the file.  So Bickel is trying to get that

25   material from Reed Smith.  But they don't have a file.  So I

79

1  think that coincides with finally them receiving the file

2  materials, after they tried to get it by force, but the judge

3  finds that the retaining lien is --

4        THE COURT:  They knew what -- they knew what had

5  been filed in the state court at that point, right?  They

6  didn't need to get the file to know what was of record in the

7  state court that there was a --

8        For example, they didn't need to know what the

9  compliance order said.  And they didn't need to know what the

10  -- you know, what the status of the case was regarding the

11  pendency of the trial and whether witnesses were, you know,

12  witnesses had already been identified.  They already knew

13  that.  I mean, (indiscernible) Mr. Jackson what he thought

14  was important, right?  (Indiscernible.)

15        MR. ANSARI:  Your Honor, on a practical basis, you

16  get a file which is held up in a retaining lien, and you make

17  a motion like that within a month, I think that's a pretty

18  reasonable time to make that motion.

19        THE COURT:  Okay.  Well, thank you for your expert

20  opinion, Mr. Ansari.

21        Let's just move on to something else.  I understand

22  you're disputing that there was a smooth transition and you

23  believe that impacted the outcome.

24        MR. ANSARI:  Sure.  And more so -- and Stephanie

25  Gase affirms to that in her declaration, declares that, and

80

1    she would be a witness at trial to testify as to that time

2    period and as to the arguments of the defendants, so the

3    trier of fact would hear that testimony and make their

4    decision at trial.

5         Your Honor, the case law also supports the

6    plaintiff's theory in more case law that A, plaintiffs in a

7    legal malpractice action -- citing (indiscernible) --

8    (indiscernible) was the approximate cause of damage and does

9    not meet -- does not establish that the defendant law firm

10    was (indiscernible) --

11         THE COURT:  Yeah.  I read your brief on that.

12    Yeah.

13         MR. ANSARI:  Okay.  And also the successor counsel

14    argument -- (indiscernible) -- also holds that material

15    issues of fact exist whether attorneys who first represented

16    client (indiscernible) including whether there was time for

17    successor counsel to (indiscernible) from attorneys' alleged

18    negligent representation.

19         THE COURT:  Let me -- yeah, okay.

20         MR. ANSARI:  And the (indiscernible) in the brief

21    supports that.  So approximate cause argument falls flat and

22    it does not comport with the facts of this case along with

23    the controlling law of New York State.

24         THE COURT:  Okay.  I have a question for you on a

25    different aspect of this, which is, if Reed Smith had taken

1    the deposition of Mr. Ross during the pendency of the

2    *Leviston* case and he testified exactly the way he testified

3    in this case and they chose to not call him at trial, there

4    wouldn't be a claim here, right?

5          MR. ANSARI:  Well, that's a difficult question to

6    answer because they would have made -- if the decision was

7    made after seeking discovery -- and I go back to the fact

8    that an attorney ethically and also in (indiscernible)

9    malpractice had the affirmative duty to take discovery,

10   probative discovery, and investigate --

11         THE COURT:  So I guess that's what I'm saying.

12   Where does the line -- where do you draw the line?  Is the

13   attorney -- in order to avoid a claim of malpractice, does

14   the attorney need to depose every witness that his client

15   thinks might have probative or helpful information?

16         MR. ANSARI:  Your Honor, when the -- this was --

17   not everybody.  But this --

18         THE COURT:  Just the ones that the client really,

19   really wants?

20         MR. ANSARI:  And also which support the defense

21   that they're telling the client they're going to perform.

22         If the defense -- and you can see those early

23   emails -- is that Rick Ross -- and this is also -- it's not

24   just a serious offense -- (indiscernible) reality, it's

25   reality.  That's what I'm arguing what happened here.  And

1    the client, Curtis Jackson, informed Peter Raymond as to what

2    happened.  This was on this website.  This was Rick Ross'

3    website.  That it was acknowledged by the defendant.  And

4    they had the duty --

5         THE COURT:  How did Rick Ross' website get the

6    video with Mr. Jackson appearing as a narrator?

