UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.:  15-21233 (AMN) |
| CURTIS JAMES JACKSON III, | : | Chapter 11 |
| *Debtor* | : | |
| | : | |
| | : | |
| CURTIS JAMES JACKSON III, | : | Adv. Pro. No. 17-02005 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| REED SMITH LLP, and | : | |
| PETER RAYMOND, | : | |
| *Defendants.* | : | Re:  AP-ECF Nos. 22, 300, 335, 356 |
| | : | |

*Appearances*

| | |
|---|---|
| Imran H. Ansari | *Counsel for Curtis James Jackson, III,* |
| Joseph P. Baratta | *Plaintiff* |
| Baratta, Baratta & Aidala, LLP | |
| 546 Fifth Avenue, 6th Floor | |
| New York, NY 10036 | |
| | |
| John L. Cesaroni | |
| Zeisler & Zeisler PC | |
| 10 Middle Street, 15th Floor | |
| Bridgeport, CT 06604 | |
| | |
| Thomas G. Rohback | *Counsel for Reed Smith LLP* |
| Axinn, Veltrop & Harkrider | *and Peter Raymond,* |
| 90 State House Square, 9th Floor | *Defendants* |
| Hartford, CT 06103 | |
| | |
| Craig M. Reiser | |
| Axinn, Veltrop & Harkrider LLP | |
| 114 West 47th Street | |
| New York, NY 10036 | |

# MEMORANDUM OF DECISION AND ORDER
# GRANTING MOTION FOR SUMMARY JUDGMENT, IN PART, AND
# DENYING MOTION FOR SUMMARY JUDGMENT AS TO PROOF OF CLAIM

## I.    __INTRODUCTION__

This decision addresses whether the defendants – a law firm and one of its lawyers – are entitled to summary judgment denying legal malpractice claims asserted by their former client.  As in many legal malpractice disputes, the amount of fees owed to the law firm (if any) is also in dispute.

The client – plaintiff Curtis James Jackson, III, also known as "50 Cent" ("plaintiff" or "Mr. Jackson") – filed a voluntary Chapter 11 bankruptcy petition on July 13, 2015 ("Petition Date"), commencing case number 15-21233 (the "Main Case").  Mr. Jackson is an internationally recognized recording artist, actor, and entrepreneur. ECF No. 19.[1]  The bankruptcy filing occurred during a contentious New York state court jury trial, leading to a short delay in concluding the trial.

Within the umbrella of the Main Case, Mr. Jackson commenced this adversary proceeding against Reed Smith LLP ("Reed Smith") and Peter Raymond (collectively, the "defendants"), his trial attorneys until he fired them just eleven (11) weeks before the New York state court jury trial started.  Mr. Jackson alleged (broadly speaking) pre-petition legal malpractice claims against the defendants and objected to Reed Smith's proof of claim filed in the Main Case for unpaid legal fees.  The parties agreed the dispute would be resolved within this adversary proceeding. AP-ECF No. 22, ¶ 5; ECF Nos. 759, 762. Familiarity with the court's earlier decision limiting the issues remaining in this adversary proceeding is assumed (the "Dismissal Decision").  *See*, Memorandum of Decision and Order, AP-ECF No. 62.

With discovery complete, the defendants seek summary judgment as to both the plaintiff's malpractice claim and Mr. Jackson's objection to their Proof of Claim 18 (the

---

[1]    Citations to the docket of the Main Case are noted by "ECF No." Citations to the docket of this adversary proceeding no. 17-02005 are noted by "AP-ECF No."

2

"Proof of Claim" or "POC 18").  AP-ECF Nos. 299-304 (collectively, "Summary Judgment Motion").  The plaintiff objects.  AP-ECF Nos. 333-335, 356.[2]  The parties submitted competing statements of fact consistent with D.Conn.L.Civ.R. 56 and oral argument on the Summary Judgment Motion was held on April 13, 2021.  *See*, AP-ECF Nos. 362, 372.

## II.    **JURISDICTION AND VENUE**

The parties consented to entry of a final order or entry of judgment by this Court, subject to traditional appeal rights.  AP-ECF No. 28, p .9, n 1; AP-ECF No. 367; *see*, Fed.R.Bankr.P. 7008, 7012(b).

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b), and the United States District Court for the District of Connecticut's General Order of Reference dated September 21, 1984.  This adversary proceeding includes core and non-core claims.  To the extent the adversary proceeding includes an objection to a proof of claim it is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (B) (allowance or disallowance of claims).  To the extent the adversary proceeding includes a pre-petition claim by a now-reorganized Chapter 11 debtor (Mr. Jackson) against a creditor of the bankruptcy estate (Reed Smith) and Mr. Raymond, it is a non-core proceeding because the resolution of the claim cannot affect the estate's pool of assets to distribute to other creditors.[3]

Venue is properly in this District pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises under or is related to the Main Case.

---

[2]    The defendants also submitted a reply brief and further affidavit in support of summary judgment. AP-ECF Nos. 349-350.

[3]    The court's decision on POC 18 will not affect the pool of assets held by the Disbursing Agent under Mr. Chapter 11 plan.  The Disbursing Agent may only make a disbursement on an allowed claim. ECF No. 552, Exhibit A, §§ 1.05, 10.06(a).  To the extent the Disbursing Agent holds funds after making all distributions required under the Chapter 11 plan, the Disbursing Agent is reqruied to pay  the excess funds to the Debtor.  ECF No. 552, Exhibit A, §§ 10.06,10.07.

### III.    NATURE OF THE PROCEEDINGS

For over a decade the defendants represented Mr. Jackson and his companies in several litigation matters.  During the period from 2010 through early 2015, this work included defending tort claims brought by Lastonia Leviston ("Ms. Leviston") against Mr. Jackson in a New York state court case captioned *Lastonia Leviston v. Curtis James Jackson, III*, New York State Supreme Court, Index No. 102499/2010 (the "Leviston Case").  Approximately eleven (11) weeks before the jury trial in the Leviston Case was to begin, Mr. Jackson fired the defendants and hired new attorneys to take the case to trial.  The new attorneys abandoned the defendants' original trial strategy centered on Mr. Jackson's testimony.  Mr. Jackson did not attend or testify during the trial, resulting in a missing witness instruction to the jury.

Ultimately, the jury returned a verdict against Mr. Jackson, finding him liable for $7,000,000 in compensatory and punitive damages.  Within the Main Case here, Mr. Jackson reached a compromise with Ms. Leviston to resolve her claims and paid her approximately $4,300,000, consistent with his confirmed Chapter 11 Plan.  As part of the compromise, Mr. Jackson abandoned his efforts to appeal the jury verdict and withdrew a separate lawsuit seeking contribution against another individual.

### IV.    RELEVANT PROCEDURAL HISTORY

#### a.  The Pending Complaint

Mr. Jackson claims the defendants breached their duty to him because they failed to investigate, depose, and preserve the ability to call at trial in the Leviston Case three potential witnesses: William A. Roberts II, a/k/a "Rick Ross" ("Mr. Roberts"), an internet provider NING Interactive, Inc. ("Internet Provider"), and Maurice Murray ("Mr. Murray")(collectively, the "Three Uncalled Witnesses").  The plaintiff alleged other

theories of liability, but they were dismissed in the earlier Dismissal Decision. *See,* AP-ECF No. 62.

According to the plaintiff's surviving theory, the failure to investigate and depose the Three Uncalled Witnesses and to preserve the ability to call them at trial was a proximate cause of at least a portion of the plaintiff's damages in the Leviston Case, in an ascertainable amount.

The plaintiff also objected to the majority of the defendants' legal fees arguing the fees are: (i) unreasonable under 11 U.S.C. § 502(b)(4);[4] and, (ii) unenforceable due to Reed Smith's failure to provide a written letter of engagement consistent with Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State of New York[5] ("22 NYCRR 1215-1"). ECF Nos. 660, 832; *see also,* AP-ECF No. 22[6] ("Amended Complaint"). Reed Smith's POC 18 in the Main Case sets forth its claim for legal fees totaling $609,235.91 for work performed in the Leviston Case and for work performed in an unrelated appeal to the United States Court of Appeals for the Second Circuit (the "Second Circuit Case"). *See,* POC 18, pp. 6-7, Schedules 1-3.

Pursuant to the Dismissal Decision, what remains of this adversary proceeding is to determine:

(1)     Whether defendants committed malpractice by failing to conduct and preserve discovery of the Three Uncalled Witnesses, which, if conducted and preserved, would have mitigated the amount of damages awarded against Mr. Jackson in the Leviston Case, and

(2)     Whether the Proof of Claim should be allowed, and if so, whether it should be reduced due to an alleged violation of 22 NYCRR 1215.1, an alleged conflict of interest, and/or alleged excessiveness.
AP-ECF No. 62, pp. 3-4, 27, 32-33.

---

[4]     The provisions of Title 11, United States Code, comprise the Bankruptcy Code. Unless otherwise noted, references to statutes are to the Bankruptcy Code and are cited as Bankruptcy Code § __.

[5]     N.Y. Comp. Codes R. & Regs. Title 22 § 1215.

[6]     Mr. Jackson amended his original complaint in response to the defendants' first motion to dismiss. *See,* AP-ECF Nos. 1, 16, 22.

**b. The Motion for Summary Judgment**

In the Summary Judgment Motion, the defendants argue the record presents no genuine issue of material fact and requires a conclusion they were not negligent in their representation of Mr. Jackson. *See*, AP-ECF No. 299-304. Defendants rely primarily on the common law principle called the "attorney judgement rule," arguing they cannot be liable for malpractice when they chose among reasonable trial strategies to create a trial defense plan focused on plaintiff's testimony rather than the testimony of the Three Uncalled Witnesses. Mr. Jackson's disagreement with this strategy, they argue, does not transform their conduct into negligence. *See,* AP-ECF No. 300, pp. 5-11, 19-23.

Even if they were negligent, defendants argue any breach of the duty owed Mr. Jackson was not a proximate cause of the jury's verdict against him, or any other damage resulting from the verdict. They contend multiple factors broke the chain of causation, including: (i) Mr. Jackson's replacement of trial counsel before trial; (ii) the new counsel's change of trial strategy so that Mr. Jackson did not attend most of the trial and did not testify as to liability; and, (iii) Mr. Jackson's post-trial settlement with Ms. Leviston and abandonment of any appeal. AP-ECF No. 300, pp. 26-28, 31-32. Further, even if the defendants' negligence caused Mr. Jackson's loss, defendants assert the amount of loss from any negligence is not ascertainable. AP-ECF No. 300, p. 18.

With limited discussion, the defendants assert they are entitled to summary judgment as to POC 18 because Mr. Jackson failed to produce evidence rebutting the *prima facie* validity of the fees or establishing the fees were excessive. AP-ECF No. 300, p. 35. The defendants' Summary Judgment Motion fails to address Mr. Jackson's

argument there was a violation of 22 NYCRR 1215.1 or an alleged conflict of interest.[7] *See*, AP-ECF No. 300. The defendants assert Mr. Jackson's failure to disclose an expert as to their fees' reasonableness or evidence contesting reasonableness of the fees entitles them to summary judgment. AP-ECF No. 300, p. 35.

Mr. Jackson objects, asserting summary judgment is inappropriate on the malpractice claim because each party has disclosed an expert regarding the applicable standard of care and, therefore, the court must hold a trial to assess the experts' credibility and weigh their opinions. AP-ECF No. 335, pp. 18-19. To establish the standard of care required for a negligence analysis, the parties submitted expert reports and deposition testimony from former New York State Court of Appeals Judge Carmen Beauchamp Ciparick ("Judge Ciparick") and Attorney Jonathan D. Lupkin ("Attorney Lupkin"). AP-ECF Nos. 302-43; 335-28; 335-30 and AP-ECF Nos. 302-42; 335-18; 335-29, respectively. Relying on his expert witness's opinion, Mr. Jackson argues the defendants' decision not to pursue discovery from the Three Uncalled Witnesses is not entitled to protection under the attorney judgment rule because it was uninformed, without reasonable diligence, and possibly influenced by a conflict of interest. AP-ECF No. 335, pp. 14, 21-27.

Mr. Jackson failed to address the defendants' assertion they are entitled to summary judgment on his claim the fees sought in POC 18 are excessive. AP-ECF No. 335, pp. 45-49. Rather, Mr. Jackson argued the defendants' alleged violation of the 22 NYCRR 1215.1 and the alleged conflict of interest – two arguments unaddressed by the defendants – preclude allowance of their attorneys' fee claim.

---

[7]     In the Dismissal Decision the court noted Mr. Jackson was not precluded "from pursuing his objection to POC 18-1 based upon the Defendants' failure to comply with 22 NYCRR 12.15.1 or the alleged conflict of interest" or "based upon charging excessive fees." AP-ECF No. 62, p. 19, fn. 14; p. 27.

### c.  The Record at the Summary Judgment Stage

The factual record here includes the parties' statements pursuant to D.Conn.L.Civ.R. 56(a)(1) and 56(a)(2), affidavits, excerpts of fact witnesses' and expert witnesses' testimony, documents, and expert witness reports.  The court has also taken judicial notice of matters of public record in the Leviston Case and the Main Case.  The court initially granted both parties' Motion to Seal, pending further review.  *See*, AP-ECF Nos. 343, 345.  After further review, notice and a hearing, the court unsealed most of the record.  *See*, AP-ECF Nos. 381, 391, 393.

The resulting record is summarized in **<u>APPENDIX A</u>** to this Memorandum of Decision.

### V.    <u>FINDINGS OF FACT</u>

### a.  Local Rule 56(a) Statements

Under Local Rule 56(a)(1), a party submitting a summary judgment motion must file a "concise statement of each material fact" showing there is no genuine issue to be tried ("56(a)(1) Statement").  D.Conn.L.Civ.R. 56(a)(1).  Local Rule 56(a)(2) requires the opposing party to file a responding document stating whether each fact is admitted or denied ("56(a)(2) Statement").  D.Conn.L.Civ.R. 56(a)(2).  Each material fact in a 56(a)(1) Statement supported by evidence will be admitted unless a fact is controverted or disputed by the 56(a)(2) Statement.  D.Conn.L.Civ.R. 56(a)(1).

The parties filed timely Rule 56(a) Statements.[8]  *See,* AP-ECF Nos. 304, 334.  Plaintiff frequently denied an asserted fact by stating supplementary information rather than denying the asserted fact or proffering factual evidence to controvert it.  *See,* AP-

---

[8]     In support of his 56(a)(2) Statement, plaintiff submitted additional declarations to "clarify any mischaracterization of facts."  *See*, AP-ECF No. 335-6, 335-13, 335-17, 335-24.  While this is not required by D.Conn.L.Civ.R. 56, the court considered the plaintiff's additional declarations.