7         MR. ANSARI:  Your Honor, that question, I can't

8    answer.  But what is important and an operative fact here or

9    allegation is that Jackson --

10        THE COURT:  If you can't answer it, how is that

11   going to be explained to the jury if Mr. Ross was called as a

12   witness?

13        MR. ANSARI:  Well, it could have been perhaps --

14   and we talk about discovery -- not just testimony, we're

15   talking about also discovery -- and it could have been

16   established through discovery from Maybach, his company,

17   through a subpoena duces tecum which -- although I know

18   counsel will say that he didn't receive anything of value,

19   but am I going to credit my subpoena duces tecum after Rick

20   Ross had provided in a manner he did now without any

21   credibility?  But they had the opportunity to fight for that

22   at that time.  It was contemporaneous.  It was when the

23   evidence was ripe.

24        And to allow that to fail and never pursue it, I

25   think the lesson here, Your Honor, allows this case to

83

1    survive summary judgment and allow a trier of fact to make

2    the decision, because ultimately the case will mandate that a

3    trier of fact makes a decision in a matter like this because

4    we didn't -- and provides enough of a (indiscernible) which

5    would allow a reasonable jury to find that something was

6    afoot here that rose to the level of negligence.

7              You can't hide something in black and white,

8    something like the emails, the correspondence with the

9    defendant.  The briefs, the arguments, the internal

10   communication.

11             You can come in and testify because you're an

12   attorney and you know all the buzz words to say that they had

13   a strategy, but you can't hide from the black and white.  Who

14   is the filter to make the credibility determination on that?

15   The trier of fact.

16             With Rick Ross, the same thing.  You can't hide

17   from what your voice is.  You're confronted with a recording.

18   You're confronted with articles contemporaneously where

19   you're saying certain things.  You're boxed in.

20             And I boxed him in a few times where he's saying I

21   didn't say that, but in the next line he's saying, oh, yeah,

22   (indiscernible) or something like that.  You just

23   acknowledged that that was your statement.  So needless to

24   say, you know what that is?  That's a credibility

25   (indiscernible).  Right?  And there's so many ways to capital

84

1    on that at trial.

2              But none of that was afforded Bickel.  None of that

3    was afforded my client (indiscernible), Your Honor.  So his

4    main thrust -- he spent his whole time, Reed Smith, in

5    developing his theory of the facts.

6              Rick Ross did it first.  He didn't even know that

7    Theo Sedlmayer was representing Rick Ross.  No one told him

8    that he tried to subpoena (indiscernible) solve all these

9    problems or anything like that.

10             He didn't learn that there was contemporaneous

11   representation by the person that Reed Smith (indiscernible)

12   were paid, from Reed Smith to Theo Sedlmayer, (indiscernible)

13   at the same time was representing Rick Ross.  It doesn't take

14   an expert (indiscernible) a juror.

15             A juror can make an assessment of credibility as to

16   whether something was not right here, wasn't kosher.

17             Because you have a text.  You have two attorneys

18   making money off -- and a lot of money -- off Rick Ross and

19   Curtis Jackson at the same time.  Those two planes have come

20   into a head-on collision.  Do they want to kill off their

21   cash cows by bringing up a conflict?  Do they want to take

22   the checks out of their --

23             THE COURT:  Well, Reed Smith -- was Reed Smith

24   representing Rick Ross during the time of the pendency of the

25   *Leviston* matter?

85

1          MR. ANSARI:  Not during the time.  He did represent

2    him previously (indiscernible) --

3          THE COURT:  Okay.  So when you say that, you're

4    really talking about Mr. Sedlmayer, right?

5          MR. ANSARI:  (Indiscernible.)  Reed Smith --

6          THE COURT:  Well, it wasn't unknown -- well,

7    anyway.  Let's move on.  Anything else you want to tell me

8    right now?

9          MR. ANSARI:  No, Your Honor.  I think the record is

10   ample with substance of fact, credibility determination,

11   testimony that needs to be evaluated, ideally not by you, but

12   at trial, but in person, but credibility determinations and

13   substance of fact should not be judged or determined on

14   paper.

15         Let alone just the basic principles of dueling

16   experts and all that, I'll leave that.  I think Your Honor is

17   pretty well versed on that.