ECF No. 334, ¶¶ 13-16, 19-20, 22-24, 27, 38, 41, 43, 45, 61.  Denying facts on this basis, "frustrate[s] [Local] Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists."  *Dingwell v. Cossette*, No. 3:17-CV-01531 (KAD), 2020 WL 5820363, at *3 n. 2 (D. Conn. Sept. 30, 2020).  Where plaintiff failed to appropriately deny a material fact supported by evidence in the record, that fact is deemed admitted for the purposes of this Memorandum of Decision.  *Miron v. Town of Stratford*, 976 F.Supp.2d 120, 127 (D. Conn. 2013).  Because the plaintiff failed to establish there is a genuine issue of material fact as to the defendants' allegations in ¶¶13, 14, 15, 16, 17, 18, 19, 20, 22, 55, 56, and 59 of defendants' 56(a)(1) Statement, the facts alleged in those paragraphs are admitted.  *See,* AP-ECF No. 334.

### b.  Reed Smith's Claims for Attorney's Fees

In 2004, approximately six years before the Leviston Case, Mr. Jackson signed a retainer agreement with Reed Smith in California (the "California Agreement").  AP-ECF No. 22, Ex. H; AP-ECF No. 67, p. 6; POC 18, p. 6.  The California Agreement stated Reed Smith would represent plaintiff, "in connection with certain of [his] activities in the entertainment business and with respect to third party claims and lawsuits that have been filed against [him]."  AP-ECF No. 22, Ex. H, p. 1.  Reed Smith asserts the California Agreement's fee arrangement provided the basis for the $537,644.22, asserted in POC 18, for fees and costs incurred over the course of the Leviston Case.  POC 18, pp. 5-6, Schedules 1-2.  The Proof of Claim also seeks $71,591.19 for fees incurred in connection with the Second Circuit Case (an appeal captioned *Simmons v. Stanberry, et al.*; Docket No. 14-3106).  POC 18, p. 7, Schedule 3.

### c. Chronology of the Leviston Case

On February 24, 2010, Ms. Leviston sued Mr. Jackson in New York state court seeking both compensatory and punitive damages because he used her image and voice in a video available on the internet for advertising purposes or purposes of trade, without her written permission ("New York Civil Rights Claim"), and, because through his conduct he intentionally inflicted emotional distress ("Emotional Distress Claim").[9]  AP-ECF No. 304, ¶ 3; AP-ECF No. 334, ¶ 3; *see also*, AP-ECF No. 302-2, p. 4, ¶ 12; AP-ECF No. 335-2, p. 4, ¶ 12 (*collectively*, AP-ECF No. 302-2 and AP-ECF No. 335-2 are the "Leviston Complaint").[10]  The video was sexually explicit and depicted the images and voices of Ms. Leviston and Mr. Murray.[11]  AP-ECF No. 304, ¶ 5; AP-ECF No. 334, ¶ 5.

Mr. Jackson posted an edited version of the video as a "trailer" on his website named "BooBooTV.com" (the "Non-Commercial Website").  AP-ECF No. 304, ¶¶ 7-8; AP-ECF No. 334, ¶¶ 7-8.  According to Mr. Jackson, he did not use the Non-Commercial Website for advertising or commercial purposes.  AP-ECF No. 302-5, p. 40.  In the "trailer," plaintiff dressed in costume and added narration.  AP-ECF No. 304, ¶ 7; AP-ECF

---

[9]      N.Y. Civ. Rights Law §§ 50, 51 provide a cause of action for "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without written consent."

[10]      Ms. Leviston initially asserted a third claim for defamation, which was later withdrawn.  *See, Leviston v. Jackson,* 980 N.Y.S.2d. 716 (Sup. Ct. 2013).

[11]      Defendants submitted, as a sealed exhibit, DVDs of the trailer and Video (Def. Ex. 11 (AP-ECF No. 302-11) and 12 (AP-ECF No. 302-12), collectively, "Sealed Videos") and a sealed transcript of the Sealed Videos' trailer (Def. Ex. 13 (AP-ECF No. 302-13)).  Plaintiff filed a Motion to Strike the Sealed Videos and the transcript, which the court denied.  *See,* AP-ECF Nos. 370, 380; *see also,* AP-ECF No. 362.  While not referencing D.Conn.L.Civ.R. 56(a)(4)(prohibiting motions to strike evidence submitted at the summary judgment stage), defendants opposed striking the exhibits because they demonstrate the difficult task defendants faced as Mr. Jackson's counsel in the Leviston Case.  *See,* AP-ECF No. 369.  The defendants conceded, however, that the Sealed Videos are not "absolutely necessary for the [c]ourt to view."  AP-ECF No. 369, p. 3.  The court may consider the admissibility of the Sealed Videos, and, may rely only on evidence that would be admissible at trial.  *See, Wanamaker v. Town of Westport Bd. of Educ.,* No. 3:11CV1791 MPS WIG, 2013 WL 3816592, at *1, 3 (D. Conn. July 22, 2013)(*quoting, Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997)("The principles governing admissibility of evidence do not change on a motion for summary judgment.").  Having concluded the Sealed Videos are not relevant to a genuine issue of material fact here, they would not be admissible at trial.  Fed.R.Evid. 402.  Accordingly, the court read the transcript (Def. Ex. 13 (AP-ECF No. 302-13)) according it no weight but did not view the Sealed Videos.

No. 334, ¶ 7.   After plaintiff posted the "trailer," a full version of the edited video (the "Video") was posted to another website called ThisisSabrinasSin.com (the "Video Website").  AP-ECF No. 304, ¶10; AP-ECF No. 334, ¶ 10.  Mr. Jackson and his employees believed Mr. Roberts owned the Video Website.  AP-ECF No. 304, ¶ 17; AP-ECF No. 334, ¶ 17.  Mr. Roberts was the father of Ms. Leviston's young child and was involved in a public rivalry with Mr. Jackson within the rap community.  AP-ECF No. 304, ¶¶ 2, 20; AP-ECF No. 334, ¶¶ 2, 20.  The Internet Provider hosting the Video Website was NING Interactive, Inc.  AP-ECF No. 304, ¶ 11; AP-ECF No. 334, ¶ 11.  After the edited Video appeared on the Video Website, plaintiff's employees streamed it to Mr. Jackson's Non-Commercial Website.  AP-ECF No. 304, ¶ 12; AP-ECF No. 334, ¶ 12.

It was and is undisputed Mr. Jackson lacked Ms. Leviston's written consent to use the Video, her image, or her voice.  AP-ECF No. 304, ¶ 6; AP-ECF No. 334, ¶ 6; AP-ECF No. 382, pp. 9-10.  Although Ms. Leviston never provided written consent to the Video's public dissemination, Mr. Murray, who appeared in the Video, "transferred or sold the [V]ideo" to Mr. Jackson and gave him verbal permission for its public use.  AP-ECF No. 304, ¶ 5; AP-ECF No. 334, ¶ 5.

### Defendants' Trial Strategy for the Leviston Case

From 2010 until they were fired on March 27, 2015, defendants represented Mr. Jackson in the Leviston Case.  AP-ECF No. 304, ¶ 4; AP-ECF No. 334, ¶ 4.  The record includes several undisputed descriptions of the defendants' trial strategy.  The defendants trial strategy centered on using Mr. Jackson's own testimony to refute the elements in Ms. Leviston's tort claims[12].  AP-ECF No. 304, ¶ 13; AP-ECF No. 334, ¶ 13; AP-ECF No. 302-

---

[12]     *See, Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 87 (2d Cir. 1989)("In order to establish a violation of section 51, a plaintiff must show that the defendant made use, within the state of New York, of plaintiff's name, portrait, or picture "for advertising purposes or for the purposes of trade" without plaintiff's written consent."); *see also, Chau v. Donovan*, 357 F.Supp.3d 276, 287 (S.D.N.Y. 2019)("To state a claim for [intentional infliction of emotional distress] under New York law, a plaintiff must allege (1) extreme and

3, p. 5 ("I was prepared to put on a defense and [sic] which centered very much on Mr. Jackson's testimony.").

Consistent with the defendants' trial strategy, they planned to have Mr. Jackson testify he purposefully put the Video on the Non-Commercial Website and not ThisIs50.com – a website he controlled where he earned advertising fees – to refute the claim the Video was used for "advertising" or "trade" purposes.  AP-ECF No. 304, ¶ 13; AP-ECF No. 302-3, p. 9.  Mr. Raymond testified as follows on this point.

> RAYMOND:    On the New York privacy statute the key is you can't use someone's photograph for commercial purposes without their written permission.  We -- while we -- we moved for summary judgment on that issue and the judge found there was an issue of fact, whether this was a commercial purpose.  We still were going to have Mr. Jackson again testify that he purposefully put this tape on [his Non-Commercial Website], not on thisis50 because thisis50 was his commercial website for which he earned advertising fees.  [The Non-Commercial Website] was specifically set up as a -- as a noncommercial website.  So he could put this video on it and therefore, there was no commercial purpose for this use of the tape.  Therefore she did not have a claim under the requirements of Civil Rights Law 50, 51.
>
> So, again, in both cases our defenses turned on Mr. Jackson's testimony and his ability to convince the jury of these two things.  And I believe that we had a, you know, we had a shot at convincing -- he had a shot of convincing the jury of these things.  I thought he was a good witness.  I thought he'd charm the jury, he's a celebrity, so they -- there would be that aspect to it also.  So I thought we had a shot at winning this case, yes.

AP-ECF No. 302-3, pp 8-11.

In addition to Mr. Jackson's testimony, the defendants intended for two additional witnesses – Christopher Singh a/k/a Broadway and Corentin Villemeur – who formerly worked for Mr. Jackson or one of his companies, to testify.  AP-ECF No. 304, ¶ 16; AP-ECF No. 334, ¶ 16.  The defendants intended these two additional witnesses to

---

outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.")(internal citations omitted).

corroborate the evidence that the Video was posted first to the Video Website and that

Mr. Jackson did not own or control the Video Website.  AP-ECF No. 304, ¶ 16; AP-ECF

No. 334, ¶ 16.  Mr. Raymond, in hopes of mitigating damages and shifting blame away

from Mr. Jackson, developed a strategy to highlight at trial the fact that the Video was

posted first to the Video Website – a website Mr. Jackson neither owned nor controlled.

> RAYMOND:  We planned to put into evidence the fact that [the Video] went up on a site prior to the link on [the Non-Commercial Website].  So we were planning to put that into evidence, whether it was Rick Ross' site or somebody else's site was irrelevant.  So we were going to put that evidence in.
>
> Whether Rick Ross [Mr. Roberts] actually controlled the site was a very contested issue, even with Rick Ross.  So we thought it was dangerous to try to rely on something that we couldn't prove that he could get up and deny.  So what we could prove was that it went up on a site called thisissabrinasin.  We had ht -- hdml code to show that.  So we could have shown the jury that somebody put it up before it went up on BooBooTV through an embedded link to that site.
>
> So we had good evidence to prove that and that's what we thought we needed to prove.

AP-ECF No. 335-11, pp. 31-33.

Mr. Raymond also testified about the decision not to retain an expert regarding the

technical details of the posting of the Video.

> RAYMOND:  We didn't -- we didn't need an expert.  We needed someone who was familiar with how the internet worked and we believed that through a combination of Mr. Villemeur and Mr. Singh and the admissions made by Mr. Burgess, [Ms. Leviston's] expert, that we had sufficient evidence to demonstrate that fact to the jury.  Which we didn't think was really in dispute, but we were going to prove it anyway.

AP-ECF No. 335-11, pp. 31-33.

To rebut the Emotional Distress Claim's intent element, defendants planned Mr.

Jackson would testify he was under the impression he had – from Mr. Murray – Ms.

Leviston's (unwritten) permission to use the tape in any way he wanted.  AP-ECF No.

304, ¶ 14; AP-ECF No. 303-3, p. 7.  Based on defendants' research, they determined

plaintiff's testimony would fall within a valid hearsay exception and would be allowed at

trial.  AP-ECF No. 302, p. 7.

> RAYMOND: [T]he key to my defense was going to be Mr. Jackson's own
> testimony. Because when he was given this tape by Maurice Murray,
> he was told by Mr. Murray that he had, that Mr. Jackson had, both
> Mr. Murray and Miss Leviston's permission to use the tape however
> he wanted.
>
> And we did a good deal of research to determine whether there
> would be a hearsay objection to that testimony and we determined
> that we could defeat a hearsay objection because it went to Mr.
> Jackson's state of mind.
>
> And it was my hope and belief that Mr. Jackson, as my key witness
> at trial, would be able to convince the jury that he honestly believed
> that he had Miss Leviston's permission to use the tape in the way
> that he ended up using it.
> AP-ECF No. 335-11, pp. 8-9.
>
> RAYMOND: So I believe he honestly believed that he had her permission to use
> the tape.  And that was going to be the key to our defense on the
> question of intentional infliction of emotional distress.  If he didn't
> intend to do it because he thought he had permission, then we were
> hopeful the jury would find that he did not commit that offense.
> AP-ECF No. 335-11, pp. 9.

Mr. Jackson testified he knew at some point the defendants' trial strategy included

his attendance and testimony during the trial on his own behalf.  AP-ECF No. 302-5, pp.

25-26; *see, e.g.*, AP-ECF No. 334, ¶¶ 13, 14, 15, 16, 19.  But, this did not happen.

Mr. Raymond also testified his strategy would involve testimony describing details

about Ms. Leviston's life.

> RAYMOND: We also had Dr. Zwern to testify about the difficult life that Ms.
> Leviston had had, and all of the trauma she'd lived through, to try to
> convince the jury that -- . . . -- this wasn't really such a big deal for
> her, in any event, even though she was now claiming it was.
> AP-ECF No. 335-11, p. 47.

*Whether to Pursue Testimony from William Leonard Roberts, II*

While Mr. Jackson first published the trailer to the Video, the full Video first appeared on the Video Website and was then streamed to the Non-Commercial Website through an embedded link.  AP-ECF No. 304, ¶¶ 10, 12, 17; AP-ECF No. 334, ¶¶ 10, 12, 17.  Defendants recognized the question before the jury did not depend on who first posted the full Video, but they hoped evidence regarding the Video's first posting on the Video Website would deflect the jury's blame away from Mr. Jackson.  AP-ECF No. 302-3, p. 15.  To this end, defendants considered pursuing discovery from Mr. Roberts as the suspected owner of the Video Website.  AP-ECF No. 304, ¶ 20; AP-ECF No. 334, ¶ 20.

However, even if Mr. Roberts's testimony could possibly deflect blame, Mr. Raymond testified he was concerned Mr. Roberts's testimony would undermine Mr. Jackson's defense if he testified that the publication of the Video had a commercial purpose, such as generating fan interest.  AP-ECF No. 304, ¶ 20; AP-ECF No. 302-3, pp. 18-19.  Mr. Raymond was concerned Mr. Roberts might testify he was not involved with the Video Website.  AP-ECF No. 304, ¶ 20; AP-ECF No. 302-3, p. 21.  Additionally, Mr. Roberts was Ms. Leviston's child's father and involved in a public rivalry within the rap community with Mr. Jackson, and Mr. Raymond believed there was a risk he could testify about psychological damage to his minor daughter from the Video's posting.  AP-ECF No. 304, ¶ 20.  It is clear from the Video transcript – and is undisputed – the plaintiff's narration of the Video would be appropriately considered to be deeply offensive to Mr. Roberts (and Ms. Leviston).  *See*, AP-ECF No. 302-13; AP-ECF No. 382, pp. 10-11.