18         This case calls for a trial.  Let the determination

19   be made by the trier of fact (indiscernible) as a matter of

20   law.

21         The fact that we're having this verbose and lengthy

22   oral argument that is not specifically talking about the law,

23   Your Honor, and case law citing this case and that case, the

24   fact that we're talking about the underlying facts and what

25   may have occurred or what occurred or what testimony

86

1    (indiscernible) or expert reports and opinions, that is

2    indicative that this is a case that is not decided on the

3    law, but decided on the facts and it needs to go to trial.

4    Thank you, Your Honor.

5            THE COURT:  Mr. Rohback, any response?

6            MR. ROHBACK:  Yes.  Thank you, Your Honor.  Let's

7    start where he ended as far as the facts.

8            In *Hatfield v. Hertz*, we talk about the standard,

9    and this is the (indiscernible) standard.  "In order for

10   summary judgment against the party who will bear the ultimate

11   burden of proof at trial, the movant's burden will be

12   satisfied if he can point to an absence of evidence to

13   support an essential element of the non-moving party's

14   claim," period, end quote.

15           That's the law on the burden.

16           We pointed to the lack of evidence.  They don't

17   have any affidavit or testimony from Murray or Ming.  And

18   what they have from Ross -- whether you call it devastating

19   or otherwise -- certainly does not help them.

20           With this either unhelpful or nonexistent

21   testimony, it's impossible to determine and ascertain damages

22   that are attributable to the lack of those three witnesses

23   testifying.

24           And while Mr. Ansari talks about a case, a

25   proximate cause rather than the proximate cause, right now

1    we're not talking about why Jackson lost at trial.  He lost

2    at trial for a lot of reasons including that video that

3    nobody really wants to look at.

4         But the fact of the matter is the case before us

5    deals with the but-for what mitigation would have resulted

6    from the testimony of those three.  And there is no other

7    mitigation out there that say there are a lot of causes that

8    could have been attributed to this mitigation factor.  That

9    has to be what he has to show now.  That the failure of these

10   three to testify at trial or be preserved in testimony,

11   helpful testimony, that's what he has to identify.  He hasn't

12   done that.  There's no evidence of that.

13        With regard to Ross, we start with the proposition

14   that who posted first doesn't matter.  And Judge Wooten has

15   said that.  Judge Wooten also instructed the jury you can

16   only assess damages against Jackson for the postings that

17   occurred on his site.  Villemeur, Singh, Jackson himself, if

18   he had been called to testify, could have said, I didn't own

19   that site.  It is unquestionably true though that they did as

20   soon as it was up streamed the video from there to the Boo

21   Boo TV Jackson site.  And it's also not in dispute that the

22   trailer was posted first by Jackson himself.

23        And as Jackson has now conceded in his motion to

24   strike, the trailer and the full video are essentially the

25   same.  In fact, it's a duplicate.  That's his word for it.

88

1        So the value of this, really it's not more than a

2    red herring.  (Indiscernible) the shiny object may be hope

3    that a jury chases some argument about Ross' involvement.

4    They didn't have to prove Ross was involved.  All they had to

5    do was say it wasn't Jackson's site.

6        And if they wanted to throw a little shade in that

7    direction to maybe add some confusion, they could have done

8    that through Villemeur or Singh if they had put them on the

9    stand because those people could have said, well, why did you

10    stream it from thisissabrinassin?  Well, because we thought

11    that was Ross' site and we got it.  There it is.  That

12    doesn't establish that it absolutely was, but it gives the

13    jury enough to go on if it wanted to.

14        What they could have done -- and this is what

15    counsel is arguing we should have done -- was to call Ross as

16    a witness.  But if we did that, Ross would come in and say it

17    wasn't my site.  Let's not have a guessing game.  Don't take

18    an inference.  It wasn't my site.  I didn't own it.  I didn't

19    post it.  I don't know how it got there, but it sure wasn't

20    me.  That's bedrock testimony they can't get around.

21        So, you know, with this, going back to the

22    judgment, Imran is looking at this possibility and he's

23    saying we've got a marginal at best argument we could throw

24    out there about Ross' involvement or non-involvement or

25    perhaps involvement.  And against that, we have the

89

1   possibility if we took his deposition and he testified the

2   way he did on April of last year, we'd get killed.  So let's

3   not take the deposition.  Let's not do it.  Let's just rely

4   on our employees.