Mr. Raymond testified, "had we known [Mr. Roberts] would be a friendly witness, and would say everything we wanted him to say, it would have been much different situation than the reality, which was that [Mr. Roberts] was not a friendly witness."  AP-

ECF No. 335-11, p. 51-52; *see also,* AP-ECF No. 302-3, p. 19 ("[Mr. Roberts] said many,

many negative things in the press about Mr. Jackson including calling him a monkey

repeatedly."). According to Mr. Raymond, the defendants understood Mr. Roberts was

not a "friendly witness" without needing to go through the process of deposing him

because the feud between Mr. Roberts and Mr. Jackson was public, as evidenced by the

articles and a radio interview provided by the parties. *See*, AP-ECF No. 302-3, p. 19

("[Mr. Roberts] said many, many negative things in the press about Mr. Jackson including

calling him a monkey repeatedly."); AP-ECF No. 335-9, p. 28 ("I have referred to [Mr.

Jackson] as a monkey"). Therefore, to avoid the possibility of providing Ms. Leviston's

counsel with a record of Mr. Roberts's damaging statements, defendants concluded any

benefit of Mr. Roberts's testimony was outweighed by the risk and chose an alternate

route focusing their strategy on Mr. Jackson's testimony. AP-ECF No. 304, ¶ 20; *see

also*, AP-ECF No. 302-3, pp. 18, 21.

After a year of effort, Mr. Jackson's counsel deposed Mr. Roberts in this adversary

proceeding. *See*, AP-ECF Nos. 302-17, 302-58, 302-59; AP-ECF Nos. 335-9, 335-41;

AP-ECF Nos. 178, 181-183, 194-195, 198-200, 205, 216-218, 224, 231, 233-236, 247,

258, 264-265, 269, 275. When Mr. Roberts finally sat for his deposition, a second

deposition date had to be scheduled and required the oversight of a court-appointed

referee. *See*, AP-ECF Nos. 293-294. In the end, the most cogent statement in this record

of Mr. Roberts's account of his involvement regarding the Video is from his affidavit. AP-

ECF No. 302-17. Mr. Roberts stated that if called at the Leviston Case trial, "[he] would

have testified that [he] never possessed the [V]ideo, and never posted it to any website,

and that it was [Mr. Roberts's] belief that the posting of the [V]ideo was done by [Mr.

Jackson] as part of [his rap beef] to cause emotional harm and for a business purpose,

namely to try and humiliate [Mr. Roberts] and Ms. Leviston, and to try to generate fan interest for [Mr. Jackson]."  AP-ECF No. 302-17, ¶ 15.

When deposed in this adversary proceeding, Mr. Roberts testified "I've never heard of [the Video Website]. I've never visited [the Video Website]."  AP-ECF No. 335-9, p. 7.  When asked about an article where Mr. Roberts had said, "Now I got [the Video Website]," Mr. Roberts replied, "I have no idea what I [meant].  It may have just been something that was mentioned at a website, but I have never owned or have never had [the Video Website]."  AP-ECF No. 335-9, 11-12.

*Whether to Pursue Testimony from the Internet Provider*

The defendants did not pursue discovery of the Internet Provider because according to Mr. Raymond, his experience was that attempting discovery of an internet provider would not be fruitful or productive, and it would not necessarily reveal who posted the Video on the Video Website.  AP-ECF No. 304, ¶ 24; *See also*, AP-ECF No. 302-3, pp. 22-23.  Additionally, as noted, Mr. Raymond intended to use Ms. Leviston's expert witness Mr. Burgess's admissions during his deposition and Mr. Jackson's employees' testimony as evidence that the Video was posted on the Video Website first.  AP-ECF No. 13, p. 12-14.

The only evidence from the Internet Provider is a letter in response to plaintiff's subpoena in connection with this case.  AP-ECF No. 302-46; AP-ECF No. 335-43.  In accordance with the Internet Provider's retention policy, "the information from January 1, 2009 through April 30, 2009 is no longer in [our] possession, custody, or control, or in existence."  AP-ECF No. 302-46; AP-ECF No. 335-43.  Plaintiff argues the records relating to the Video Website existed and were available to the defendants at one point

but had been destroyed by approximately April 2, 2012.  *See,* AP-ECF No. 335, pp. 37-38.  This is speculation.

*Whether to Pursue Testimony from Maurice Murray*

Defendants also considered pursuing discovery from Mr. Murray.  AP-ECF No. 304, ¶ 22.  As with Mr. Roberts, they hoped to deflect the jury's blame or anger away from Mr. Jackson.  While it could have been helpful to have Mr. Murray corroborate plaintiff's testimony, Mr. Raymond concluded his testimony could be harmful to plaintiff's defense if he testified differently than Mr. Jackson.  AP-ECF No. 304, ¶ 22; AP-ECF No. 334, ¶ 22.  Mr. Raymond testified he considered and rejected pursuing Mr. Murray's testimony because of the danger he represented.

> RAYMOND:  Under any balancing [one] wanted to do, it was a million times better than trying to get Maurice Murray on the stand -- the admitted long-term criminal, who at that time was in jail, in any event -- who I knew for a fact, at that point, did not have Ms. Leviston's permission to give Mr. Jackson this tape.  As I said, she wrote him numerous texts and other writings, begging -- demanding -- she get the tape back from him.  She broke into his apartment and stole every tape that she could find, in hopes of finding the tape, to get it back.  So I knew that was going to be the testimony if Maurice Murray got on the stand. … You never know if you're going to get it in, but it was a million times better chance of getting Mr. Jackson to be able to testify about his state of mind than having Maurice Murray testify to the fact.  We didn't even know what Maurice Murray would say.  He might have said, "I didn't give them permission." But even if he said he gave them permission, he would have gotten shredded on cross-examination by someone like [the questioning attorney].

AP-ECF No. 335-11, pp. 70-71.

Not only had Mr. Murray been convicted of a crime, and therefore the jury might view him as untrustworthy, but defendants also understood from discovery in the Leviston Case that Mr. Murray did not have Ms. Leviston's permission to give Mr. Jackson the Video.  AP-ECF No. 304, ¶ 6; AP-ECF No. 334, ¶ 6; AP-ECF No. 302-56; AP-ECF No. 335-49; AP-ECF No. 302-3, pp. 45-46.  From discovery in the Leviston Case, Mr.

Raymond knew Ms. Leviston sent text messages to Mr. Murray demanding the return of the Video and had broken into Mr. Murray's apartment to steal it.  AP-ECF No. 302-3, p. 45.  If Mr. Murray admitted he lacked permission or was cross examined on this point – as the information about the text messages and the break in suggested might be possible – then Mr. Raymond believed it would weaken Mr. Jackson's testimony.  AP-ECF No. 304, ¶ 22; AP-ECF No. 334, ¶ 22.

During the discovery phase of this adversary proceeding, Mr. Jackson's counsel made several attempts to subpoena Mr. Murray.  *See,* AP-ECF No. 203.  However, there is no testimony or any affidavit from Mr. Murray in the present record.  *See*, AP-ECF No. 203; *see also,* AP-ECF No. 382, p. 66.

### Discovery Conducted, Compliance Conference Order, and the Note of Issue

During 2011 and in early 2012, Reed Smith and Mr. Raymond participated in discovery in the Leviston Case by taking and defending depositions, including those of Ms. Leviston, Mr. Jackson, Mr. Jackson's employees Mr. Singh and Mr. Villemeur, and, Ms. Leviston's expert witness Mr. Burgess.  *See*, AP-ECF Nos. 335-4, 335-5, 335-42; AP-ECF Nos. 302-6, 302-7, 302-10, 302-14, 302-15, 302-18.

On February 29, 2012, Evan Farber, a Reed Smith attorney acting on behalf of Mr. Jackson, signed a "Compliance Conference Order" that was essentially a discovery schedule filed in the State Court, setting forth the remaining depositions to be conducted. AP-ECF No. 335-11, p. 72-73; *see also*, AP-ECF No. 22, Ex. F.  Once filed, the document was endorsed with a notation – "so ordered" – and it became a state court order.  The Compliance Conference Order – sometimes referred to by the parties as the "so-ordered stipulation" or, discovery agreement – limited both Mr. Jackson's and Ms. Leviston's ability to call any witness at trial "other than those [Ms. Leviston had] already deposed"

by May 1, 2012, which did not include the Three Uncalled Witnesses. *See*, AP-ECF No. 22-6, pp. 2-4; AP-ECF 334 ¶¶ 19, 26.

On October 11, 2012, Ms. Leviston's counsel filed a "Note of Issue" in the Leviston Case. A note of issue is a trial readiness form, usually filed by a plaintiff and served on all parties, confirming discovery known to be necessary has been completed and alerting the court a case is ready for trial. *See*, NY CPLR § 3402.

The record does not shed much light on exactly what the defendants did as they prepared the Leviston Case for trial, or how much time they spent. Some deposition dates are reflected in excerpts filed here. And, deposition testimony here describes some pleadings and legal research the defendants performed. Phone conversations and correspondences are also reflected in emails that are part of the record. However, there is little or no reference to what the defendants did between October 2012 (when Ms. Leviston's counsel filed the Note of Issue) through approximately December 2014. The record here does not contain any attorney time records. Instead, to substantiate POC 18, defendants submitted a list of invoices that provide little to no information about the legal services provided.

### Communication Between Attorney and Client

To the extent the record includes written communication between the defendants and their client regarding the Leviston Case, there are emails to representatives of Mr. Jackson, rather than Mr. Jackson himself. Despite representing Mr. Jackson in multiple other cases over many years, Mr. Raymond did not possess Mr. Jackson's phone number or email address. AP-ECF No. 350-2, p. 8. His method of communicating with Mr. Jackson during most of the time the Leviston Case was pending was to speak to one or more of Mr. Jackson's associates or colleagues, including Nikki Martin, and, another attorney who represented Mr. Jackson, Theodor Sedlmayr. AP-ECF No. 350-4, p. 9; AP-

ECF No. 335-11, pp. 38, 42, 81, 163, 294; AP-ECF No. 335-32; AP-ECF No. 335-45. A fair inference from this record is that Mr. Jackson relied upon his representatives, including Ms. Martin and Attorney Sedlmayr, to communicate with him about the Leviston Case. According to Mr. Farber's testimony, "we had been instructed by Mr. Jackson to communicate with Ms. Martin as a client representative." AP-ECF No. 350-4, p. 9. Mr. Farber also testified the defendants had informed Ms. Martin about the Compliance Conference Order before the plaintiff filed the Note of Issue, and, they "had been instructed by Mr. Jackson to communicate with Ms. Martin as a client representative and that's what [the lawyers] were in the practice of doing." AP-ECF No. 350-4, p. 9; AP-ECF No. 302-5, p. 36.

Both parties provided evidence establishing that the details of the defense strategy were discussed with Mr. Jackson's representatives including Nikki Martin and Theodor Sedlmayr, and later, Steven Savva and Craig Weiner. *See, e.g.*, AP-ECF No. 303-9 (Mr. Raymond explaining to Ms. Martin and Mr. Savva the risk of a deposition of Mr. Murray); AP-ECF No. 303-21 (Mr. Raymond encouraging Mr. Sedlmayr and Ms. Martin to encourage Mr. Jackson to consider settling the Leviston Case); AP-ECF No. 302-22 (Mr. Raymond, Mr. Savva and Ms. Martin discussing whether to hire jury consultants); AP-ECF No. 302-25 (Mr. Raymond explaining to Ms. Martin the risk of Mr. Murray's testimony); AP-ECF No. 335-32 (Mr. Raymond discussing with Mr. Sedlmayr and Ms. Martin the use of Mr. Roberts's testimony and relaying a conversation with Ms. Leviston's counsel regarding potential settlement offers on January 11, 2011); AP-ECF No. 335-45 (Mr. Raymond relaying to Ms. Martin and Mr. Sedlmayr the substance of a meeting between the defendants and Mr. Jackson on January 24, 2011).

Infrequently, Mr. Jackson and the Reed Smith attorneys would meet in person. One such meeting took place in January 2015 to prepare for the trial in the Leviston Case. AP-ECF No. 335-6, ¶ 18; AP-ECF No. 302-5, p. 12.

### The January 2015 Meeting Between Defendants and Mr. Jackson

Mr. Jackson retained new attorneys to handle some of his business matters in approximately December 2014, including Mr. Craig Weiner and Mr. Steven Savva. AP-ECF No. 335-6, ¶ 4. As with Ms. Martin and Mr. Sedlmayer, defendants were informed to consult with Mr. Savva and Mr. Weiner as to "all decisions and strategies they undertook in their preparation" for trial. AP-ECF No. 335-6, ¶ 4. Mr. Savva attended the January 2015 meeting between the defendants and Mr. Jackson. AP-ECF No. 335-6 ¶ 18; AP-ECF No. 335-17, ¶ 3. During and around the time of the January 2015 meeting, it appears Mr. Savva and Mr. Weiner learned for the first time that the defendants considered the possibility of an adverse trial result in the Leviston Case to be significant. AP-ECF No. 335-17, ¶ 5; AP-ECF No. 335-24, ¶ 8. It appears the new attorneys were just becoming familiar with the allegations and legal basis for the Leviston Case at that time. For example, Mr. Jackson's new attorneys learned for the first time that the statute which gave rise to the Leviston Case – N.Y. Civ. Rights Law §§ 50, 51 – provided a cause of action if an image or the voice of an individual was used without *written* permission.[13] Pl. Ex. 16 ¶ 5; Pl. Ex. 23 ¶¶ 5-6. Mr. Jackson never claimed he had written permission from Ms. Leviston to use her image or voice. AP-ECF No. 382, pp. 9-10.

Mr. Savva and Mr. Weiner first learned about the Compliance Conference Order in December 2014, after they had already hired a private investigator and obtained new information in their quest to locate Mr. Murray and to obtain information from the Internet

---

[13]     The New York statute plainly states it is the use of a person's image or voice without written permission that creates a cause of action. N.Y. Civ. Rights Law §§ 50, 51.

Provider.  AP-ECF No. 335-17, ¶ 6; AP-ECF No. 335, ¶ 7; AP-ECF No. 335-50.  In an early 2015 email, Ms. Martin described the existence of the Compliance Conference Order as a "surprise development", that would be "very difficult" to explain to Mr. Jackson, although Mr. Farber testified in his deposition in this case the Compliance Conference Order was explained to Ms. Martin years earlier.    AP-ECF No. 335-24, ¶ 8. Notwithstanding Mr. Savva and Mr. Weiner's surprise in late 2014 or early 2015, however, nothing in the record directly contradicts Mr. Farber's testimony that he told Ms. Martin about the Compliance Conference Order before Ms. Leviston's counsel filed the note of issue on October 11, 2012, indicating the Leviston Case was trial ready.  *See,* AP-ECF No. 350-4, p. 8.  Mr. Jackson's testimony and affidavit do not contradict Mr. Farber's testimony on this point and so it is unopposed.  AP-ECF No. 335-3; AP-ECF No. 335-6.