5          And this idea about not relying on employees, most

6   corporations that are in litigation rely on their employees

7   to testify.  It's not a common practice to say let's not have

8   our employees testify.  Let's have non-parties testify.

9          So this is one where you want people who are

10  believable to go on the stand, people that if you have some

11  confidence will be prepared to testify in the way that you

12  think they're going to testify and not have some loose cannon

13  get up there and bury you.  And that's what they were looking

14  at.

15         And again, that compliance order back in 2012,

16  that's another red herring because nothing, nothing stopped

17  them from saying we want to add these guys to the witness

18  list.  We're new counsel.  We think this is important.  We

19  want to bring them on at trial.  They never asked for that.

20  They never asked Judge Wooten we want to take Murray's

21  deposition.

22         And the only way they said they wanted to take

23  Ross' deposition was they made a hook.  We want to start a

24  third-party claim, something new in the case, add a party,

25  adjourn the trial, and the judge said, we're not going to

90

1    adjourn the trial.  He even said it, that you're giving me

2    that as a reason to adjourn the trial and we're not going to

3    adjourn it.

4          We manipulated the trial now for a while for Mr.

5    Jackson's very busy schedule.  He's got to go to the Cannes

6    Film Festival, or off to Las Vegas, or on the Jimmy Fallon

7    show.  We've worked around his schedule.  And this is the

8    week where we had some time.  We're not moving it.

9          They could have come in earlier and said, just let

10   us put him on the witness list and we'll work out the details

11   later.

12         And as we know now, there was no testimony that

13   would have made (indiscernible).  This is the time that the

14   oldest, long discovery period for them to have come forward

15   and say here's the testimony that we had alleged in our

16   complaint that would have shown that damages would have been

17   mitigated and they don't have that testimony.

18         On that basis, summary judgment should be granted

19   for Reed Smith, Your Honor.

20         THE COURT:  Okay.  Thank you.  All right.

21         I'm going to follow it at this point.  I think

22   we're going to -- I think we're done with the hearing for

23   today.  I'm going to enter a scheduling order regarding the

24   sealing issues that we've talked about.

25         And then I think at that point -- I'm assuming --

91

1    and let me just check a little back -- Mr. Rohback, you don't

2    have any objection I assume, but I don't want to do that

3    without giving you the opportunity to tell me I'm wrong, that

4    you do not oppose the continued hearing of the items that we

5    talked about, the handful of things in the plaintiff's

6    exhibit, is that right?

7              MR. ROHBACK:  No objection, Your Honor.

8              THE COURT:  So you're okay if I continue to hear

9    the portions of the things that we talked about?

10             MR. ROHBACK:  Yes, Your Honor.

11             THE COURT:  Okay.  All right.  So my scheduling

12   order is just going to then provide a deadline for the --

13   just so that we don't lose track of it -- for the plaintiff

14   to file something to specify exactly what needs to remain

15   under seal and what portions of documents of the ones we

16   talked about.

17             What is a comfortable deadline, Mr. Ansari, for you

18   to do that?  You know.  You tell me.  We're at April 13th

19   now.

20             MR. ANSARI:  Your Honor, April 21st?

21             THE COURT:  Sure, that's fine.  Is that enough

22   time?

23             MR. ANSARI:  Yeah.  I think we should be fine.

24             THE COURT:  Okay.  All right.  So --

25             MR. ANSARI:  I'm sorry, Your Honor.  Go ahead.

92

1          THE COURT:  No.  Go ahead.

2          MR. ANSARI:  If we -- the page 7, the missing page

3     7 --

4          THE COURT:  Yes.  The mysterious page 7, yeah.

5          MR. ANSARI:  -- all right, we will do a diligent

6     search for page 7 and submit that to the Court.

7          THE COURT:  Yeah.  If you have that, that would be

8     helpful.  I mean, I didn't know if it was intentionally

9     omitted, you know.