### Failed Communication

Mr. Jackson argues the defendants failed to communicate or consult with him about their trial strategy decisions, and, he makes clear he disagrees with the choices that were made.  As discussed, numerous paragraphs of plaintiff's 56(a)(2) Statement fail to dispute the substance of the defendants' assertions of what the trial strategy was, and, instead state Mr. Jackson did not approve the trial strategy, disagreed with the trial strategy, or, was not apprised of the trial strategy.  In a similar vein, Mr. Jackson testified he was not told about the Compliance Conference Order until January 2015.  AP-ECF No. 335-6, p. 8.

The record supports the conclusion that Mr. Jackson instructed the defendants to relay information about the Leviston Case to his representatives and that this was done. For the most part, the record is silent about what happened once the information went to Mr. Jackson's representatives.  The undisputed record here also demonstrates the defendants engaged in discovery on Mr. Jackson's behalf in the Leviston Case, as well

23

as more than one attempt to broach the idea of settlement with Ms. Leviston's attorneys and with Mr. Jackson's representatives. Mr. Jackson was deposed in the Leviston Case and so a fair inference may be made that he knew discovery was proceeding in the case in 2011. AP-ECF No. 335-7.

### Eleven Weeks Before the Leviston Case

Approximately eleven (11) weeks before trial was to begin in the Leviston Case – on March 27, 2015 – the plaintiff fired the defendants as his counsel, and retained new counsel, Bickel & Brewer ("Bickel"). AP-ECF No. 304, ¶ 25; AP-ECF No. 334, ¶ 25. Thereafter, Bickel filed a witness list consisting of Mr. Jackson, his two employees — Mr. Singh and Mr. Villemeur — and two mental health professionals as expert witnesses. AP-ECF No. 304, ¶ 26. Plaintiff states, as a way of disputing this fact, that Bickel was unable to submit a list including the Three Uncalled Witnesses, due to the preclusive effect of the Compliance Conference Order. AP-ECF No. 334, ¶ 26.

One month after being retained and before trial, Bickel filed an application to stay the trial in order to: (1) allow Bickel more time to review the case file; (2) add Mr. Roberts as a third-party defendant; and, (3) allow additional discovery of Mr. Roberts and the Internet Provider. AP-ECF No. 304, ¶ 29; AP-ECF No. 334, ¶ 29; AP-ECF No. 302-24; AP-ECF No. 335-15. Judge Paul Wooten, the presiding judge in the Leviston Case, denied the application. AP-ECF No. 304, ¶ 30.

The parties disagree as to the effect of Judge Wooten's decision ("Wooten Decision"). Plaintiff states the Wooten Decision, "referenced the preclusive effect of the [Compliance Conference Order], precluding the introducing [sic] of new evidence and calling witnesses at trial who were not timely identified and deposed." AP-ECF No. 334, ¶ 30. After reviewed of the transcript containing the Wooten Decision, plaintiff's statement

appears unfounded.  *See,* AP-ECF No. 391; AP-ECF No. 302-24; AP-ECF No. 335-15.

Bickel did request, "to seek discovery of Mr. Roberts or the company that runs or ran [the

Video Website] website to find…who that website was under control of and who posted

the video itself."  AP-ECF No. 335-15, p. 7.  Bickel made this request on the grounds that

Tweets regarding Mr. Roberts and his ownership of the Video Website had been

uncovered.  AP-ECF No. 335-15, p. 7.  Judge Wooten denied the request because,

"information regarding … Twitter is public information and should or could have come to

their attention much earlier and therefore, there is no reason to delay the trial on that

grounds."  AP-ECF No. 335-15, p. 42.  Wooten's Decision was premised on a concern

about delaying or rescheduling the trial.  AP-ECF No. 335-15, pp. 41-42.    It is unclear

whether discovery was prohibited.

Judge Wooten also clarified, "[Mr. Jackson] didn't discharge [Mr. Raymond] for

cause, it was just an issue of financial convenience as to trying to save some money."

AP-ECF No. 335-15, p. 24.  This was undisputed by the Bickel attorney present at the

hearing representing Mr. Jackson.  AP-ECF No. 335-15, p. 25.

On May 14, 2015, Mr. Jackson appealed Wooten's Decision and on May 21, 2015,

he sued Mr. Roberts in a separate action for "contribution on a proportionate basis

towards any and all amounts [Mr.] Jackson may have to pay" Ms. Leviston as a result of

the Leviston Case.[14]  AP-ECF No. 304, ¶¶ 31, 33; AP-ECF No. 334, ¶ 33.  Regardless of

the reason Mr. Jackson terminated Reed Smith and Mr. Raymond as his attorneys in the

Leviston Case, it is clear the path to seek or to conduct discovery at that late date was

very narrow.

---

[14]     The contribution case against Mr. Roberts was withdrawn when Mr. Jackson entered into a
settlement of Ms. Leviston's case, within the bankruptcy.

**The Leviston Case Trial**

Trial in the Leviston Case commenced on June 15, 2015. AP-ECF No. 304, ¶ 33; AP-ECF No. 334, ¶ 33. Bickel did not focus its trial strategy on Mr. Jackson's state of mind and tried the liability phase of the case without his testimony. They also were unable to present testimony from the Three Uncalled Witnesses. AP-ECF No. 334, ¶¶ 35-36. Mr. Jackson did not attend the liability phase of the trial. Further, Bickel did not call Mr. Singh to testify, even though he was a listed witness. AP-ECF No. 304, ¶ 37; AP-ECF No. 334, ¶ 37. Bickel did introduce testimony of one employee (Mr. Villemeur) and one mental health professional as an expert witness. AP-ECF No. 304, ¶ 39; AP-ECF No. 334, ¶ 39. Mr. Villemeur's testimony on direct examination was focused on how Mr. Jackson's website ThisIs50.com functioned, even though that website appears to have had nothing to do with the Video. AP-ECF No. 302-30. Mr. Villemeur was not cross examined by Ms. Leviston's counsel. AP-ECF No. 302-31, p. 4. Following Mr. Villemeur's testimony, Bickel rested its case. AP-ECF No. 302-31, p. 5.

Because Mr. Jackson did not testify during the liability phase of the trial, the jury was given a missing witness instruction, allowing the jury to draw a negative inference against him due to his absence from the courtroom during the trial and his failure to testify. AP-ECF No. 304, ¶ 40; AP-ECF No. 334, ¶ 40. On July 10, 2015, the jury awarded Ms. Leviston $2,500,000 in compensatory damages for each tort claim, for a total award of $5,000,000. AP-ECF No. 302-33, pp. 7-9; AP-ECF No. 302-39.

The day the jury was to begin hearing evidence on the second stage of the trial to consider whether punitive damages should be awarded – on July 13, 2015 – Mr. Jackson filed his bankruptcy petition commencing the Main Case here, thereby staying the state court trial. ECF No. 1; 11 U.S.C. § 362(a). Ms. Leviston sought immediate relief from

stay pursuant to Bankruptcy Code § 362(d)(1) to allow the punitive damages phase to proceed before the empaneled jury.  ECF No. 7.

On July 24, 2015, after the bankruptcy court granted relief from stay, the jury awarded Ms. Leviston an additional $2,000,000 in punitive damages, for a total award of $7,000,000.  AP-ECF No. 304, ¶¶ 44-45; AP-ECF No. 334, ¶¶ 44-45; ECF No. 20.  Mr. Jackson did attend the jury trial during the punitive damages phase when the court required his attendance.  *See*, AP-ECF No. 302-5, pp. 24-25.

In Mr. Jackson's post-trial motion attacking the result, he argued the $2,500,000 compensatory damages awards for both the Emotional Distress Claim and the New York Civil Rights Claim were duplicative, and the $2,000,000 punitive damages award was excessive.  AP-ECF No. 304, ¶¶ 45-47; AP-ECF No. 334, ¶¶ 45-49; AP-ECF No. 302-40.  Counsel for Mr. Jackson represented to the bankruptcy court there was "certain to be an appeal in the Leviston [C]ase," because Mr. Jackson had "significantly meritorious appellate issues, evidentiary and ruling wise."  AP-ECF No. 302-54, p. 4.

Plaintiff reached an agreement with Ms. Leviston that allowed her claim in the amount of $7,000,000 and determined that $6,000,000 of the amount would be non-dischargeable pursuant to Bankruptcy Code § 523(a)(6).  This agreement and the confirmation of his Chapter 11 Plan had the effect of abandoning Mr. Jackson's plans to appeal the jury verdict and claims for contribution against Mr. Roberts.  AP-ECF No. 304, ¶¶ 46-50; AP-ECF No. 334, ¶¶ 46-50; *see also*, Third Amended Disclosure Statement, ECF No. 484 at 45; Chapter 11 Plan of Reorganization, ECF No. 485, § 6.01(c), pp. 22-23; Order Confirming Chapter 11 Plan, ECF No. 552, pp. 9-10.

### d. Expert Witnesses

As part of discovery process in this adversary proceeding, each party retained two expert witnesses: one in the field of attorney malpractice (Attorney Lupkin and Judge Ciparick) and the other in the field of attorney ethics (Professor Green and Professor Gillers). Plaintiff argues summary judgment is improper in light of the findings of "dueling experts," and states the expert reports in the summary judgment record are in conflict as to whether defendants committed legal malpractice, the ethical considerations implicated in this case, and whether the California Agreement was sufficient. *See*, AP-ECF No. 335, p. 12.

### 1. Expert Opinion Regarding Attorney Malpractice

Plaintiff relies on a written report by Attorney Lupkin ("Lupkin Report") and his testimony to establish the standard of care that should have been met by the defendants in their role as Mr. Jackson's counsel in the Leviston Case. AP-ECF No. 335-29; AP-ECF No. 335-18. In rebuttal, defendants retained their own legal malpractice expert, Judge Carmen Beauchamp Ciparick and submitted her report ("Ciparick Report") and testimony. AP-ECF Nos. 302-43; 335-30; 335-28.

The Lupkin Report is incomplete because Attorney Lupkin indicated he was provided – and relied upon – a statement of assumed facts, annexed as appendix D to his report. AP-ECF No. 335-29, ¶ 21. However, the fled version of the Lupkin Report failed to include appendix D, and thus the facts underlying Lupkin's opinion are unknown.[15] *See*, AP-ECF No. 335-29.

With regard to the applicable standard of care, Attorney Lupkin opined that an attorney "exercising the reasonable skill and knowledge commonly possessed by a

---

[15] The filed version of Lupkin's Report also failed to include appendix C – the materials Attorney Lupkin reviewed in rendering his opinion. AP-ECF No. 335-29, ¶ 21.

member of the legal professional litigating civil disputes in New York Supreme Court," has a responsibility to investigate and prepare every phase of the client's case.  AP-ECF No. 335-29, p. 20.  Attorney Lupkin applied his definition of the standard of care to his understanding of the facts here and concluded the defendants' conduct did not meet the standard of care because they made "needlessly uninformed, and possibly conflicted, decision to ignore [the Three Uncalled Witnesses] without conducting reasonable diligence."  AP-ECF No. 335-29, p. 22.

Judge Carmen Ciparick, retained by defendants, agreed with Attorney Lupkin's definition of the standard of care and agreed an attorney is responsible to investigate and prepare every phase of a client's case.  But, she elaborated that in her opinion New York attorneys exercise their professional judgment in deciding whether to pursue evidence from particular witnesses.  AP-ECF No. 302-43, p. 17.  Judge Ciparick pointed out discovery presented the risk of gaining unfavorable information an attorney then must share with opposing counsel.  *See,* AP-ECF No. 302-43, p. 17; AP-ECF No. 335-30 ¶¶ 46-51; AP-ECF No. 335-28 pp. 7, 11

### 2.  *Expert Opinion Regarding Attorney Ethics*

Though the defendants did not seek summary judgment on Mr. Jackson's objection to POC 18 based upon an alleged violation of 22 NYCRR 1215.1 or an alleged conflict of interest, Mr. Jackson includes in his 56(a)(2) statement and objection citations to both defendants' and his own ethics experts' reports.  *See*, AP-ECF No. 334, pp. 25-27; AP-ECF No. 335-26; AP-ECF No. 335-31.

Professor Bruce Green, retained by Mr. Jackson, concluded defendants violated New York Rules of Professional Conduct in multiple ways over the course of the Leviston Case.  For example, Professor Green stated the California Agreement was insufficient to

establish the scope and terms of Reed Smith's defense of Mr. Jackson in the Leviston Case because the Leviston Case was outside the scope set forth in the agreement.  AP-ECF No. 335-26, p. 4.  Professor Green opined that by failing to set forth the scope and terms of the representation in writing, Reed Smith violated New York Rule of Professional Conduct 1.5(b) and 22 NYCRR Part 1215.1.  AP-ECF No. 335-26, pp. 3-5.  Professor Green also took issue with the division of fees between defendants and Mr. Sedlmayr, and concluded the arrangement was a violation of New York Rule of Professional Conduct 1.5(g).  AP-ECF No. 335-26, pp. 5-6.  Lastly, Professor Green opined that Reed Smith violated New York Rule of Professional Conduct 1.4 by entering into the Compliance Conference Order in 2012 and not disclosing it to Mr. Jackson.  AP-ECF No. 335-26, p. 8.  Importantly, Professor Green's opinion is based on facts the present record does not support, particularly regarding whether the defendants informed Mr. Jackson or his designated representative (Ms. Martin) of the terms of the Compliance Conference Order.

Professor Stephen Gillers, retained by defendants but not relied upon for purposes of summary judgment, disagreed with Professor Green and opined that Reed Smith's conduct in the Leviston Case complied with its obligations under the New York Rules of Professional Conduct and New York Lawyer's Code of Professional Responsibility as they were applied in New York State from 2004 to 2015.  *See,* AP-ECF No. 335-31, p. 32.  According to Professor Gillers, based on the facts given and the language of Rule 1.5(b), the 2004 California Agreement applied to the Leviston Case as there was no requirement that Reed Smith prepare an updated retainer agreement for the Leviston Case.  *See*, AP-ECF No. 335-31, p. 35.  The California Agreement disclosed both the

possibility of a change in fees and the fee sharing with Mr. Sedlmayr. *See*, AP-ECF No. 335-31, p. 35.

## VI.    APPLICABLE LAW AND BURDEN OF PROOF

### a.  Burdens of Proof at Summary Judgment Stage

The initial burden at the summary judgment stage rests with the movant, who must demonstrate no genuine issue of material fact exists*. See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122 (2d Cir. 2013); Fed.R.Civ.P. 56(c).   The moving party must "provide evidence on each element of its claim or defense," after which "the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence."   *Cohen Lans LLP v. Naseman*, 14-CV-4045 (JPO), 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (*citing, Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.,* No. 12-CV-5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014*)).   Viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, a motion for summary judgment may be granted only if "no reasonable [fact finder] could find in favor of the [non-moving] party."   *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)(internal quotation marks omitted); *see also, Anderson*, 477 U.S. at 255 (at summary judgment stage, court cannot weigh evidence or make credibility determinations).