10         If the transcript's from the state court, I don't

11    know if it was not relevant just in the context of the page 6

12    and page 8 -- I think it probably is relevant -- and what was

13    curious is that in both parties' exhibits it was omitted so

14    I'm thinking we're working from the same copy and it may just

15    have been mis-scanned or whatever.

16         MR. ANSARI:  Sure.

17         THE COURT:  Yeah.  If you could look for that.  You

18    know, I'll hold the record open for you to do that.  You want

19    to say until April -- I'm going to give you until April 30th.

20    If you come back and tell me you need to get a new transcript

21    or something, I'll give you more time to do that.

22         MR. ANSARI:  Okay.  Thank you, Your Honor.

23         THE COURT:  Okay.  Yeah.  For that piece of it.

24    I'll just say April 30th is your deadline for both of those

25    things.  Okay?  To give me the specific exhibits that need to

93

1    be sealed or unsealed.  Of those handfuls, the majority of

2    them are going to be unsealed.  But the ones that we've

3    talked about specifically, I'm giving you more time to just

4    tell me why they need to remain under seal.

5              I agree with you on the two transcripts that you've

6    identified, the Roberts transcript.

7              I'm going to keep the defendants' exhibit regarding

8    the information regarding Mr. Murray under seal.  I don't

9    think it's probative to -- I don't think it's probative

10   except on word.  It's not necessary to be unsealed in my view

11   and I'm going to make particularized findings as I'm required

12   to do why it should remain under seal.  Okay.

13             And then you'll have my decision hopefully soon

14   after that.

15             MR. ANSARI:  Thank you.

16             THE COURT:  All right.

17             MR. ROHBACK:  Thank you, Your Honor.

18             THE COURT:  Now, I forecast to you that I'm likely

19   to deny summary judgment as to the proof of claim.

20             I haven't made a final decision about what I'm

21   going to do on the new malpractice claim, so I'm considering

22   that.  I appreciate the argument today.  I know you guys

23   spent -- you guys -- you gentlemen spent time preparing for

24   today's argument and, you know, revisiting something.  I know

25   that takes a lot of time especially when you, you know, you

94

1    were living it a year ago and then you put it down for a

2    while.  And I appreciate you getting ready to argue today and

3    I appreciate your attention.

4            And I'm trying to wrap this up for you and move the

5    case forward in whatever way it needs to move forward.  And

6    so thank you very much.

7            MR. ANSARI:  Thank you, Your Honor.

8            MR. ROHBACK:  Thank you, Your Honor.

9            THE COURT:  All right.

10           MR. ANSARI:  I'm hoping we're back in person one

11   day so I can use that excuse to get Frank Pepe's.  And,

12   again, as --

13           THE COURT:  Well, I have heard -- I have heard that

14   Pepe's, they have a drive-by service, you know, where you

15   pull up and they give you the pizza in the car window kind of

16   thing.  So if you're in the mood for a road trip, you can do

17   that.  There's also -- I think there's also a Pepe's in

18   Fairfield.  There might be one in Greenwich.  I'm not sure.

19           MR. CESARONI:  I think they're delivering now, Your

20   Honor, through a third -- which is earth-shattering for

21   Connecticut.

22           THE COURT:  That's big, yeah.  That's big.  All

23   right, gentlemen.  Yeah.

24           I think this is a remarkable hearing in a number of

25   ways, one of which is that no one has volunteered their

1    vaccine status.  It seems that a lot of people are telling me

2    how many shots they've had and when their next shot is.  So I

3    wish everyone, you know, a good reopening as we go along

4    through this pandemic, which has certainly been an experience

5    for all of us.  So thank you.

6            I think the Zoom worked well today.  I appreciate

7    your attention.  And we'll be in touch via the docket at some

8    point.  Okay.

9            ALL COUNSEL:  Thank you.

10           (Proceedings concluded at 1:33 p.m.)

11    I, CHRISTINE FIORE, court-approved transcriber and

12    certified electronic reporter and transcriber, certify that

13    the foregoing is a correct transcript from the official

14    electronic sound recording of the proceedings in the above-

15    entitled matter.

16

17    *Christine Fiore*

18    _____        April 19, 2021

19       Christine Fiore, CERT

20

21

22

23

24

25