The parties bear shifting burdens regarding a creditor's proof of claim in a bankruptcy case.  A timely filed proof of claim is *prima facie* evidence of the claim's validity and amount.  Fed.R.Bankr.P. 3001(f).   Upon the filing of a proof of claim and in the absence of an objection, a claim is deemed allowed.  11 U.S.C. § 502(a).  To prevail on an objection to a proof of claim, the objecting party must "produce evidence at least equal

in probative force" to evidence offered by the claimant to "refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re Hampton Ventures*, LLC, 599 B.R. 474, 488 (Bankr. D. Conn. 2019)(*quoting, In re Driscoll*, 379 B.R. 415, 420 (Bankr. D. Conn. 2008)).  "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence."  *Hampton Ventures*, 599 B.R. at 488 (*quoting, In re Vanegas*, 290 B.R. 190, 193 (Bankr. D. Conn. 2003)).

### b. Summary Judgment Standard:  Whether There Is a Genuine Issue of Material Fact

A genuine issue of fact has been interpreted to mean a genuine issue of *material* fact.  *See, Anderson,* 477 U.S. at 247–48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.")(emphasis included).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."  *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (*quoting, SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  The governing law "applied to the case determines which facts are material for purposes of deciding a summary judgment motion."  *Diamond v. Sokol*, 468 F. Supp. 2d 626, 632 (S.D.N.Y. 2006).

Summary judgment is warranted if the pleadings, the discovery, and disclosure materials, along with any admissible affidavits, demonstrate there is no genuine issue of material fact necessitating resolution at trial.  Fed.R.Civ.P. 56(c); *People's United Bank v. Culver*, 17-CV-00723 (VAB), 2020 WL 6546006, at *3 (D. Conn. Nov. 6, 2020).

32

### c.  New York Law Regarding Legal Malpractice

The parties agree New York law governs the underlying malpractice claim. *American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry"); *see*, AP-ECF No. 300, p. 24; AP-ECF No. 335, p. 13.  The elements of a legal malpractice claim under New York law are: (1) whether a defendant acted negligently; (2) if so, whether the negligence was the proximate cause of the loss the client sustained; and, (3) whether the loss sustained by the client resulted in actual and ascertainable damages.  *See, Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)(internal citations omitted); *see also, Ocean Ships, Inc. v. Stiles,* 315 F.3d 111, 117 (2d Cir. 2002)("The elements of legal malpractice under New York law are (1) a duty, (2) a breach of the duty, and (3) proof that the actual damages were proximately caused by the breach of the duty.")(internal citations omitted).

Generally, to prevail in a cause of action for legal malpractice, a plaintiff must establish the attorney, "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession and that the attorney's breach of this duty proximately caused plaintiff to sustain actual and ascertainable damages." *Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40, 49–50 (N.Y. 2015)(internal citation omitted).  "To succeed on a motion for summary judgment in a legal malpractice action, the defendant must establish that the plaintiff cannot prove at least one of these essential elements."  *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010).

### Applicable Law: Duty and Breach of Duty

To establish a breach of a duty owed to a client, "a court must find sufficient evidence that the defendant-attorney's conduct 'fell below the ordinary and reasonable

skill and knowledge commonly possessed by a member of his profession.'" *Stonewell Corp.*, 678 F. Supp. 2d at 209 (*quoting, Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006)).

### 1. The Attorney Judgment Rule

However, "[n]either an error in judgment nor in choosing a reasonable course of action constitutes malpractice." *Hand v. Silberman*, 15 A.D.3d 167 (N.Y. App. Div. 1st Dept. 2005). When assessing whether an attorney breached a professional obligation to a client, "where allegations involve errors in the exercise of an attorney's professional judgment in areas such as strategy, the selection of appropriate evidence or argument, they are not actionable as malpractice." *Schlenker v. Cascino,* No. 5650-11, 2013 WL 1748704, at *2 (N.Y. Sup. Ct. Apr. 12, 2013)(*quoting, Bixby v. Somerville*, 62 A.D.3d 1137, 1140 (N.Y. App. Div. 3d Dept. 2009)). "Generally, an attorney may only be held liable for ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action." *Achtman*, 464 F.3d at 337. But, a client's disagreement with his attorney's decision or a difference of opinion as to optimal trial strategy does not raise a genuine issue of material fact. *Iannazzo v. Day Pitney*, *LLP*, No. 04 CIV 7413, 2007 WL 2020052, *9 (S.D.N.Y. July 10, 2007).

"Decisions regarding the evidentiary support for a motion or the legal theory of a case are commonly strategic decisions and a client's disagreement with its attorney's strategy does not support a malpractice claim, even if the strategy had its flaws." *Brookwood Companies, Inc. v. Alston & Bird LLP*, 146 A.D.3d 662, 667 (N.Y. App. Div. 1st Dept. 2017). "[A]n attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment where the proper course is open to reasonable doubt".

*Brookwood Companies, Inc.*, 146 A.D.3d at 667 (*citing, Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428, 430 (N.Y. App. Div. 1st Dept.1990).

"Attorneys are free to select among reasonable courses of action in [pursuing a] client['s] case[ ] without [ ] exposing themselves to liability for malpractice." *Schlenker*, 2013 WL 1748704, at *2 (*citing, Iocovello v. Weingrad & Weingrad, LLP*, 4 A.D.3d 208, (N.Y. App. Div. 1st Dept. 2004)). Where it is apparent an attorney exercised reasonable judgment as to how to proceed, or where the client cannot establish another requisite element of the claim as a matter of law, summary judgment should be granted. *See, Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 211 (S.D.N.Y. 2010)(holding the record did not reflect the attorney's decision "constituted anything less than competent legal representation under difficult circumstances."); *see also, Diamond*, 468 F. Supp. 2d at 633 ("[r]easonableness of a defendant attorney's conduct may be determined as a matter of law."); *Brookwood Companies, Inc.*, 146 A.D.3d at 667 ("an attorney's selection of one among several reasonable courses of action does not constitute malpractice."); *Pacesetter Communs. Corp. v. Solin & Breindel*, *P.C.*, 150 A.D.2d 232, 235–236 (N.Y. App. Div. 1st Dept. 1989)(complaints that "are no more than the second-guessing of counsel's strategic judgment in the selection of trial tactics" do not rise to the level of legal malpractice). Lawyers "are not guarantors of a favorable outcome in litigation." *Ayala v. Fischman*, No. 97 CIV 6698(LMM), 2001 WL 1491292, at *4 (S.D.N.Y. Nov. 26, 2001); *Morrison Cohen Singer & Weinstein v. Schwartz*, 92-CV-1493(TPG), 1995 WL 169032, at *3 (S.D.N.Y. Apr. 10, 1995); *Rosner v. Paley*, 65 N.Y.2d 736, 738 (N.Y.1985).

An attorney can make a decision based on numerous strategies without risking a legal malpractice claim. *See, Stonewell Corp.*, 678 F.Supp.2d at 211 (holding a claim

based on a client's "displeasure, developed only with the benefit of hindsight, regarding a defendant-attorney's selection of one among several reasonable strategic options" is an insufficient basis for a legal malpractice claim.); *Hatfield v. Herz*, 109 F.Supp.2d 174, 183 (S.D.N.Y. 2000)(defendant attorney's decision not to call a witness was clearly a reasonable strategic decision which did not constitute malpractice); *L.I.C. Com. Corp. v. Rosenthal*, 202 A.D.2d 644 (N.Y. App. Div. 2d Dept. 1994)(same).   An attorney is not required to investigate every possible strategy, rather an attorney must demonstrate a "reasonable strategic explanation" for the alleged negligence.  *Ackerman v. Kesselman*, 100 A.D.3d 577, 579 (N.Y. App. Div. 2d Dept. 2012).

## 2.  The Role of Expert Testimony

In determining negligence in a legal malpractice case, expert testimony may be required to establish an applicable standard of care.  *See, In re Basic Food Grp., LLC*, No. 15-10892 (JLG), 2020 WL 7496686, at *9 (Bankr. S.D.N.Y. Dec. 18, 2020); *see also*, *Barack v. Seward & Kissel, LLP*, 16 CIV 9664, 2017 WL 4023141, at *3 (S.D.N.Y. Sept. 12, 2017) ("Expert testimony is normally needed to establish that the attorney fell below this standard.")(internal citations omitted).   "Expert testimony is normally needed to establish that the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession."  *Northrop v. Thorsen*, 46 A.D.3d 780, 782 (N.Y. App. Div. 1st Dept. 2007).

However, expert opinion is unnecessary in a malpractice case where "the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of the professional service, or the attorney's conduct falls below *any* standard of due care."  *Kranis v. Scott*, 178 F.Supp.2d 330, 334 (E.D.N.Y. 2002)(*emphasis added*).   "The requirement that there be expert support for a claim of malpractice reflects the reality that

a lawyer's duties to a client, particularly in complex or nuanced situations, are often not self-evident to a lay person, and discerning the standard of care as to a particular legal problem is often outside of the ordinary experience of a lay fact-finder." *Joseph DelGreco & Co. v. DLA Piper L.L.P. (U.S.)*, 899 F.Supp.2d 268, 278 (S.D.N.Y. 2012), *aff'd sub nom. In re Joseph DelGreco & Co., Inc.*, 535 F.App'x 31 (2d Cir. 2013); *see also, Wo Yee Hing Realty, Corp. v. Stern,* 99 A.D.3d 58, 63 (N.Y. App. Div. 1st Dept. 2012))(concluding that an expert affidavit is not required when the legal malpractice claim turns on discrete factual questions, not "byzantine" issues involving immigration law).

Despite the need for expert opinion, New York courts recognize that an expert may not offer opinion as to whether the attorney committed legal malpractice because those determinations are reserved for the court. In *Russo v. Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, LLP*, 301 A.D.2d 63, 68–69 (N.Y. App. Div. 1st Dept. 2002), a legal malpractice action in which the plaintiff relied on the affidavit of an attorney to oppose a summary judgment motion, the Court, in affirming the grant of summary judgment, stated:

> Essentially, the affiant-attorney was offering a legal opinion as to what performance or absence thereof constitutes legal malpractice. But making those determinations is the function of a court. As we recently pointed out in another case, expert witnesses should not ... offer opinion as to the legal obligations of parties ...; that is an issue to be determined by the trial court. Expert opinion as to a legal conclusion is impermissible.
> *Russo v. Feder, et al.* 301 A.D.2d at 68-69

S*ee also*, *Basic Food Group, LLC*, 2020 WL 7496686, at *9 ("the [expert's] Report is inadmissible to establish that [the attorney's] performance constituted malpractice since it is the Court's function to make that determination"); *Dimond v. Salvan*, 78 A.D.3d 407 (N.Y. App. Div. 1st Dept. 2010)("We separately note that the opinion offered by plaintiff's legal malpractice expert is improper since it is the function of the court to determine whether defendant's performance constituted malpractice").

Additionally, courts are not required to accept at the summary judgment stage expert opinions that are conclusory, lack factual analysis, ignore the case specific facts, or address the wrong standard of care. *See, Basic Food Group, LLC*, 2020 WL 7496686, at \*8 (The court attaches no weight to the experts report as it (i) is devoid of factual or legal analysis, (ii) ignores the facts of this case, and (iii) does not address, at all, the standard of care that closing counsel owed); *see also, Healy v. Finz & Finz, P.C.*, 82 A.D.3d 704, 707 (N.Y. App. Div. 2d Dept. 2011)("The conclusory assertion of the plaintiffs' expert attorney—that the firm simply chose the wrong experts—is insufficient to sustain a cause of action alleging legal malpractice"); *Brady v. Bisogno & Meyerson*, 32 A.D.3d 410 (N.Y. App. Div. 2d Dept. 2006)("[c]onclusory expert opinions are insufficient to raise a triable issue of fact to defeat a summary judgment motion.").

Summary judgment may not be appropriate where the expert opinions are in contradiction, also known as "dueling experts", and when those opinions are important to resolution of a material factual dispute. *See, Realtime Data, LLC v. Stanley*, 897 F.Supp.2d 146, 153 (S.D.N.Y. 2012)(*citing, Hodosh v. Block Drug Co., Inc.,* 786 F.2d 1136, 1143 (Fed.Cir. 1986))("The fact issues herein must be resolved by trial in which the conflicting views of the experts will be subject to the refining fire of cross examination."). If dueling expert testimony regarding a material fact is offered at the summary judgment stage, the court can only determine whether the expert is merely asserting his own opinion without proof, which would be insufficient to defeat summary judgment, or whether two experts in the field could have reasonable differences. *Realtime Data, LLC*, 897 F.Supp.2d at 153. "If it is the latter, then the court must leave credibility determinations and the weighing of the experts' opinions to the jury." *Realtime Data, LLC*, 897 F.Supp.2d at 153.

### Applicable Law: Proximate Cause

To establish an attorney's negligence was a proximate cause of a client's loss, the party opposing summary judgment must "show evidence from which a reasonable factfinder could conclude that it is more probable that the [complained of] event was caused by the defendant than that it was not." *Diamond v. Sokol*, 468 F. Supp. 2d 626, 633 (S.D.N.Y. 2006)(*quoting, Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)).  New York law requires the opposing party be able to "meet the 'case within the case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter."  *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 272 (N.Y. App. Div. 1st Dept. 2004); *see also, Even St. Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP*, 643 F.Supp.2d 317, 322 (S.D.N.Y. 2008)("The 'but for' prong requires the trier of fact in effect [to] decide a lawsuit within a lawsuit, because it demands a hypothetical re-examination of the events at issue absent the alleged malpractice.").  Overall, the causation element "seeks to insure a tight causal relationship exists between the claimed injuries and the alleged malpractice and demands a nexus between loss and injury."  *Even St. Prods., Ltd.*, 643 F.Supp.2d at 322 (internal citations omitted).

Where new counsel was introduced in the underlying action, new counsel severs the chain of causation so long as (s)he had "sufficient opportunity to protect the [client's] rights."  *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 12-CV- 9459 (PAE), 2013 WL 3357921, at *6 (S.D.N.Y. July 2, 2013), *aff'd*, 552 F. App'x 79 (2d Cir. 2014)(attorney's alleged negligence was not the proximate cause where new counsel was introduced five months before the underlying case settled)(internal citations omitted); *see also, Albin v. Pearson*, 289 A.D.2d 272, 273 (N.Y. App. Div. 2d Dept. 2001)(attorney's alleged negligence was not the proximate cause of the client's injuries, where successor counsel

had three years to vindicate the client's legal rights); *Kozmol v. Law Firm of Allen L. Rothenberg*, 241 A.D.2d 484, 485–86 (N.Y. App. Div. 2d Dept. 1997)(plaintiff clients could not prove proximate cause in a legal malpractice claim where successor counsel had 120 days to recommence a dismissed action). Further, a legal malpractice claim fails where, "[i]t is clear that the proximate cause of any damages sustained by plaintiff was not the alleged malpractice of defendants, but rather the intervening and superseding failure of plaintiff's successor attorney." *Boye v. Rubin & Bailin*, *LLP*, 152 A.D.3d 1, 9–10 (N.Y. App. Div. 1st Dept. 2017)(internal citations omitted).

### Applicable Law: Ascertainable Loss

A valid claim for legal malpractice must have a showing of clearly calculable "actual and ascertainable damages." *See, Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442-443 (N.Y. 2007)(holding litigation expenses to correct the defendants' error and expert fees for retrial, were expenditures readily ascertainable and calculated by the lower court.); *Bellinson Law, LLC v. Iannucci*, 102 A.D.3d 563, 563 (N.Y. App. Div. 1st Dept. 2013)(holding damages could not be construed as actual and ascertainable where the "claimed damages in the underlying action were, at the time of settlement, subject to potential dismissal."); *Gallet, Dreyer & Berkey, LLP v. Basile*, 141 A.D.3d 405, 406 (N.Y. App. Div. 1st Dept. 2016)(finding the plaintiff's claim as to damages was speculative.). "[A] plaintiff must prove the existence of actual and ascertainable damages and, therefore, [a]bsent proof of actual damages, a claim for attorney malpractice is unsupportable." *EVIP Canada Inc., et al. v. Schnader Harrison Segal & Lewis LLP*, 18-CV-11456 (LJL), 2021 WL 964943 (S.D.N.Y. March 15, 2021)(internal citations omitted); *see also, Giambrone v. Bank of New York*, 253 A.D.2d 786, 787 (N.Y. App. Div. 2d Dept. 1998)(a plaintiff must offer more than "[m]ere speculation about a loss resulting from an attorney's alleged omission").

## A Conflict of Interest Does Not Give Rise to a Claim

New York courts have generally concluded that an alleged violation of the New York Rules of Professional Conduct, without more, does not support a malpractice claim. *See, Cohen v. Kachroo*, 115 A.D.3d 512 (N.Y. App. Div. 1st Dept. 2014); *see also, Doscher v. Meyer*, 177 A.D.3d 697, 699 (N.Y. App. Div. 2d Dept. 2019)("a violation of the Rules of Professional Conduct, in itself, does not give rise to a private cause of action against an attorney or law firm").  Thus, "[w]hile a conflict of interest amounting to a violation of the Rules of Professional Conduct does not, in and of itself, amount to malpractice, 'liability can follow where the client can show that he or she suffered actual damage as a result of the conflict.'"  *Bryant v. Monaghan*, 15-CV-8427, 2018 WL 4932086, at *5 (S.D.N.Y. Aug. 1, 2018)(*quoting*, *Esposito v. Noto*, 132 A.D.3d 944, 945 (N.Y. App. Div. 2d Dept. 2015))(*quoting, Tabner v. Drake*, 9 A.D.3d 606, 610 (N.Y. App. Div. 3rd Dept. 2004)).  However, "it is clear that the absence of resulting damages is fatal to plaintiff's cause of action for legal malpractice" based upon a violation of the Code of Professional Responsibility.  *Kaminsky v. Herrick, Feinstein LLP*, 59 A.D.3d 1, 13 (N.Y. App. Div. 1st Dept. 2008).

### d.  Enforceability of Proof of Claim and Determination of Amount Owed

While plaintiff does not expressly rely on 11 U.S.C. § 502(b)(1), he hints that POC 18 may be unenforceable under applicable law.  *See,* 11 U.S.C. § 502(b)(1); ECF No. 660.  Here, the "applicable law" that determines whether the attorney's fee claim is enforceable against the debtor is New York state law.  *See*, *Travelers Cas. and Sur. Co. of Am. v. P. Gas and Elec. Co.*, 549 U.S. 443, 450–51 (2007) (citations omitted).

An objection raised under Bankruptcy Code § 502(b)(4) permits a court to examine the claim of a debtor's attorney independently and to disallow it to the extent that it exceeds the reasonable value of the attorney's services.  *See, In re Regino*, 585 B.R.

322, 327 (Bankr. E.D.N.Y. 2018). An attorney's fee is reasonable when it "represent[s] the reasonable value of the services rendered." *In re Ridgemour Meyer Properties, LLC*, No. 08-13153 (SMB), 2018 WL 2305765, at *12 (Bankr. S.D.N.Y. May 18, 2018), *aff'd*, 599 B.R. 215 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020)(internal citations omitted). In general, factors to determine the "reasonable value of the services rendered" include: "(1) the time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; (2) the lawyer's experience, ability, and reputation; (3) the amount involved and benefit resulting to the client from the services; (4) the customary fee charged for similar services; (5) the contingency or certainty of compensation; (6) the results obtained; and (7) the responsibility involved." *Ridgemour Meyer Properties, LLC*, 2018 WL 2305765, at *12 (internal citations omitted). In calculating a fee, courts generally apply the "lodestar" method by multiplying the number of hours reasonably expended by a reasonable hourly rate. *See, Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 172 (2d Cir. 1998)(*quoting, Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The reasonable hourly rate in the lodestar method should be based on the prevailing market rates for attorneys with comparable skill and standing in the pertinent legal community. *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000). "Hours that are excessive, redundant, or otherwise unnecessary, are to be excluded ... and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch*, 148 F.3d at 172 (citations and internal quotation marks omitted).

"Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch*, 148 F.3d at 173. "The party

seeking an award of fees should submit evidence supporting the hours worked and rates claimed, and where the documentation of hours is inadequate, the Court may reduce the award accordingly." *In re Ridgemour Meyer Properties, LLC*, 2018 WL 2305765, at *16 (internal citations omitted).

## VII.   **DISCUSSION**

Duty.  Breach.  Causation.  Damages.  Four deceptively simple concepts.  Each must be proven to win a negligence claim.  Here, to defend against summary judgment, Mr. Jackson argues he can prove each of these elements at a future trial.  Discovery is now complete and Mr. Jackson needed to show there is a material fact – one that would cause a factfinder to reach a conclusion in his favor – that is in genuine dispute.  "An issue of fact is genuine if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law." *WWBITV, Inc.,*  589 F.3d at 49.

Based on the record here, I cannot conclude there is any genuine issue of material fact.  Of course, Mr. Jackson and the defendants do not agree on all the facts.  But, there is no *material* fact – one that would cause a factfinder to reach a different conclusion – that is in genuine dispute.  Clearly Mr. Jackson is upset about the way the Leviston Case played out from when the complaint was filed through to the jury verdict.  But, his claim here boils down to second-guessing his attorneys' pre-trial and trial strategy.  New York law is clear that second-guessing a strategy decision – even if it were a bad decision and the client was not informed of every element of the strategy – does not automatically result in a legal conclusion that the attorney's duty to his client was breached.

Applying the relevant law, after review of the entire record, and, drawing all inferences in favor of Mr. Jackson, I cannot conclude that there is a genuine issue of

material fact that requires a trial. Notably, this case highlights how not every error or mistake is a breach of duty, not every breach of duty causes damages, and intervening events can break the chain of causation.

### a. Duty and Breach

It is undisputed the defendants owed Mr. Jackson a duty to investigate and prepare every phase of his defense to the Leviston Case. In order to assess the scope of the duty owed in the legal profession, expert opinion is often needed unless a narrow exception is met. *See*, *Basic Food Group, LLC*, 2020 WL 7496686, at *8. Here, the conduct Mr. Jackson complains of is not so obvious that it eliminates the need for expert testimony.

The defendants retained former Judge Ciparick and Mr. Jackson retained Attorney Lupkin as their expert witnesses. The experts agree as to the duty owed by attorneys practicing in New York to their client. Attorney Lupkin cites to *Brady* for the proposition that "[a]n attorney has the responsibility to investigate and prepare every phase of his or her client's case." *Brady*, 2006 WL 2257908. But *Brady* does not stand for this proposition. The conclusion reached in *Brady* was that conclusory expert opinions are insufficient to raise a triable issue of fact to defeat a summary judgment motion. *Brady*, 2006 WL 2257908. This quote from *Brady* upon which Attorney Lupkin relies is, at best, *dicta*, and, at worst, a misstatement – and overstatement -- of the duty. The quote refers the reader to *Parksville Mobile Modular, Inc. v. Fabricant*, 73 A.D.2d 595, 598 (N.Y. App. Div. 2d Dept. 1979), which in turn refers the reader to *Giaramita v. Flow Master Mach. Corp.*, 234 N.Y.S.2d 817, 818 (N.Y. Sup. Ct. 1962) – not a malpractice case – but rather a case about whether to restore a personal injury case to the court's calendar. Neither case stands for the proposition that Attorney Lupkin seeks – that an attorney's duty is somehow broader and stricter than the ordinary and

reasonable skill of other members of the bar.  Accordingly, the court is unpersuaded as
to this portion of Lupkin's standard of care recitation.

Both Attorney Lupkin and Judge Ciparick rely on New York case law and opine
that the overarching legal duty of New York attorneys is, "to exercise the ordinary
reasonable skill and knowledge commonly possessed by a member of the legal
profession."  Mr. Jackson's expert, Attorney Lupkin cites four cases to describe the
scope of the duty and all four recite nearly identical statements of the standard of care,
including: (1) *Brady*, 2006 WL 2257908 ("On a cause of action to recover damages for
legal malpractice, a plaintiff must prove that the defendant failed to exercise the care,
skill, and diligence commonly possessed and exercised by a member of the legal
profession."); (2) *Armendariz v. Horowitz L. Group, LLC*, 14 CV 4070, 2015 WL
1849871, at *2 (S.D.N.Y. Apr. 22, 2015)("To successfully plead a claim for legal
malpractice under New York law, a plaintiff must allege that the attorney-defendant (1)
failed to exercise the ordinary reasonable skill and knowledge commonly possessed by
a member of the legal profession"); (3) *Gonzalez v. Ellenberg*, No. 0602011/00 2004
WL 2812884, *4 (N.Y. Sup. Ct. Oct. 12, 2004)("Legal Malpractice is defined as the
failure by an attorney to exercise that degree of skill commonly exercised by an ordinary
member of the legal community."); and (4) *Bernstein*, 160 A.D.2d 428 ("An attorney is
liable in a malpractice action if it can be proved that his conduct fell below the ordinary
and reasonable skill and knowledge commonly possessed by a member of the
profession).  Defendants' expert, Judge Ciparick agrees.  AP-ECF No. 302-43, p. 17.

### The Three Uncalled Witnesses

The foundation of Mr. Jackson's legal malpractice claim rests on the defendants'
failure to conduct discovery and preserve the ability to call the Three Uncalled Witnesses
at trial.  It is undisputed the defendants decided not to interview, subpoena, or depose the

Three Uncalled Witnesses before entering into the Case Compliance Order.  Mr. Jackson argues this failure constitutes a breach of the duty owed to him because the evidence or testimony of the Three Uncalled Witnesses would have mitigated damages.

### William A. Roberts, II, a/k/a Rick Ross

Mr. Jackson claims the defendants breached their duty by failing to seek discovery and preserve Mr. Roberts's testimony because Mr. Roberts could have testified he posted the Video first and/or he controlled the Video Website, thereby deflecting blame away from Mr. Jackson, and then, arguably, reducing the amount of damages awarded by the jury.  AP-ECF No. 335, p. 21-22.

But, the record is clear – and undisputed – that Mr. Raymond considered whether Mr. Roberts would be a beneficial witness but believed the risks outweighed the benefit. *See*, AP-ECF No. 335-11, p. 51.  Specifically, Mr. Raymond expressed concerns that Mr. Roberts might testify about psychological damage to his (and Ms. Leviston's) daughter or about the Video being posted as a method of generating fan interest (*i.e.,* a commercial purpose).  AP-ECF No. 304, ¶ 20.  This is not the situation where the record is devoid of facts regarding any deliberation about whether to seek discovery from Mr. Roberts. Rather, the record reflects Mr. Raymond weighed Mr. Roberts's possibly helpful testimony as to the Video Website's control and/or ownership of the Video Website against his possibly damaging testimony stemming from his dispute with Mr. Jackson.  *See*, AP-ECF No. 302-3, p. 19, L. 2-24.  Critically, for purposes of the Summary Judgment Motion, Mr. Jackson did not submit evidence disputing the defendants' deliberation or consideration occurred.

After going to much effort to depose Mr. Roberts in this adversary proceeding, his testimony failed to establish the defendants were wrong by not pursing Mr. Roberts.  In fact, Mr. Roberts's testimony during his deposition was internally inconsistent, combative,

and, generally unfavorable to, or at times directly negative to, Mr. Jackson's position in the Leviston Case.  *See, e.g.* AP-ECF No. 335-9, pp. 5-6 (answering "I don't recall" to basic questions about his own record label); AP-ECF No. 335-9, p. 7; AP-ECF No. 302-58, pp. 3-4 (denying knowledge and ownership of the Video Website).  This record supports the defendants' contention that their decision not to seek discovery from – or preserve Mr. Roberts as a witness – was a reasonable strategic decision.  *See, L.I.C. Commercial Corp.*, 202 A.D.2d at 644–45 (holding after the potential witness in the underlying action was deposed in the instant case and the testimony was "confusing and generally unfavorable to the plaintiff's position" the attorney's determination not to call the witness was not malpractice).

Mr. Jackson asserts Mr. Roberts's unfavorable testimony would not have been damaging arguing – implausibly – that a jury could have found Mr. Roberts not credible and any good trial lawyer could have impeached him.  AP-ECF No. 335, pp. 26-27.  The logical leap the plaintiff asks the court to make is to conclude the jury would have determined that Mr. Roberts was lying and in fact owned the Video Website, or had in fact posted the Video first, even in the face of his testimony under oath that these things were not so.  This argument is not persuasive.  Even if plaintiff's counsel's confidence that a Perry Mason-like impeachment strategy would have convinced the jury Mr. Roberts was lying, the record undisputedly shows the defendants considered, but strategically chose not to pursue Mr. Roberts.  What is lacking is a genuine issue of material fact requiring a trial.

To create at least one genuine issue of material fact, Mr. Jackson relies on Attorney Lupkin's opinion stating the decision to not seek discovery from Mr. Roberts was uninformed.  AP-ECF No. 335-29, ¶¶ 75, 77.  Attorney Lupkin claims a reasonable

attorney under the circumstances should have done more informal discovery (by asking Mr. Roberts's counsel (Mr. Sedlmayr) questions) and more formal discovery (by seeking documents before a deposition) before deciding to forgo Mr. Roberts as a potential witness. AP-ECF No. 335-29, ¶¶ 77, 78. Judge Ciparick points out taking discovery presented the risk of uncovering unfavorable information an attorney then must share with opposing counsel. *See*, AP-ECF No. 302-43, p. 17.

The court is not required to accept Attorney Lupkin's opinion. *See, Basic Food Group, LLC*, 2020 WL 7496686, at *8; *see also, Healy v. Finz & Finz, P.C.*, 918 N.Y.S.2d 500, 503 (N.Y. App. Div. 2d Dept. 2011); *Brady*, 32 A.D.3d 410. First, the opinion that informal discovery must be undertaken is conclusory as Attorney Lupkin admitted he did not have any basis to know whether informal questioning would have produced any fruitful information. AP-ECF No. 335-29, ¶ 77. In essence, Attorney Lupkin asserted an attorney must ask informal questions to a potential witness without a basis for believing the questions will lead to relevant information to avoid breaching the duty owed. This contention runs counter to Attorney Lupkin's cited scope of discovery allowing litigants to seek "any materials reasonably calculated to lead to the discovery of relevant information." AP-ECF No. 335-29, p. 15, ¶ 31.

Attorney Lupkin's conclusion that "Mr. [Roberts] and/or his employees may have had documents in their possession, custody, or control that would have connected Mr. [Roberts] to [the Video Website]" is merely speculative. *See*, AP-ECF No. 335-29, ¶¶ 71, 78. Attorney Lupkin failed to cite to any facts supporting such a conclusion in his report. *See*, AP-ECF No. 335-29, ¶¶ 71, 78. Conclusory expert opinions are insufficient to raise a triable issue of fact to defeat summary judgment. *See, Feldman v. Finkelstein & Partners, LLP*, 131 A.D.3d 505, 506-507 (N.Y. App. Div. 2d Dept. 2015).

Second, as noted, Attorney Lupkin's expert report is incomplete because it omits a statement of assumed facts, as well as appendix C listing the materials Attorney Lupkin reviewed in rendering his opinion.  AP-ECF No. 335-29, ¶ 21.

Third, Attorney Lupkin's opinion misapplies the standard of care and then applies a more burdensome duty on attorneys.  Under Attorney Lupkin's approach, a reasonable attorney must informally investigate any and every potential witness to determine what he or she would say – even if counsel has concerns about the value of the witness's possible testimony or credibility or if the witness does not fit in with the attorney's trial strategy.  That is not the applicable standard of care.  To constitute malpractice the conduct must fall below ordinary and reasonable skill and knowledge commonly possessed by a member of the legal profession.  This standard describes the conduct of an average attorney – not the most stellar and thorough attorney with years of experience, unlimited time, and unlimited resources.

Here, the defendants made a trial strategy choice to focus on two points: (1) disproving an element of liability under the New York Civil Rights Claim – mainly that the Video was not posted for a commercial purpose; and, (2) disproving an element regarding the Emotional Distress Claim by establishing that Mr. Jackson (i) believed he had Ms. Leviston's consent, and, (ii) did not believe the posting of the Video would distress her.  AP-ECF No. 335-11, pp. 5, 8-11, 31-33.  To support these two points, the defendants intended to rely on Mr. Jackson's own testimony.  AP-ECF No. 335-11, pp. 5, 8-11, 31-33.  Importantly, Attorney Lupkin did not opine about the reasonableness of the defendants' trial strategy.  AP-ECF No. 335-29, p. 22, ¶ 55.  New York law is clear that an error in judgment or an honest mistake about the proper course of action among reasonable courses of action does not constitute malpractice.  *See*, *Brookwood*

*Companies, Inc.*, 146 A.D.3d at 667; *see also, Hand*, 15 A.D.3d 167.   Applying that

principle here and considering the summary judgment record, I find the defendants had

a trial strategy because they considered seeking discovery from Mr. Roberts, decided the

possible risks outweighed the benefits, and, chose not to pursue it.   Based on this record,

I conclude the defendants' conduct falls within the protection of the attorney judgment

rule.   Even if the defendants made a mistake, the record supports the conclusion they

selected a reasonable course to defend the claims in the Leviston Complaint.   Failing to

take any action would have breached their duty to Mr. Jackson, but here selecting a

strategy Mr. Jackson did not agree with regarding Mr. Roberts did not.

Although Mr. Jackson speculates a different strategy might have ultimately led to

a more beneficial result for him, this type of speculation about other possible legal

avenues is insufficient because it fails to identify a genuine issue of material fact that

requires a trial.

### The Internet Provider

Mr. Jackson also fails to identify a genuine issue of material fact that requires a

trial regarding the Internet Provider.   The claim the defendants fatally failed to pursue

important evidence from the Internet Provider fails for several reasons.   First, the record

supports a conclusion the defendants thought about and pursued a trial strategy

regarding the Internet Provider's potential records or testimony.   The record reflects Mr.

Raymond considered taking the discovery from the Internet Provider, but in his

experience such discovery was unlikely to result in fruitful evidence to support Mr.

Jackson's case.   *See*, AP-ECF No. 304 ¶ 24; *see also*, AP-ECF No. 302-3, pp. 22-23.

Mr. Raymond further explained that it was unnecessary to prove who specifically owned

and controlled the Video Website, and the important point would be to show the Video

was first posted elsewhere.   He expected to do that through other evidence, including Mr.

Jackson's employees, the html code for the Video Website and Ms. Leviston's expert witness in the Leviston Trial, Mr. Burgess.  AP-ECF No. 302-3, pp. 21-22.  Finally, Mr. Jackson would have been able to testify to his non-control and non-ownership of the Video Website.  AP-ECF No. 304, ¶ 20; AP-ECF No. 334, ¶ 20.

Mr. Jackson failed to submit evidence disputing the fact that the defendants had a plan for establishing that he did not own or control the Video Website, where the Video first appeared.  Rather, he disputes the defendants' strategy choice and suggests they were wrong, naïve, or lazy in their approach to technical issues in the case.  AP-ECF No. 334, ¶ 19.  But this unsupported argument fails to establish a genuine issue of material fact.

Another central contention against the defendants is that they failed to inform Mr. Jackson of their decision regarding the Internet Provider but, if in fact true, such a failure would not result in the legal conclusion that the decision was an unreasonable one.  *See*, AP-ECF No. 334, ¶ 24.  Plaintiff's 56(a)(2) Statement acknowledges that discovery from the Internet Provider may have only corroborated evidence already available.  *See*, AP-ECF No. 334, ¶ 24.

Again, the plaintiff relies on Lupkin's Report in hopes of creating a disputed material fact.  AP-ECF No. 335, p. 34.  But, the court need not defer to Attorney Lupkin's opinion regarding the failure to depose or subpoena the Internet Provider for the same reasons discussed regarding Mr. Roberts.  Attorney Lupkin also appears to disproportionately assign importance to proving Mr. Roberts owned or controlled the Video Website without any explanation of why that was so critical as compared to proof the Video was posted on any other website first.  AP-ECF No. 335-29, ¶ 30; AP-ECF No. 335, p. 36.  Mr. Jackson emphasizes the defendants' own expert witness, Judge Ciparick,

testified that tying Mr. Roberts to the Video Website would have been "icing on the cake"
and this demonstrates the importance of the Internet Provider's foregone evidence.  AP-
ECF No. 335, p. 33.

Based on the record here, the court is not persuaded that proving Mr. Roberts
owned or controlled the Video Website was of such importance to Mr. Jackson's defense
that the decision is not entitled to protection under the attorney judgment rule.  The
defendants have explained their trial strategy and the elements of liability they hoped to
defend against, and the decision not to pursue discovery from the Internet Provider
appears to have been just one choice among a selection of reasonable courses of action.

The discovery from the Internet Provider obtained in this adversary proceeding –
consisting of a letter informing there were no surviving records from the relevant time
period – provides no support for the plaintiff's claim.  Plaintiff argues – implausibly based
on this response and without evidence – that the records relating to the Video Website
existed, were beneficial to mitigating damages, and were available to the defendants
before being destroyed.  *See,* AP-ECF No. 335, pp. 37-38.  This argument is
unpersuasive because it assumes what we do not have: the actual records from the
Internet Provider.  The defendants' decision not to pursue the Internet Provider or its
employees or agents as a witness in the Leviston Case is entitled to protection of the
attorney judgment rule.

**Maurice Murray**

Regarding Mr. Murray, defendants again argue their decision not to pursue his
testimony falls within the range of possible, reasonable trial strategy decisions.  The
record reflects Mr. Raymond considered and balanced the pros and cons of seeking
discovery and preserving Mr. Murray's testimony for trial.  AP-ECF No. 335-11, pp. 70-
71.  While the plaintiff argues Mr. Murray might have provided the jury with an alternative

scapegoat, Mr. Raymond was concerned deposing him or calling him to testify at trial might undermine Mr. Jackson if he (Mr. Murray) testified he never had permission from Ms. Leviston to authorize the posting of the Video, or worse, that he never told Mr. Jackson he did have permission.  AP-ECF No. 335, pp. 70-71.  The defendants were also concerned that even if Mr. Murray testified he had Ms. Leviston's consent, he would be severely discredited on cross-examination based upon his criminal history and other discovery in the Leviston Case showing Ms. Leviston had never authorized him to share the Video.  AP-ECF No. 304, ¶ 6; AP-ECF No. 334, ¶ 6; AP-ECF No. 302-3, pp. 45-46; AP-ECF No. 302-56; AP-ECF No. 335-49.  The record reflects the defendants chose not to seek discovery from or preserve Mr. Murray as a trial witness because he presented a risk of weakening Mr. Jackson's defense.  AP-ECF No. 304, ¶ 22; AP-ECF No. 334, ¶ 22.

Mr. Jackson's reliance on Attorney Lupkin's opinion regarding the lack of discovery from Mr. Murray is insufficient to create a genuine issue of material fact to defeat summary judgment.  In addition to the already noted deficiencies of Lupkin's Report, Attorney Lupkin's opinion – that the defendants' strategy to rely on Mr. Jackson's testimony, rather than Mr. Murray's testimony, was suboptimal – is just the sort of second-guessing that New York case law suggests does not give rise to a malpractice claim.  *See*, *Schlenker*, 2013 WL 1748704, *5 ("An attorney's exercise of professional judgment involving the selection of appropriate evidence to be introduced at trial generally is not actionable as malpractice."); *See also, Pacesetter Commun. Corp.*, 150 A.D.2d 232 ("the second-guessing of counsel's strategic judgment in the selection of trial tactics [does] not rise to the level of legal malpractice.").

As the plaintiff here, Mr. Jackson failed to present evidence challenging the defendants' evidence showing they had deliberated about Mr. Murray as claimed, or,

creating a material dispute about such deliberation.  Despite attempts to seek discovery

from Mr. Murray in this case, the plaintiff failed to create any record from Mr. Murray about

what he would have testified to during the Leviston Case.  Thus, in the absence of

evidence to the contrary, the record supports the defendants' argument that the decision

not to seek discovery from Mr. Murray or preserve him as a trial witness fell within the

range of permissible strategic decisions protecting attorneys from a finding of negligence.

### The Relevance of the Alleged Conflict of Interest

The plaintiff argues the defendants' explanation of their trial strategy choices is not

reasonable for several other reasons.  First, the plaintiff argues Mr. Raymond did not

pursue discovery from Mr. Roberts because of Attorney Sedlmayr's refusal to accept

service on Mr. Roberts's behalf.  AP-ECF No. 335, p. 28.  To the extent this is a conflict

of interest argument, the court already dismissed it.  Under New York legal malpractice

law, the alleged conflict of interest resulting from Attorney Sedlmayr's representation of

Mr. Roberts is not a basis for a legal malpractice claim.  *See,* AP-ECF No. 62, p. 18

("neither the alleged conflict of interest nor non-compliance with New York law constitutes

a cause of action for legal malpractice under New York law.")(*citing, Stonewell Corp.,* 678

F. Supp. 2d at 211-12 ("A 'conflict of interest, even if a violation of the Code of

Professional Responsibility, does not by itself support a legal malpractice cause of

action.'")(*quoting, Sumo Container Station, Inc. v. Evans, Orr, Pacelli, Norton & Laffan,

P.C.*, 278 A.D.2d 169, 171 (N.Y. App. Div. 1st Dept. 2000)).

### b.  Causation

Moving to causation, even if the defendants breached their duty to Mr. Jackson,

there is no evidence to support a conclusion that *but for* defendants' breach, the damages

Mr. Jackson suffered may have been mitigated or absolved.  In fact, this court already

ruled, "Mr. Jackson fail[ed] to adequately plead a viable legal malpractice claim as to the jury's ultimate liability determination."  AP-ECF No. 62, p. 23.  What survived after the court's Dismissal Decision is plaintiff's claim "that but for the defendants' negligence, the damages he suffered may have been mitigated or absolved."  AP-ECF No. 62, p. 23.

In cases like this one, in which the attorney's alleged error came in failing to make a particular argument or call a particular witness, the causation element requires a "case within a case" analysis of whether, had the argument been made, the outcome of the earlier litigation would have been different.  *Weil, Gotschal & Mange, LLP,* 10 A.D.3d at 272.  To that end, the record on summary judgment should offer evidence showing testimony from Mr. Roberts, the Internet Provider or Mr. Murray would have mitigated or eliminated the jury's damages award.  But it does not.  There is no evidence or even argument about how a reasonable factfinder might conclude the jury's verdict would have been in favor of Mr. Jackson.

Mr. Jackson paints a picture of the Bickel firm setting out for trial with one arm tied behind its back, constrained by the Compliance Conference Order and unable to remedy the missteps taken by the Reed Smith attorneys.  *See*, AP-ECF No. 303, pp. 45-46.  But even if true, which the court is unpersuaded is the case, it is a well settled concept in New York malpractice law that the introduction of new counsel serves as an intervening cause in a legal malpractice claim where there was sufficient opportunity to protect the client's rights.  *See, Schutz*, 2013 WL 3357921, at *6.

### Retention of New Counsel and a Change of Trial Strategy Breaks Causation Chain

Whether or not Bickel had the opportunity to procure testimony from the Three Uncalled Witnesses is irrelevant in light of the critical fact that Bickel did not call Mr. Jackson to testify during the Leviston trial.  As described at length, Mr. Jackson's

testimony was the focus of defendants' trial strategy. Bickel abandoned that strategy and Mr. Jackson did not appear or testify. As a result, the trial court instructed the jury to draw a negative inference against Mr. Jackson as to his motive and intent. This alone is an "intervening and superseding failure of plaintiff's successor [counsel]" that severed the chain of causation in this case. *Boye*, LLP, 152 A.D.3d at 9–10 (internal citations omitted).

### A Client Should Not Be Penalized for Later Settling Its Claim

With regard to the settlement with Ms. Leviston, the court is not convinced the settlement here should be viewed as a break in the causation chain. If defendants intended to rely on a "likely to succeed standard" they have not offered any evidence of the likelihood of plaintiff's success on appeal. *See, Grace v. Law*, 24 N.Y.3d 203, 204 (N.Y. 2014)(stating that "a party who is likely to succeed on appeal of the underlying action should be required to press an appeal. However, if the client is not likely to succeed, he or she may bring a legal malpractice action without first pursuing an appeal of the underlying action"). Generally, where a court has ruled in favor of a defendant law firm based on the "likely to succeed standard," the "success" in issue was as a matter of law on procedural grounds. *See, Buczek v. Dell & Little, LLP,* 127 A.D.3d 1121 (N.Y. App. Div. 2d Dept. 2015)(The "order would have been reversed on appeal since it was error, as a matter of law, to dismiss the action pursuant to CPLR 3216 where no 90–day demand had been served and where a note of issue had previously been filed and remained in effect"). Under the circumstances here, the court need not determine whether the settlement should constitute a break in the causation chain since the change in counsel suffices.

**Plaintiff's Argument Linking Defendants' Conduct to Bankruptcy Costs**

For the first time, Mr. Jackson argues in the briefing for the Summary Judgment
Motion that the harm caused by defendants' alleged negligence might be measured by
the costs of the Chapter 11 process in the Main Case.  However, the record of the Main
Case supports the conclusion that Mr. Jackson's reorganization efforts addressed several
other significant debts in the millions of dollars other than those to Ms. Leviston.  The link
between the defendants' conduct in the Leviston Case and Mr. Jackson's fees associated
with the Chapter 11 proceedings is attenuated and indirect.  Accordingly, this argument
is unpersuasive.

### c.  Damages

Because defendants need only demonstrate plaintiff's inability to prove one of the
elements of a legal malpractice case, and defendants have demonstrated that plaintiff
cannot establish either a breach of a duty, or that any alleged breach was a proximate
cause of plaintiff's loss, the court need not consider whether, but for the alleged
negligence, plaintiff would have been able to mitigate his damages.  *See*, *Hatfield*, 109 F.
Supp. 2d at 189.

### d.  Excessiveness Objection to Proof of Claim

The plaintiff's objection to POC 18 survived the Dismissal Decision on three
grounds: (1) an alleged violation of 22 NYCRR 1215.1; (2) an alleged conflict of interest;
and (3) excessiveness pursuant to Bankruptcy Code § 502(b)(4).  AP-ECF No. 62.  The
defendants moved for summary judgment on plaintiff's claim of excessiveness asserting
the plaintiff failed to disclose an expert as to reasonableness.  AP-ECF No. 300, p. 40.
The defendants argue this failure results in the plaintiff failing to satisfy his burden to rebut
the *prima facie* validity of the amount of the claim.  *See*, AP-ECF No. 300, p. 40; *see also*,

*In re Regino*, 585 B.R. at 326 ("The objector bears the initial burden of coming forward with evidence sufficient to overcome the presumption of the validity of the claim, and once that is done the burden shifts to the claimant to prove the validity and amount of the claim by a preponderance of the evidence."). The defendants fail to cite to any controlling authority requiring the disclosure of an expert in an excessiveness challenge to fees. The court is unpersuaded that expert testimony is required, or, that the failure entitles them to summary judgment. Accordingly, a schedule leading to an evidentiary hearing to determine whether to allow the claim, and if so, in what amount, will be established in a separate scheduling order.

### VIII.    <u>CONCLUSION</u>

Because the court concludes there is no genuine issue of material fact regarding the legal malpractice claim, the Summary Judgment Motion will be granted in part, thereby dismissing the remainder of Count Two of plaintiff's amended complaint.

All other arguments made have been considered and determined to be without merit.

Because the parties consented to entry of a final order or entry of judgment by this Court, subject to traditional appeal rights, this is a final order subject to traditional rights of appeal, with a fourteen (14) day appeal period. *See*, Fed.R.Bankr.P. 8001, *et seq.*, Fed.R.Bankr.P. 8002(a)(1); *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S.Ct. 582 (2020); AP-ECF No. 28, p .9, n 1; AP-ECF No. 367; *see*, Fed.R.Bankr.P. 7008, 7012(b).

Dated this 21st day of June, 2021, at New Haven, Connecticut



Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut

# APPENDIX A
# Record on Summary Judgment
# A.P. Case No. 17-2005 (AMN)

| Plaintiff's Exhibits, Filed as AP-ECF No. 335 | | | |
|---|---|---|---|
| **Exhibit Number** | **ECF No.** | **Description** | **Status** |
| 1 | 335-2 | Lastonia Leviston Complaint | Unsealed |
| 2 | 335-3 | Deposition of Curtis J. Jackson, III | Unsealed |
| 3 | 335-4 | Deposition of Christopher Singh in Lastonia Leviston Case | Unsealed |
| 4 | 335-5 | Deposition of Corentin Villemeur from the Leviston Case | Unsealed |
| 5 | 335-6 | Declaration of Curtis J. Jackson, III | Unsealed |
| 6 | 335-7 | Transcript of William Leonard Roberts, II radio interview | Unsealed |
| 7 | 335-8 | Deposition of William Leonard Roberts, II, | Unsealed |
| 8 | 335-9 | Online news article used as an exhibit in William Leonard Roberts, II Deposition | Unsealed |
| 9 | 335-10 | Deposition of Evan Farber | Unsealed |
| 10 | 335-11 | Deposition of Peter Raymond | Unsealed |
| 11 | 335-12 | Answer to Complaint in Leviston Case | Unsealed |
| 12 | 335-13 | Declaration of Stephanie Gase | Unsealed |

| 13 | 335-14 | Memorandum of Law in Support of an Order to Show Cause in Leviston Case | Unsealed |
|----|--------|-------------------------------------------------------------------------|----------|
| 14 | 335-15 | Transcript from a hearing in the Leviston Case | Unsealed |
| 15 | 335-16 | Notice of Motion in Leviston Case | Unsealed |
| 16 | 335-17 | Declaration of Stephen J. Savva | Unsealed |
| 17 | 335-18 | Deposition of  Jonathan D. Lupkin | Unsealed |
| 18 | 335-19 | Transcript of trial from the Leviston Case | Unsealed |
| 19 | 335-20 | Jury Verdict Sheet in the Leviston Case | Unsealed |
| 20 | 335-21 | Amounts of certain General Unsecured Claims filed in the Main Case | Unsealed |
| 21 | 335-22 | Amended Damages Assessment | Unsealed |
| 22 | 335-23 | Accounting by Boulevard Management, Inc. | Unsealed |
| 23 | 335-24 | Declaration of Craig Weiner | Unsealed |
| 24 | 335-25 | Reed Smith Proof of Claim | Unsealed |
| 25 | 335-26 | Expert Report of Bruce Green | Unsealed |
| 26 | 335-27 | Deposition of Theodor K. Sedlmayr | Unsealed |
| 27 | 335-28 | Deposition of Judge Carmen Beauchamp Ciparick | Unsealed |

| 28 | 335-29 | Expert Report of Jonathan D. Lupkin | Unsealed |
|----|--------|--------------------------------------|----------|
| 29 | 335-30 | Expert Report of Judge Carmen Beauchamp Ciparick | Unsealed |
| 30 | 335-31 | Expert Report of Stephen Gillers | Unsealed |
| 31 | 335-32 | Email from Peter Raymond to Theodor Sedlmayr, Evan Farber, and Nikki Martin | Unsealed |
| 32 | 335-33 | Email from Peter Raymond to Evan Farber, Geoffrey Cramton, and Sarah Levitan | Unsealed |
| 33 | 335-34 | Draft Subpoena, prepared by Defendants | Unsealed |
| 34 | 335-35 | Mock Jury Report | Unsealed |
| 35 | 335-36 | Email from Evan Farber to Elias Mantzopoulos and Alexander Ulmer | Unsealed |
| 36 | 335-37 | Email from Sarah Levitan to Peter Raymond | Unsealed |
| 37 | 335-38 | Draft Opening Statement | Unsealed |
| 38 | 335-39 | Email from Evan Farber to Geoffrey Cramton and Sarah Levitan | Unsealed |
| 39 | 335-40 | Email from Othiamba Lovelace to Evan Farber | Unsealed |
| 40 | 335-41 | Deposition of William Leonard Roberts, II, | Unsealed |
| 41 | 335-42 | Deposition of Steven G. Burgess from the Leviston Case | Unsealed |

| 42 | 335-43 | Letter sent from NING Interactive Inc. to Alex Sieburth in response to a Subpoena Duces Tecum | Unsealed |
| 43 | 335-44 | Email from Nikki Martin to Peter Raymond and Evan Farber | Unsealed |
| 44 | 335-45 | Email from Peter Raymond to Theodor Sedlmayr, Nikki Martin, Wallace Neel, and Evan Farber | Unsealed |
| 45 | 335-46 | Draft Subpoena | Unsealed |
| 46 | 335-47 | Investigative Memorandum | Sealed |
| 47 | 335-48 | Email from Evan Farber to Peter Raymond | Unsealed |
| 48 | 335-49 | New Jersey Department of Corrections Offender Profile | Unsealed |
| 49 | 335-50 | Email from Craig Weiner to Evan Farber and Stephen Savva | Unsealed |
| 50 | 335-51 | Transcript of trial from the Leviston Case | Unsealed |
| 51 | 335-52 | Deposition of Bruce Green | Unsealed |

| Defendants' Exhibits, Filed as AP-ECF Nos. 302 | | | |
|---|---|---|---|
| Exhibit Number | ECF No. | Description | Status |
| 1 | 302-1 | Plaintiff's First Amended Objections and Responses to Defendants' First Set of Requests for Admission | Unsealed |
| 2 | 302-2 | Lastonia Leviston Complaint | Unsealed |

| 3 | 302-3 | Deposition of Peter Raymond | Unsealed |
|---|---|---|---|
| 4 | 302-4 | Deposition of Evan Farber | Unsealed |
| 5 | 302-5 | Deposition of Curtis James Jackson, III, | Unsealed |
| 6 | 302-6 | Deposition of Curtis James Jackson, III from the Lastonia Leviston Case | Unsealed |
| 7 | 302-7 | Deposition of Lastonia Leviston from the Lastonia Leviston Case | Unsealed |
| 8 | 302-8 | Lastonia Leviston Case transcript of trial | Unsealed |
| 9 | 302-9 | email from Peter Raymond to Stephen Savva and Nikki Martin, | Unsealed |
| 10 | 302-10 | Deposition of Christopher Singh from the Lastonia Leviston Case | Unsealed |
| 11 | 302-11 | The Video | Sealed |
| 12 | 302-12 | The Video | Sealed |
| 13 | 302-13 | Transcript of Exhibit 12 | Sealed |
| 14 | 302-14 | Deposition of Corentin Villemeur from the Leviston Case | Unsealed |
| 15 | 302-15 | Deposition of Steven G. Burgess from the Leviston Case | Unsealed |
| 16 | 302-16 | Transcript of trial from the Leviston Case | Unsealed |
| 17 | 302-17 | Affidavit of William Leonard Roberts, II | Unsealed |
| 18 | 302-18 | Deposition of Lastonia Leviston from the Leviston Case | Unsealed |

| 19 | 302-19 | Summons and Complaint filed in *Jackson v. Roberts*, No. 651805/15, in New York Supreme Court | Unsealed |
|---|---|---|---|
| 20 | 302-20 | Answer to Complaint, filed in *Jackson v. Roberts*, Adversary Proceeding No. 15-01120-shl, in the U.S. Bankruptcy Court for the Southern District of New York | Unsealed |
| 21 | 302-21 | email from Peter Raymond to Theodor Sedlmayr and Nikki Martin | Unsealed |
| 22 | 302-22 | email from Peter Raymond to Nikki Martin | Unsealed |
| 23 | 302-23 | Letter from Curtis James Jackson, III to Peter Raymond, dated March 27, 2015 | Unsealed |
| 24 (Part I) | 302-24 | Transcript from a hearing in the Leviston Case | Unsealed |
| 24 (Part II) | 302-25 | Transcript from a hearing in the Leviston Case | Unsealed |
| 25 | 302-26 | Peter Raymond to Nikki Martin and Evan Farber | Unsealed |
| 26 | 302-27 | Email from Michael Oppenheim to Nikki Martin | Unsealed |
| 27 | 302-28 | Trial Witness List from the Leviston Case | Unsealed |
| 28 | 302-29 | Transcript of trial from the Leviston Case | Unsealed |
| 29 | 302-30 | Transcript of trial from the Leviston Case | Unsealed |

| 30 | 302-31 | Transcript of trial from the Leviston Case | Unsealed |
|----|--------|--------------------------------------------|----------|
| 31 | 302-32 | Transcript of trial from the Leviston Case | Unsealed |
| 32 | 302-33 | Transcript of trial from the Leviston Case | Unsealed |
| 33 | 302-34 | Email from Stephanie Gase to Philip Freidin | Unsealed |
| 34 | 302-35 | Memorandum of Law in Support of Order to Show Cause in the Leviston Case | Unsealed |
| 35 | 302-36 | Notice of Motion in the Leviston Case | Unsealed |
| 36 | 302-37 | Affirmation in Support of Emergency Motion | Unsealed |
| 37 | 302-38 | Final Jury Verdict Questionnaire on liability in the Leviston Case | Unsealed |
| 38 | 302-39 | Final Jury Verdict Questionnaire on punitive damages in the Leviston Case | Unsealed |
| 39 | 302-40 | Memorandum of Law in Support of Post-Trial Motion filed by Mr. Jackson in the Leviston Case | Unsealed |
| 40 | 302-41 | Reply Memorandum in Support of Mr. Jackson's Post-Trial Motion in the Leviston Case | Unsealed |
| 41 | 302-42 | Deposition of Jonathan D. Lupkin | Unsealed |
| 42 | 302-43 | Expert Report of Judge Carmen Beauchamp Ciparick | Unsealed |
| 43 | 302-44 | Transcript of Telephonic Hearing in the Main Case | Unsealed |

| 44 | 302-45 | Plaintiff's Amended Objections and Responses to Defendants' First Set of Interrogatories | Unsealed |
| 45 | 302-46 | Letter sent from NING Interactive Inc. to Alex Sieburth in response to a Subpoena Duces Tecum served by Plaintiff, dated December 18, 2019 | Unsealed |
| 46 | 302-47 | Transcript of trial from the Leviston Case | Unsealed |
| 47 | 302-48 | Transcript of trial from the Leviston Case | Unsealed |
| 48 | 302-49 | Transcript of trial from the Leviston Case | Unsealed |
| 49 | 302-50 | Motion to Dismiss filed in the Leviston Case | Unsealed |
| 50 | 302-51 | Notice of Motion in the Leviston Case | Unsealed |
| 51 | 302-52 | Notice of Removal, filed in *Leviston v. Jackson*, No. 1:15-cv-03989-KPF, in the U.S. District Court for the Southern District for New York. | Unsealed |
| 52 | 302-53 | Second Notice of Removal, filed in *Leviston v. Jackson*, No. 1:15-cv-03989-KPF, in the U.S. District Court for the Southern District for New York. | Unsealed |
| 53 | 302-54 | Transcript from a hearing in the Main Case | Unsealed |
| 54 | 302-55 | Deposition of Bruce Green | Unsealed |

| 55 | 302-56 | Memorandum from Andrews International, Inc. | Sealed |
| 56 | 302-57 | Transcript of trial from the Leviston Case | Unsealed |
| 57 | 302-58 | Deposition of William Leonard Roberts, II, April 22, 2020 | Sealed, Unsealed Redacted Document Filed as AP-ECF No. 391, Exhibit A. |
| 58 | 302-59 | Continued deposition of William Leonard Roberts, II, April 24, 2020 | Unsealed |